**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>UPG ENTERPRISES LLC, *et al*.<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-15734 (DRF)<br><br>(Jointly Administered)<br><br>**RE: DKT NO. 15** |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "**DIP Motion**")[2] of UPG Enterprises LLC and its debtor affiliates, as debtors and debtors in possession (together, the "**Debtors**" and each a "**Debtor**") in the above-captioned cases (the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(e), 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 4001-2 and 9013-1 of the Local Rules of the United States Bankruptcy Court for the Northern District of

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal EIN are as follows: UPG Enterprises, LLC (4790); UP Investment Holdings LLC (8445); UPI LS LLC (6446); UPI MakUSA LLC (1401); UPG Metal Services LLC (8496); GenX Leasing Partners LLC (4464); UP Central Office LLC (0397); UP Equipment Holdings LLC (0431); Metalex LLC (6707); UPG Fabrication LLC (9021); National Metalwares Holdings LLC (2789); National Metalwares L.P. (9247); Sidecar NM LLC (4555); Chicago Steel Holdings LLC (0967); Douglass Logistics LLC (6025); Lexington Steel LLC (2209); Maksteel USA LLC (6796); Maksteel Transport LLC (9011); and UPG Flat Roll Group LLC (7515). The Debtors' mailing address is 1400 16th St., #250, Oak Brook, IL 60523.

[2] Capitalized terms used but not defined herein are defined as in the DIP Loan Agreement (as defined herein) or the DIP Motion, as applicable.

Illinois (the "**Local Rules**"), seeking entry of this interim order (this "**Interim Order**") among other things:

(a) authorizing UPG Enterprises LLC and the other Debtors to obtain postpetition financing ("**DIP Financing**") from Firehorse Capital LLC, in its capacities as lender and administrative agent (the "**DIP Lender**" and "**DIP Agent**," respectively), pursuant to a junior secured superpriority debtor in possession term loan facility (the "**DIP Facility**") subject to the terms and conditions set forth in that certain Credit and Security Agreement dated as of September 22, 2026, by and among UPG Enterprises LLC, the other Borrowers (as defined therein) from time to time party thereto, and Firehorse Capital LLC, as lender and administrative agent (as amended, restated, supplemented, or otherwise modified from time to time, the "**DIP Loan Agreement**"), attached hereto as **Exhibit 1**, in an aggregate principal amount not to exceed $6,083,000 (the commitments in respect thereof, the "**DIP Commitments**"), consisting of (i) new money term loan commitments in an aggregate principal amount not to exceed $6,083,000 (the "**New Money DIP Loan Commitments**" and the term loans thereunder, the "**New Money DIP Loans**"), of which $2,000,000 shall be available upon entry of this Interim Order approving the DIP Facility on an interim basis (the "**Interim Availability**") and an additional $4,083,000 shall be available after entry of the order approving the DIP Facility on a final basis (the "**Additional Availability**"; such order, the "**Final Order**," and together with the Interim Order, the "**DIP Orders**"), in each case subject to the satisfaction of applicable conditions precedent, and (ii) upon entry of the Final Order, the Promissory Note (as defined below) shall automatically be deemed exchanged for and converted into a postpetition term loan (the "**Roll-Up DIP Loan**") in a principal amount equal to the outstanding principal amount and accrued and unpaid interest of the Bridge Loans as of the entry of the Final Order, which Roll-Up DIP Loan, together with the New Money DIP Loans, shall constitute the "**DIP Loans**"; which DIP Facility and DIP Liens (as defined herein) on the DIP Collateral (as defined in the DIP Loan Agreement) to secure the DIP Obligations (as defined herein) shall be junior and subordinate to the liens and replacement liens granted under or in connection with the Prepetition Secured Loan Documents by and among the Prepetition Secured Obligors and the Prepetition Secured Lenders (each term as defined herein), subject to the priorities set forth in this Interim Order;

(b) authorizing Firehorse Capital LLC, as the sole DIP Lender and DIP Agent, to fund the New Money DIP Loan Commitments and, upon entry of the Final Order, to effect the automatic exchange and conversion of the Promissory Note into the Roll-Up DIP Loan pursuant to the DIP Loan Agreement and this Interim Order;

(c) authorizing the Debtors to execute, deliver and perform under the DIP Loan Agreement and all other loan documentation related to the DIP Facility, including, without limitation, as applicable, security agreements, pledge agreements, control agreements, mortgages, deeds, charges, guarantees, promissory notes, intercompany notes, certificates, instruments, intellectual property security

agreements, notes, and such other documents that may be reasonably requested by the DIP Agent and the DIP Lender, in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Loan Agreement and any other loan documents, the "**DIP Documents**");

(d) authorizing the Debtors to incur loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, exit fees and any other fees payable pursuant to the DIP Documents), costs, expenses and other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the DIP Documents (collectively, the "**DIP Obligations**"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(e) subject to the Carve-Out (as defined herein), the Prepetition Secured 507(b) Claims and the other Prepetition Secured Adequate Protection Claims, as set forth in this Interim Order, granting to the DIP Agent, for itself and for the benefit of the DIP Lender, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations of the Debtors, which shall be payable from all prepetition and postpetition assets and property of the Debtors and all proceeds thereof (including, upon entry of the Final Order, Avoidance Actions and Avoidance Action Proceeds (as defined herein));

(f) granting to the DIP Agent, for itself and for the benefit of the DIP Lender, valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code on all prepetition and postpetition property of the Debtors' estates and all proceeds thereof as set forth in paragraph 6 below, including, upon entry of the Final Order, any Avoidance Actions and Avoidance Action Proceeds, in each case subject to the Carve-Out and any Prepetition Secured Adequate Protection Liens, as set forth in this Interim Order;

(g) authorizing Firehorse Capital LLC, in its capacities as DIP Lender and DIP Agent, to take all commercially reasonable actions to implement and effectuate the terms of this Interim Order;

(h) authorizing the Debtors to waive, subject to entry of the Final Order granting such relief, (i) their right to surcharge the Bridge Loan Collateral (as defined herein), Prepetition Secured Collateral (as defined herein), the DIP Collateral (as defined herein) pursuant to section 506(c) of the Bankruptcy Code and (ii) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(i) subject to entry of the Final Order granting such relief, waiving the equitable doctrine of "marshaling" and other similar doctrines (i) with respect to the DIP Collateral for the benefit of any party other than the DIP Agent or the DIP Lender, (ii) with respect to any of the Bridge Loan Collateral for the benefit of any party other than the Bridge Loan Secured Parties, and (iii) with respect to the Prepetition

Secured Collateral, for the benefit of any party other than the Prepetition Secured Lenders;

(j) authorizing the Debtors to use proceeds of the DIP Facility and the Cash Collateral (as defined herein) solely in accordance with this Interim Order and/or the DIP Documents, as applicable (for the avoidance of doubt, no proceeds of the DIP Facility or Cash Collateral shall be used to pay administrative expense claims under Section 503(b)(9) of the Bankruptcy Code);

(k) authorizing the Debtors to pay (i) the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents, and (ii) the principal, interest, fees, expenses and other amounts payable under the Prepetition Secured Loan Documents as such become earned, due and payable to the extent provided in, and in accordance with this Interim Order;

(l) subject to the restrictions set forth in this Interim Order, authorizing the Debtors to use Prepetition Secured Collateral (as defined herein) and the Bridge Loan Collateral, including, in each case, Cash Collateral, and provide adequate protection to the Prepetition Secured Lenders for any diminution in value of their respective interests in the Prepetition Secured Collateral, including, without limitation, any diminution in value resulting from the imposition of the Automatic Stay under section 362 of the Bankruptcy Code (the "**Automatic Stay**"), and the Debtors' use, sale, or lease of the Prepetition Secured Collateral;

(m) vacating and modifying the Automatic Stay to the extent set forth herein to the extent necessary to permit the Debtors and their affiliates, the DIP Agent and the DIP Lender, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of this Interim Order, the DIP Documents and, upon entry, the Final Order and to deliver any notices of termination described below and as further set forth herein;

(n) waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and, upon entry, the Final Order; and

(o) scheduling a final hearing (the "**Final Hearing**") to consider final approval of the DIP Facility and use of Cash Collateral pursuant to the Final Order, as set forth in the DIP Motion and the DIP Documents filed with this Court, as applicable.

The Court having considered the interim relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of John Sordillo, Chief Restructuring Officer of UPG Enterprises LLC in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "**First Day**

**Declaration**”), the available DIP Documents, and the evidence submitted and arguments made at the interim hearing held on September 24, 2026 (the “**Interim Hearing**”); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, otherwise is fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the continued operation of the Debtors’ businesses and the preservation of the value of the Debtors’ assets; and it appearing that the Debtors’ entry into the DIP Documents is a sound and prudent exercise of the Debtors’ business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A. *Petition Date*. On September 22 and 23, 2026 (the “**Petition Date**”), as applicable, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Northern District of Illinois (the “**Court**”). On September 23, 2026, this Court entered an order approving the joint administration of the Chapter 11 Cases.

B. *Debtors in Possession*. The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C. *Jurisdiction and Venue*. This Court has core jurisdiction over the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334. Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Court may enter a final order consistent with Article III of the United States Constitution. Venue for the Chapter 11 Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D. *Committee Formation*. As of the date hereof, the United States Trustee for the Northern District of Illinois (the "**U.S. Trustee**") has not appointed an official committee of unsecured creditors in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "**Creditors' Committee**").

E. *Notice*. The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). Notice of the Interim Hearing and the DIP Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and no other or further notice of the Interim Hearing was required.

F. *Cash Collateral*. As used herein, the term "**Cash Collateral**" shall mean all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of the Bridge Loan Secured Parties, the DIP Lender, and/or the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code. The term "**DIP Loan Proceeds**" as used herein shall mean all cash borrowed under and funds advanced pursuant to the DIP Facility, which monies (i) shall and hereby constitute or will constitute "cash collateral" of the DIP Lender within the meaning of section 363(a) of the Bankruptcy Code, (ii) shall be held in a segregated debtor in possession deposit account designated as the "**DIP Loan Account**," and (iii) shall not otherwise be co-mingled with any other cash of the Debtors. For the

avoidance of doubt, the initial $2,000,000 Interim Availability shall be deposited into the DIP Loan Account and used from the DIP Loan Account to pay expenses and other amounts permitted under this Interim Order and the DIP Documents, and any surplus DIP Loan Proceeds or Net Cash Proceeds (as defined in the DIP Loan Agreement) shall remain in the DIP Loan Account.

G. *Debtors' Stipulations*. Subject only to the provisions contained in paragraph 19 hereof, and after consultation with their attorneys and financial advisors, the Debtors admit, and subject to entry of the Final Order, stipulate and agree that:

(i) *Bridge Loans*. Pursuant to that certain *Fourth Amended and Restated Promissory Note* dated as of September 17, 2026, in the original principal amount of $4,984,214.59, issued by the Debtors, the Monroe Entities (as defined below) and the Elk Grove Entities (as defined below) in favor of Firehorse Capital LLC (the "**Promissory Note**") as amended, restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date (collectively, the "**Bridge Loan Documents**," and the loans issued pursuant thereto, the "**Bridge Loans**" and the obligations thereunder, the "**Bridge Loan Obligations**"), Firehorse Capital LLC, as the prepetition lender (the "**Bridge Loan Secured Parties**"), extended the Bridge Loans to and for the benefit of UPG Enterprises LLC, UPG Electrical LLC, and the other borrowers under the Bridge Loan Documents (collectively, the "**Bridge Loan Obligors**"). For the avoidance of doubt, Mapes & Sprowl Steel LLC, Cortran LLC, and Mapes Holdings LLC (collectively, the "**Elk Grove Entities**"), and UPG Electrical LLC, Carter Motor Company, LLC, and UPG Electrical Holdings LLC (collectively, the "**Monroe Entities**") are obligors under the Bridge Loan Documents but are not Bridge Loan Obligors as such term is defined herein, are not Borrowers under the DIP Loan Agreement, and are not presently subject to this Interim Order.

(ii) *Bridge Loan Obligations*. The Bridge Loan Obligors are justly and lawfully indebted and liable to the Bridge Loan Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, consisting of the original principal amounts of $4,984,214.59 under the Promissory Note, plus accrued and unpaid interest thereon, premiums, reimbursement obligations (contingent or otherwise), fees, costs, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses), charges, indemnities, and any other amounts, liabilities, or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing, or chargeable in connection therewith, in each case, as and to the extent provided in the Bridge Loan Documents.

(iii) *Bridge Loan Liens*. As more fully set forth in the Bridge Loan Documents, prior to the Petition Date, to secure the Bridge Loan Obligations, the Bridge Loan Obligors granted to Firehorse Capital LLC, as lender, valid, binding, non-avoidable, properly perfected and enforceable continuing liens on and security interests in (collectively, the "**Bridge Loan Liens**") all collateral securing the Bridge Loan Obligations under the Bridge Loan Documents (collectively, the "**Bridge Loan Collateral**"), which Bridge Loan Liens are junior to the Prepetition Secured Liens held by the Prepetition Secured Parties, but rank senior to all other liens against the Bridge Loan Collateral.

(iv) *Validity, Perfection and Priority of Bridge Loan Liens*. The Debtors acknowledge and agree that as of the Petition Date (a) the Bridge Loan Liens on the Bridge Loan Collateral were and are valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Bridge Loan Secured Parties for fair consideration and reasonably equivalent value; (b) the Bridge Loan Liens were and are senior in priority over any and all other liens on the Bridge Loan Collateral, subject and junior only to the Prepetition Secured

Liens, certain liens and security interests senior by operation of law, and liens and security interests in existence immediately prior to the Petition Date capable of being perfected under section 546(b) of the Bankruptcy Code, solely to the extent any such liens are valid, properly perfected, non-avoidable and senior in priority to the Bridge Loan Liens as of the Petition Date (the "**Bridge Loan Permitted Prior Liens**"), (c) the Bridge Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the Bridge Loan Obligors enforceable in accordance with the applicable Bridge Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Bridge Loan Liens or Bridge Loan Obligations exist, and no portion of the Bridge Loan Liens or Bridge Loan Obligations are subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action and/or choses in action, including, without limitation, "lender liability" causes of action, avoidance claims under Chapter 5 of the Bankruptcy Code (or any state law equivalent) whether arising under applicable state law or federal law (including, without limitation, any recharacterization, subordination, avoidance, disgorgement, recovery or other claims arising under or pursuant to sections 105, 510, or 542 through 552 of the Bankruptcy Code), against any of the Bridge Loan Secured Parties or their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the Bridge Loans, Bridge Loan Liens or the Bridge Loan Obligations; and (f) the Debtors waive, discharge, and release any right to challenge any of the Bridge Loan or the Bridge Loan Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Bridge Loan Liens securing the Bridge Loans.

(v) *Wintrust Facility*. Pursuant to that certain *Loan and Security Agreement* dated as of August 22, 2022 (as amended by that certain *Forbearance Agreement and Fourth Amendment to Loan and Security Agreement* dated as of January 30, 2026, and as further amended, supplemented or otherwise modified from time to time, and together with the Loan Documents (as defined therein) and any other agreements and documents executed or delivered in connection therewith, the "**Wintrust Loan Documents**," and the loans issued and other financial accommodations made pursuant thereto, the "**Wintrust Loans**,"), by and among Metalex LLC, National Metalwares L.P., UPG Fabrication LLC, National Metalwares Holdings LLC, and Sidecar NM LLC, as borrowers, and Schaumburg Bank & Trust Company, N.A. (a subsidiary of Wintrust Financial Corporation), as administrative agent for the lenders thereunder (in such capacity, the "**Wintrust Agent**"), the lenders thereunder extended the Wintrust Loans to and for the benefit of such borrowers. As of the Petition Date, the outstanding aggregate principal and interest due under the Wintrust Loan Documents is not less than $7,520,357.86, plus all other "Obligations" (as defined in the Wintrust Loan Documents), including, without limitation, all accrued, accruing, and unpaid interest (including default rate interest), fees, costs, expenses, and disbursements (including, without limitation, all attorneys' fees, accountants' fees, auditor fees, appraisers' fees, financial advisors' fees, and related fees, costs, expenses, and disbursements), in each case, payable pursuant to the Wintrust Loan Documents, plus all amounts allowable under Section 506(b) of the Bankruptcy Code (collectively, the "**Wintrust Obligations**").

(vi) *White Oak Facility*. Pursuant to that certain *Loan and Security Agreement* dated as of December 31, 2024 (as amended, supplemented or otherwise modified from time to time (the "**White Oak Loan Agreement**"), and together with the Loan Documents (as defined therein) and any other agreements and documents executed or delivered in connection therewith,

the "**White Oak Loan Documents**," and the loans issued and other financial accommodations made pursuant thereto, the "**White Oak Loans**,"), by and among Maksteel USA LLC, Chicago Steel Holdings LLC, and Lexington Steel LLC, as US borrowers, Maksteel Holdings ULC, as Canadian borrower, Maksteel Holding Corp. and UPG Flat Roll Group LLC, as guarantors, the financial institutions party thereto as lenders from time to time, and White Oak Commercial Finance, LLC, as administrative agent for the lenders (in such capacity, the "**White Oak Agent**"), the lenders thereunder, extended the White Oak Loans to and for the benefit of such borrowers, in an aggregate revolver commitment amount of $90,000,000 (the "**White Oak Facility**"). As of the Petition Date, the outstanding aggregate principal and interest due under the White Oak Loan Documents is not less than $50,424,614.73, plus all other "Obligations" (as defined in the White Oak Loan Documents), including, without limitation, all accrued, accruing, and unpaid interest (including default rate interest), fees, the Prepayment Premium and Make-Whole Amount (as such terms are defined in the White Oak Loan Agreement) that are due and payable in accordance with Sections 2.03(d), 8.01(f), and 8.02(a)(ii) of the White Oak Loan Agreement, costs, expenses, and disbursements (including, without limitation, all attorneys' fees, accountants' fees, auditor fees, appraisers' fees, financial advisors' fees, and related fees, costs, expenses, and disbursements), in each case, payable pursuant to the White Oak Loan Documents, plus all amounts allowable under Section 506(b) of the Bankruptcy Code (the "**White Oak Obligations**").

(vii) The Wintrust Loan Documents, and the White Oak Loan Documents are collectively referred to herein as the "**Prepetition Secured Loan Documents**" (and together with the Bridge Loan Documents, the "**Prepetition Loan Documents**"). The Wintrust Loans, and the White Oak Loans are collectively referred to herein as the "**Prepetition Secured Loans**" (and together with the Bridge Loans, the "**Prepetition Loans**"). The Wintrust Obligations, and the

White Oak Obligations are collectively referred to herein as the "**Prepetition Secured Obligations**" (and together with the Bridge Loan Obligations, which are secured by the Bridge Loan Liens, the "**Prepetition Obligations**"). For the avoidance of doubt, the Prepetition Obligations include the Bridge Loan Obligations and the Prepetition Secured Obligations. The Wintrust Agent, and the White Oak Agent are collectively referred to herein as the "**Prepetition Secured Agents**." The lenders under the Wintrust Loan Documents and the White Oak Loan Documents, together with the Prepetition Secured Agents, are collectively referred to herein as the "**Prepetition Secured Lenders**" (and together with the Bridge Loan Secured Parties, the "**Prepetition Secured Parties**"). The entities that are borrowers or guarantors under the Wintrust Loan Documents, and/or the White Oak Loan Documents are collectively referred to herein as the "**Prepetition Secured Obligors**."

(viii) *Prepetition Secured Obligations*. The Prepetition Secured Obligors are justly and lawfully indebted and liable to the Prepetition Secured Lenders without defense, challenge, objection, claim, counterclaim, or offset of any kind, as stated above under the Prepetition Secured Loans, which loans were issued pursuant to, and in accordance with, the Prepetition Secured Loan Documents, plus accrued and unpaid interest thereon, premiums, reimbursement obligations (contingent or otherwise), fees, costs, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses), charges, indemnities, and any other amounts, liabilities, or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing, or chargeable in connection therewith, in each case, as and to the extent provided in the Prepetition Secured Loan Documents.

(ix) *Prepetition Secured Liens*. As more fully set forth in the Prepetition Secured Loan Documents, to secure the Prepetition Secured Obligations, the borrowers and guarantors under the Prepetition Secured Loan Documents have granted to the respective Prepetition Secured Agents, for the benefit of the respective Prepetition Secured Lenders, valid, binding, non-avoidable, properly perfected and enforceable first-priority liens on and security interests in (collectively, the "**Prepetition Secured Liens**," and together with the Bridge Loan Liens, the "**Prepetition Liens**") all assets described as "Collateral" in the Prepetition Secured Loan Documents (collectively, the "**Prepetition Secured Collateral**"), which Prepetition Secured Liens are senior to the Bridge Loan Liens pursuant to (i) the applicable Intercreditor Agreement (as defined in the applicable Wintrust Loan Documents or White Oak Loan Documents, as applicable), (ii) one or more intercreditor agreements entered into between one or more of the Prepetition Secured Agents and the DIP Agent (as amended or otherwise modified from time to time, collectively, the "**Intercreditor Agreements**"), and (iii) the terms of this Interim Order, and senior to all other obligations of the Prepetition Secured Obligors and liens against the Prepetition Secured Collateral.

(x) *Validity, Perfection and Priority of Prepetition Secured Liens*. The Debtors acknowledge and agree that as of the Petition Date (a) the respective Prepetition Secured Loan Documents evidence and govern the Prepetition Secured Loans, the Prepetition Secured Obligations, the Prepetition Secured Liens, and the prepetition financing relationship among the respective Debtors and Prepetition Secured Parties, and are valid and enforceable by the Prepetition Secured Parties against the respective Debtors; (b) the Prepetition Secured Liens on the Prepetition Secured Collateral were and are valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition Secured Lenders for

fair consideration and reasonably equivalent value; (c) the Prepetition Secured Liens were and are senior in priority over any and all other liens on the Prepetition Secured Collateral, subject only to liens and security interests senior by operation of law and liens and security interests in existence immediately prior to the Petition Date capable of being perfected under section 546(b) of the Bankruptcy Code, solely to the extent any such liens are valid, properly perfected, non-avoidable and senior in priority to the Prepetition Secured Liens as of the Petition Date (the "**Prepetition Secured Permitted Prior Liens**," and together with the Bridge Loan Permitted Prior Liens, the "**Prepetition Permitted Prior Liens**"); (d) the Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Secured Obligors enforceable in accordance with the Prepetition Secured Loan Documents; (e) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Secured Liens or Prepetition Secured Obligations exist, and no portion of the Prepetition Secured Liens or Prepetition Secured Obligations are subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (f) the Debtors and their estates have no claims, objections, challenges, causes of action and/or choses in action, including, without limitation, "lender liability" causes of action, avoidance claims under Chapter 5 of the Bankruptcy Code (or any state law equivalent) whether arising under applicable state law or federal law (including, without limitation, any recharacterization, subordination, avoidance, disgorgement, recovery or other claims arising under or pursuant to sections 105, 510, or 542 through 552 of the Bankruptcy Code), against the Prepetition Secured Lenders or their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the Prepetition Secured Loans, Prepetition Secured Liens or the

Prepetition Secured Obligations; and (g) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Secured Loans or the Prepetition Secured Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Secured Liens securing the Prepetition Secured Loans.

(xi) *Default by the Debtors*. The Debtors acknowledge and stipulate that they have been and are in default of their obligations under the Prepetition Loan Documents.

(xii) *No Control*. None of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Secured Loan Documents.

(xiii) *No Claims or Causes of Action*. No claims or causes of action held by the Debtors or their estates exist against, or with respect to, the Prepetition Secured Parties (in their capacity as such) under or with respect to any agreements by and among the Debtors and any Prepetition Secured Parties that are in existence as of the Petition Date.

(xiv) *Release*. Subject to and upon the entry of the Final Order granting such relief, and subject in all respects to the provisions of this Interim Order, including the challenge provisions set forth in paragraph 19 hereof, in consideration of the DIP Lender making the New Money DIP Loans available to the Debtors pursuant to the DIP Loan Agreement and the Prepetition Secured Parties consenting to the use of Cash Collateral, and effective only upon entry of such Final Order, each of the Debtors and (subject to paragraph 19) the Debtors' estates, on its and their own behalf and on behalf of its and their respective past, present and future predecessors, heirs, successors, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases

and forever discharges and acquits the Prepetition Secured Parties, the DIP Agent, the DIP Lender, and each of their respective Representatives (as defined herein) (collectively, the "**Released Parties**") from (i) all damages, loss, claims, demands, liabilities, obligations, actions and causes of action whatsoever which any Debtor might now have, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, against any Released Party, and (ii) any and all derivative claims, estate claims, and causes of action held by the Debtors' estates, pending or threatened, including Avoidance Actions, preference claims, fraudulent transfer claims, and any other derivative claims or causes of action that could be asserted by or on behalf of the Debtors' estates, in each case whether presently known or unknown, and of every nature and extent whatsoever, and, with respect to (i) and (ii) above, on account of or in any way concerning, arising out of or founded on the Promissory Note, the Bridge Loans, the Prepetition Loan Documents, the Prepetition Secured Loan Documents, the DIP Loan Agreement, any other DIP Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, or the transactions giving rise to the Bridge Loans, without implied limitation, all such loss or damage of any kind heretofore sustained or that might arise as a consequence of the dealings between the parties. For the avoidance of doubt, nothing in this release shall relieve the DIP Lender or the Debtors of their DIP Obligations under the DIP Documents from and after the date of this Interim Order.

H. *Corporate Authority*. Each Debtor has all requisite corporate power and authority to execute and deliver the DIP Documents to which it is a party and to perform its obligations thereunder.

I. *Findings Regarding the DIP Financing and Use of Cash Collateral*.

The Findings below are made solely for the purposes of this Interim Order and the amounts funded in accordance herewith and shall have no preclusive effect on any findings the Court may make in connection with additional borrowings under the DIP Facility after a Final Hearing and the rights of all parties in interest are reserved with respect to such further findings.

(i) Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the Debtors to obtain financing pursuant to the DIP Documents.

(ii) The Debtors have an immediate and critical need to obtain the DIP Financing and to use the Prepetition Secured Collateral and the Bridge Loan Collateral (including Cash Collateral) in order to, among other things (a) administer and preserve the value of their estates; (b) permit the orderly continuation of the operation of their business, (c) maintain business relationships with vendors, suppliers and customers, (d) make payroll, (e) satisfy other working capital and operational needs, and (f) fund expenses of the Chapter 11 Cases. In the absence of the DIP Facility and the use of Cash Collateral, the Debtors' business and estates would suffer immediate and irreparable harm. The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Secured Collateral and Bridge Loan Collateral, the incurrence of new indebtedness under the DIP Documents and other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the value of the Debtors' going concern and to a successful sale of all or substantially all of the Debtors' assets.

(iii) The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative

expense. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting to the DIP Lender, the DIP Liens and the DIP Superpriority Claims (each as defined herein) and incurring the Adequate Protection Obligations (as defined herein), in each case subject to the Carve-Out to the extent set forth herein, under the terms and conditions set forth in this Interim Order and in the DIP Documents.

(iv) Based on the DIP Motion, the First Day Declaration and the record presented to the Court at the Interim Hearing, the extension of credit under the DIP Financing, the terms of the adequate protection granted to the Prepetition Secured Lenders as provided in paragraph 13 of this Interim Order (the "**Adequate Protection**"), and the terms on which the Debtors may use the Prepetition Secured Collateral and the Bridge Loan Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(v) The DIP Financing, the Adequate Protection and the use of the Prepetition Secured Collateral and the Bridge Loan Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the Debtors, the DIP Agent, the DIP Lender, the Prepetition Secured Lenders, and the Bridge Loan Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents and any DIP Obligations, shall be deemed to have been extended by the DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Lender and the DIP Agent (and their respective successors and

assigns) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise, all to the maximum extent permitted by law.

(vi) The Prepetition Secured Lenders and the Bridge Loan Secured Parties have acted in good faith regarding the DIP Financing and the Debtors' use of the Prepetition Secured Collateral and the Bridge Loan Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses, in accordance with the terms hereof, and the Prepetition Secured Lenders (and their successors and assigns) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise, all to the maximum extent permitted by law.

(vii) The Prepetition Secured Lenders are entitled to the Adequate Protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code. Based on the DIP Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Secured Collateral and the Bridge Loan Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Secured Collateral and the Bridge Loan Collateral (including Cash Collateral); *provided that* nothing in this Interim Order or the DIP Documents shall (x) be construed as the affirmative consent by the Prepetition Secured Lenders for the use of Cash Collateral other than on the terms set forth in this Interim Order and in the context of the DIP Financing authorized by this Interim Order to the extent such consent has been or is deemed to have been given, (y) be construed as a consent by any party to the terms of

any other financing or any other lien encumbering the Prepetition Secured Collateral or Bridge Loan Collateral (whether senior or junior) other than as contemplated by the DIP Financing authorized by, and in accordance with the provisions of, this Interim Order or (z) prejudice, limit or otherwise impair (A) the rights of the Prepetition Secured Lenders to seek new, different or additional adequate protection or assert any rights of the Prepetition Secured Lenders (subject in all respects to the terms of this Interim Order) or (B) the rights of the Bridge Loan Secured Parties under the Bridge Loan Documents, subject to the automatic exchange and satisfaction of the Promissory Note as the Roll-Up DIP Loan, and the rights of any other party in interest, including the Debtors, to object to such relief are hereby preserved.

(viii) The Debtors have prepared and delivered to the advisors to the DIP Lender and the Prepetition Secured Lenders an initial budget (the "**Initial DIP Budget**"), attached hereto as **Exhibit 2**. The Initial DIP Budget reflects, among other things, the Debtors' and its subsidiaries' anticipated sources and uses of cash for each calendar week and the Debtors' projected availability under each of the Prepetition Loan Documents for each calendar week, in form and substance satisfactory to the DIP Lender and the Prepetition Secured Agents. The Initial DIP Budget may be modified, amended, extended and updated from time to time in accordance with the DIP Loan Agreement and this Interim Order, and once approved by the DIP Lender and the Prepetition Secured Agents, shall supplement and replace the Initial DIP Budget (the Initial DIP Budget and each subsequent approved budget, shall constitute, without duplication, an "**Approved Budget**"). The Debtors believe that the Initial DIP Budget is reasonable under the facts and circumstances. The DIP Lender and the Prepetition Secured Lenders are relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject only to permitted variances), the other

DIP Documents and this Interim Order in determining to enter into the postpetition financing arrangements provided for in this Interim Order and to consent to the use of Cash Collateral.

(ix) The Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code. Subject to entry of the Final Order granting such relief, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Bridge Loan Secured Parties with respect to proceeds, product, offspring, or profits with respect to any of the Bridge Loan Collateral. As of the date hereof, there exist no claims or causes of action against the Prepetition Secured Parties, the DIP Agent, or the DIP Lender with respect to, in connection with, related to, or arising from this Interim Order or the DIP Loan Agreement that may be asserted by the Debtors.

J. *Immediate Entry*. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2), (c)(2) and 6003. Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Financing and the use of Cash Collateral in accordance with this Interim Order and the DIP Documents are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

K. *Prepetition Permitted Prior Liens; Continuation of Prepetition Liens*. Nothing herein shall constitute a finding or ruling by this Court that any alleged Prepetition Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing herein shall prejudice the rights of any party in interest, including, but not limited to the Debtors, the DIP Lender, or the Prepetition Secured Parties, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Prepetition Permitted Prior Lien and/or security interests. The right of a seller of goods to reclaim such goods under section 546(c) of the

Bankruptcy Code is not a Prepetition Permitted Prior Lien and is expressly subject to the DIP Liens and the Prepetition Liens. The Prepetition Liens and the DIP Liens are continuing liens and the DIP Collateral is and will continue to be encumbered by such liens until indefeasible payment in full of all Prepetition Obligations and all DIP Obligations, respectively, in light of the integrated nature of the DIP Facility, the DIP Documents, and the Prepetition Loan Documents.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. *Motion Granted*. The relief sought in the DIP Motion is granted as set forth herein, on an interim basis. The interim financing described herein is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in this Interim Order. All objections to entry of this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits. The rights of all parties in interest to object to the entry of a Final Order are fully reserved. The findings and conclusions made in this Interim Order are solely for the purposes of this Interim Order and the amounts funded in accordance herewith and shall have no preclusive effect on any findings or conclusions the Court may make in connection with additional borrowings under the DIP Facility after a Final Hearing, and the rights of all parties in interest are reserved with respect to such further findings. For the avoidance of doubt, no party may rely on any of the findings or conclusions in this Interim Order in connection with the Debtors seeking entry of the Final Order.

2. *Authorization of the DIP Financing and the DIP Documents*.

(a) The Debtors are hereby authorized to execute, deliver, enter into and, as applicable, perform all of their obligations under the DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith, and the DIP Loan Agreement is incorporated into this Interim Order as if set forth herein. The Debtors are hereby authorized to borrow money pursuant to the DIP Loan Agreement, subject to any limitations on borrowing under the DIP Documents, which shall be used for all purposes permitted under the DIP Documents (and subject to and in accordance with the Approved Budget) (subject to any permitted variances). Upon entry of this Interim Order, as provided in the Interim DIP Budget, the Debtors are authorized to use proceeds of the DIP Loans to pay the DIP Fees and Expenses (as defined below), subject to paragraph 18 of this Interim Order.

(b) Subject to the terms of this Interim Order, in furtherance of the foregoing and without further approval of this Court, each Debtor is authorized to perform all acts, to make, execute and deliver all instruments, certificates, agreements, charges, deeds and documents (including, without limitation, the execution or recordation of pledge and security agreements, mortgages, financing statements and other similar documents), and to pay all fees, expenses and indemnities in connection with or that may be reasonably required, necessary, or desirable for the Debtors' performance of their obligations under or related to the DIP Financing, including, without limitation:

(i) the execution and delivery of, and performance under, each of the DIP Documents except as otherwise expressly provided in this Interim Order;

(ii) the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the Debtors and the DIP Agent, acting in accordance with the terms of the

DIP Loan Agreement and this Interim Order, may agree, it being understood that no further approval of this Court shall be required for any authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other like obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments, the fees or the rate of interest payable thereunder; *provided* that, for the avoidance of doubt, updates and supplements to the Approved Budget required to be delivered by the Debtors under the DIP Documents shall not, for purposes of this Interim Order or any Final Order, be considered amendments or modifications to the Approved Budget or the DIP Documents that require further approval of this Court;

(iii) the non-refundable payment to the DIP Lender, from the proceeds of the DIP Facility, of all fees, premiums and rights received as consideration under or in connection with the DIP Facility (collectively, the "**DIP Fees and Expenses**") provided, however, that notwithstanding anything to the contrary in this Interim Order, (i) the Debtors are not authorized to pay any fees and expenses of the DIP Lender's counsel until entry of a Final Order and (ii) the approval of the Exit Fee shall be subject to entry of the Final Order granting such relief and shall be calculated based upon actual borrowings by the Debtors after the Petition Date under the DIP Facility and not upon the New Money DIP Loan Commitments; and

(iv) the performance of all other acts required under or in connection with the DIP Documents except as otherwise expressly provided in this Interim Order.

3. *DIP Obligations*. Subject to the terms of this Interim Order and only with respect to borrowings under the DIP Facility pursuant to this Interim Order,

(a) Upon execution and delivery of the DIP Documents, and entry of this Interim Order, the DIP Documents shall constitute legal, valid, binding and non-avoidable obligations of the Debtors, enforceable against each Debtor and its estate in accordance with the terms of the DIP Documents and this Interim Order, and any successors thereto, including any trustee appointed in the Chapter 11 Cases or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**").

(b) The Debtors shall be jointly and severally liable for the DIP Obligations.

(c) Except as permitted hereby, no obligation, payment, transfer, or grant of security hereunder or under the DIP Documents to the DIP Agent and/or the DIP Lender (including their Representatives) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4. *Roll-Up*. Nothing in this Interim Order shall authorize the Roll-Up DIP loan; provided, however, that the Debtors may seek entry of a Final Order providing the following: The Bridge Loan Obligations shall automatically be deemed exchanged for and converted into the Roll-Up DIP Loan in the amount of the Bridge Loan Obligations as of entry of the final order and, upon such exchange and conversion, the Bridge Loan Obligations shall automatically be deemed fully

satisfied. Such exchange and conversion shall not constitute a novation, and such Roll-Up DIP Loan shall constitute DIP Obligations for all purposes hereunder and under the DIP Documents and this Interim Order. Amounts of the Roll-Up DIP Loan repaid may not be reborrowed. For the avoidance of doubt, the exchange and conversion of Promissory Note into the Roll-Up DIP Loan shall not in any way enhance the priority of such obligations relative to the Prepetition Secured Obligations or the Prepetition Secured Liens, and the Roll-Up DIP Loan shall in all respects be junior and subordinate to the Prepetition Secured Obligations and the Prepetition Secured Liens. For the avoidance of doubt, none of the provisions of this Paragraph 4 are authorized or ordered under this Interim Order.

5. *Carve-Out*.

(a) *Carve-Out.* As used in this Interim Order, the term "**Carve-Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717, which amounts shall not be limited by any budget, (ii) reasonable fees and expenses incurred by a trustee and payable under section 726(b) of the Bankruptcy Code (without regard to the Carve-Out Trigger Notice (as defined below)) in an aggregate amount not to exceed $50,000, (iii) to the extent allowed at any time, whether by interim order, final order, or other order, all accrued but unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code and any Creditors' Committee (the "**Estate Professionals**") at any time on or before the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice up to but not in excess of the amount approved in the Approved Budget for each such Estate Professional (whether to be actually paid or to be

accrued) through the date of the Carve-Out Trigger Notice (the amounts set forth in the foregoing clauses (i), (ii), and (iii), the "**Pre-Carve-Out Trigger Notice Amount**"), which amount shall be funded by the Debtors into a non-interest bearing account (the "**Professional Fee Account**") on Wednesday of each week (or such other day of the week agreed to by the Debtors and the DIP Agent) for the next week's fees and expenses set forth in the Approved Budget (the "**Weekly Carve-Out Funded Amount**"); and (iv) Allowed Professional Fees of the Estate Professionals incurred after the date of delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, final order or other court order, in an aggregate amount not to exceed $100,000 for the Debtors' professionals and $50,000 for professionals of the Creditors' Committee (the amount set forth in this clause (v) being the "**Post-Carve-Out Trigger Notice Cap**"). For the avoidance of doubt, (x) for the purposes of the Carve-Out, each of the Estate Professionals included in the Approved Budget shall have the aggregate budget allocated to such professional therein, and any fees and expenses incurred by an Estate Professional in excess of their allocated Carve-Out budget shall not be payable from the Carve-Out; and (y) the Carve-Out shall be reduced dollar-for-dollar by any payments of fees and expenses to such Estate Professional. Nothing herein shall limit the ability of any Estate Professional to seek payment of any allowed fees and expenses as an administrative expense in these Bankruptcy Cases. For purposes of this Interim Order, the "**Carve-Out Trigger Notice**" shall mean a written notice (which may be made via electronic mail or other electronic means) delivered by the DIP Agent to (i) the Debtors and their counsel, Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, 16th Floor, Wilmington, Delaware 19801, Attn: Derek C. Abbott (dabbott@morrisnichols.com); Matthew O. Talmo (mtalmo@morrisnichols.com); Tamara K. Mann (tmann@morrisnichols.com); and Liam Davis (ldavis@morrisnichols.com), with a concurrent copy to the Prepetition Secured

Agents and their respective counsel, (ii) Goldberg Kohn Ltd., 55 E Monroe St, Suite 3300, Chicago, IL 60603, Attn: Dimitri G. Karcazes (Dimitri.Karcazes@goldbergkohn.com) and Eva D. Gadzheva (Eva.Gadzheva@goldbergkohn.com), (iii) Seyfarth Shaw LLP, 233 S Wacker Dr #8000, Chicago, IL 60606, Attn: Gus Paloian (GPaloian@seyfarth.com) and Nicholas Marcus (NMarcus@seyfarth.com), and (iv) counsel for any Official Committee of Unsecured Creditors (if one is appointed), stating that the Post-Carve Out Trigger Notice Cap has been invoked. The Carve-Out Trigger Notice may only be delivered following the occurrence and during the continuation of an event of default under the DIP Facility. Notwithstanding anything to the contrary in this Interim Order, any success or transaction fees earned by SC&H Capital and Angle Advisors, as investment bankers to the Debtors (collectively, the "**Investment Bankers**"), shall constitute Allowed Professional Fees for purposes of the Carve-Out, regardless of if such fees are included in the Approved Budget and funded into the Professional Fee Account; provided, however, that any such asserted success and transaction fees earned by the Investment Bankers upon the closing of the applicable transactions shall be funded into the Professional Fee Account at the time such transaction closes for payment to the respective Investment Banker, unless such asserted success and transaction fees are approved by the Court and paid in connection with the closing of the applicable transactions.

(b) *Post-Carve-Out Trigger Notice*. On the date on which a Carve-Out Trigger Notice is delivered in accordance with this paragraph 5 (any such date, the "**Carve-Out Trigger Date**"), the Debtors shall utilize all available cash to fund a reserve in an amount equal to the Carve-Out (the "**Carve-Out Reserve**") solely to the extent of available cash in the DIP Loan Account unless the applicable Prepetition Secured Agents have otherwise agreed. All funds in the Carve-Out Reserve shall be used first to pay the obligations set forth in clauses (a)(i)-(iii) in the

above definition of "Carve-Out" until paid in full, and then as set forth in the DIP Loan Agreement. Notwithstanding anything to the contrary in this Interim Order or the DIP Documents, the failure of the Carve-Out Reserve to satisfy in full the fees of Estate Professionals shall not affect the priority of the Carve-Out.

(c) *Payment of Carve-Out on or After the Carve-Out Trigger Date*. Any payment or reimbursement made on or after the occurrence of the Carve-Out Trigger Date in respect of any Allowed Professional Fees incurred after the occurrence of the Carve-Out Trigger Date shall permanently reduce the Post-Carve-Out Trigger Notice Cap on a dollar-for-dollar basis.

(d) *Priority of Carve-Out*. Each of the DIP Liens, the Prepetition Secured Liens, the Bridge Loan Liens, the Prepetition Secured Adequate Protection Liens, the Prepetition Secured Adequate Protection Claims and the DIP Superpriority Claims (as defined below) shall be subject and subordinate to payment of the Carve-Out; provided that, upon the funding of the Weekly Carve-Out Funded Amount, the subordination of the liens and claims of the DIP Lender and the Prepetition Secured Lenders in respect of the Carve-Out amounts listed in subparagraph 5(a)(iii), shall be limited to the funds deposited into the Professional Fee Account for the Allowed Professional Fees covered by any such Weekly Carve-Out Funded Amount(s).

(e) *Professional Fee Account*. Notwithstanding anything to the contrary contained in this Interim Order, until an Event of Default or the Termination Date has occurred, the Debtors shall be permitted to borrow under the DIP Facility, subject to all of its terms and conditions, on a weekly basis to fund the Professional Fee Account in the amount contemplated under paragraph 5(a)(iii) for the professional fees and expenses listed in the Approved Budget for the upcoming week. For the avoidance of doubt, the Carve-Out shall be funded solely from proceeds of the DIP Facility and not from the Prepetition Secured Collateral (including Cash

Collateral) without the prior written consent of the respective Prepetition Secured Agent unless the Prepetition Secured Obligations of the respective Prepetition Secured Parties have been paid in full in cash. The Debtors shall be permitted to pay, from the Professional Fee Account, as and when the same may become due and payable the Allowed Professional Fees, in accordance with the Approved Budget, regardless of whether an Event of Default or the Termination Date has occurred. None of the provisions of this Interim Order or any Loan Document (as defined in the DIP Loan Agreement) shall prohibit or restrict the payment of fees and expenses to any Estate Professional from any retainer held by such Estate Professional. Any amounts remaining in the Professional Fee Account after the payment of all Allowed Professional Fees of Estate Professionals up to amounts in the Approved Budget pursuant to final fee applications and orders shall be returned to the DIP Lender.

(f) *No Direct Obligation to Pay Allowed Professional Fees*. Neither the DIP Lender nor the Prepetition Secured Lenders shall be responsible for the payment or reimbursement of any fees or disbursements of any Estate Professional incurred in connection with these Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code, regardless of whether such fees or expenses have been allowed by the Court. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender or the Prepetition Secured Lenders in any way to pay compensation to or to reimburse expenses of any Estate Professionals, to advance further funding after delivery of a Carve-Out Trigger Notice, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. Nothing shall limit the ability of any Estate Professional to seek payment of any allowed fees and expenses as an administrative expense in these Bankruptcy Cases; provided, however, that the allowance or payment of any such fees and expenses shall not increase or modify the DIP Lender’s obligation to fund amounts in accordance

with the DIP Loan Agreement; and provided, further, that for the avoidance of doubt, any such allowed fees and expenses in excess of the Carve-Out shall not be payable from, charged against, or otherwise satisfied from the Prepetition Secured Collateral (including Cash Collateral) without the prior written consent of the respective Prepetition Secured Agent unless the Prepetition Secured Obligations of the respective Prepetition Secured Lenders have been paid in full in cash.

6. *DIP Superpriority Claims*. Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations incurred under this Interim Order shall constitute allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) with, to the fullest extent permitted under the Bankruptcy Code or other applicable law and subject to the last sentence of this Paragraph 6, priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, including any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a) (other than section 507(a)(1)), 507(b), 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "**DIP Superpriority Claims**") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and shall be payable from all pre- and postpetition assets and property of the Debtors, whether existing on the Petition Date or thereafter acquired, and all proceeds thereof (excluding, until entry of a Final Order, if any, granting such relief, the Excluded Interim Collateral (defined below)). The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified,

on appeal or otherwise, all to the maximum extent permitted by law. The DIP Superpriority Claims shall be junior and subordinate to, and subject to the prior payment in full, in cash, of (1) the Prepetition Secured Obligations, (2) the Prepetition Liens; (3) the Prepetition Secured Adequate Protection Liens, (4) Prepetition Secured 507(b) Claims and the other Prepetition Secured Adequate Protection Claims, and (5) the Carve-Out, to the extent provided under this Interim Order.

7. *DIP Liens*. As security for the DIP Obligations incurred under this Interim Order, effective and automatically and properly perfected upon the entry of this Interim Order, and without the necessity of the execution, recordation or filing by the Debtors or the DIP Agent of mortgages, security agreements, control agreements, pledge agreements, financing statements, intellectual property filings or other similar documents, notation of certificates of title for titled goods or other similar documents, instruments, deeds, charges or certificates, or the possession or control by the DIP Agent of, or over, any Collateral, and without any further action by the DIP Agent, the DIP Agent, for its own benefit and for the benefit of the DIP Lender, is hereby granted, pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and the DIP Loan Agreement, continuing, valid, binding, enforceable, non-avoidable, automatically perfected, postpetition security interests and liens (all security interests and liens granted to the DIP Agent, for its benefit and for the benefit of the DIP Lender, pursuant to this Interim Order and the DIP Documents, the "**DIP Liens**") on all Collateral, including the DIP Collateral, subject to the priorities set forth in subparagraphs (b) through (e) below; provided, however, that notwithstanding anything to the contrary herein or in the DIP Documents, the DIP Liens shall not extend to and the DIP Collateral shall not consist of (i) Avoidance Actions, (ii) Avoidance Action Proceeds, (iii) Other Estate Actions, or (iv) the proceeds of any Other Estate Actions (collectively with (i), (ii) and (iii) the

"Excluded Interim Collateral") or (v) assets, contracts, leases and other licenses solely to the extent a DIP Lien is not permitted by law to attach to such property, in which case the proceeds of such assets, contracts, leases and other licenses shall be DIP Collateral. The term "**DIP Collateral**" means all current or hereafter acquired assets, interests, rights, and property of any nature whatsoever, whether real or personal, of the Debtors and/or their estates following the commencement of the Chapter 11 Cases, including, without limitation, all assets, interests, rights, and property pledged hereunder, and all cash, any investment of such cash, inventory, accounts receivable, including intercompany accounts (and all rights associated therewith), other rights to payment whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, investment property, inventory, deposit accounts, "core concentration accounts," "cash collateral accounts," and any bank accounts and in each case all amounts on deposit therein (or credited thereto), equity interests, securities accounts, securities entitlements, securities, commercial tort claims, books, records, plants, equipment, farm products, general intangibles, documents, instruments, interests in leases and leaseholds, interests in real property, fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copyrights, trademarks, tradenames, other intellectual property, all licenses therefor, interests of any Debtor in any foreign subsidiary, and all proceeds, rents, issues, profits, offspring, products and substitutions, if any, of any of the foregoing, including proceeds of other estate claims (except for claims or causes of action that constitute Excluded Interim Collateral), whether received by judgment, settlement or otherwise. Upon entry of a Final Order, if any, granting such relief, "DIP Collateral" shall include the Excluded Interim Collateral.

(a) *Collateral*. To secure the full and complete payment and performance of the DIP Obligations, the Debtors hereby grant to the DIP Agent, for the benefit of the DIP Lender, a security interest in all assets of the Debtors, including, without limitation, all DIP Collateral (collectively, the "**Collateral**"); provided, however, that for purposes of this Interim Order and only with respect to the DIP Lender and Bridge Loan Lender, "Collateral" shall not include Excluded Interim Collateral. If any Debtor now has, or hereafter acquires, any right, title, or interest in any commercial tort claim that is not described above, the Debtors shall promptly (and in any event within ten (10) days hereafter or after such acquisition, as applicable) give the DIP Agent and each Prepetition Secured Agent (with respect to such Debtor that is a Prepetition Secured Obligor under the respective Prepetition Secured Loan Document) written notice thereof and the Debtors shall execute and deliver to the DIP Agent and each Prepetition Secured Agent (with respect to such Debtor that is a Prepetition Secured Obligor under the respective Prepetition Secured Loan Document) a security agreement in form and substance satisfactory to the DIP Agent and the respective Prepetition Secured Agent (with respect to such Debtor that is a Prepetition Secured Obligor under the respective Prepetition Secured Loan Document) for the purpose of granting to the DIP Agent and such Prepetition Secured Agent (with respect to such Debtor that is a Prepetition Secured Obligor under the respective Prepetition Secured Loan Document) a valid and enforceable security interest in such commercial tort claim to further secure the DIP Obligations and the respective Prepetition Secured Obligations. Each of the Debtors represents and warrants to the DIP Agent that the security interests granted to the DIP Agent in this Interim Order are now and shall at all times be valid and enforceable first priority security interests, subject to the Carve-Out, Prepetition Secured Liens, the Adequate Protection Liens, and for the avoidance of doubt, any Intercreditor Agreement.

(b) *Liens on DIP Loan Proceeds*. Subject to and to the extent provided in this Interim Order, pursuant to section 364(c)(2) of the Bankruptcy Code and Section 3.10(a)(ii) of the DIP Loan Agreement, the DIP Agent, for the benefit of the DIP Lender, is hereby granted a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all DIP Loan Proceeds and any accounts holding such proceeds, subject only to the Carve-Out and any adequate protection liens granted to the Prepetition Secured Lenders to the extent provided under this Interim Order. The Debtors are hereby ordered to and shall (i) hold all DIP Loan Proceeds and any Net Cash Proceeds in the DIP Loan Account, (ii) use the initial $2,000,000 Interim Availability from the DIP Loan Account to pay expenses and other amounts permitted under this Interim Order and the DIP Documents, and (iii) not otherwise co-mingle the DIP Loan Proceeds with any other cash of the Debtors.

(c) *Liens on Unencumbered Property*. Subject to and to the extent provided in this Interim Order, pursuant to section 364(c)(2) of the Bankruptcy Code and Section 3.10(a)(ii) of the DIP Loan Agreement, the DIP Agent, for the benefit of the DIP Lender, is hereby granted a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all DIP Collateral (including, subject to entry of a Final Order, if any, the Excluded Interim Collateral) that is not subject to (i) a valid, perfected and non-avoidable security interest or lien or (ii) a valid and non-avoidable security interest or lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the "**Unencumbered Property**"), subject, and junior, to the Prepetition Secured Adequate Protection Liens granted to each of the Prepetition Secured Parties with respect to the assets of the respective Prepetition Secured Obligors.

(d) *Liens on Other Collateral*. Subject to and to the extent provided in this Interim Order, pursuant to sections 364(c)(3) of the Bankruptcy Code and Section 3.10(a)(iii) of the DIP Loan Agreement, the DIP Agent, for the benefit of the DIP Lender, is hereby granted a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all other Collateral (i.e., Collateral other than Collateral described in subparagraph (c) above). Such security interest and lien shall be (i) senior to all other Liens and security interests in such Collateral, other than (ii) valid, binding, enforceable, perfected and unavoidable Liens in favor of third parties that were (A) in existence immediately prior to the Petition Date, including the Prepetition Secured Liens, or (B) perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; *provided that* the Liens of the DIP Agent set forth in this subparagraph shall be subject and subordinate to the Carve-Out and any Prepetition Secured Adequate Protection Liens granted to each of the Prepetition Secured Parties with respect to the assets of the respective Prepetition Secured Obligors to the extent provided under this Interim Order.

(e) *Liens Senior to Certain Other Liens*. Subject to the terms of any Intercreditor Agreement and this Interim Order with respect to the Prepetition Secured Lenders' liens and replacement and additional liens on the Prepetition Secured Collateral, the DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this Interim Order (including with respect to the Prepetition Secured Adequate Protection Liens), any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, or (C) any

intercompany or affiliate liens of the Debtors or security interests of the Debtors; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof.

8. *Protection of Rights of DIP Lender, Prepetition Secured Lenders, and Bridge Loan Secured Parties.*

*Bridge Loan Rights*. The Bridge Loan Secured Parties shall retain their rights under the Bridge Loan Documents and with respect to the Bridge Loan Obligations, Bridge Loan Liens, and Bridge Loan Collateral, subject to entry of a Final Order, if any, granting such relief, the automatic exchange and satisfaction of the Promissory Note as the Roll-Up DIP Loan approving the DIP Motion and pursuant to the DIP Loan Agreement. For the avoidance of doubt, nothing in this Interim Order shall be construed to prime the Bridge Loan Liens or to impair Firehorse Capital LLC's rights in its capacity as the bridge loan lender, except as expressly provided by the Roll-Up. For the avoidance of doubt, nothing in this Interim Order shall affect the rights of the Bridge Loan Secured Parties under the Bridge Loan Documents with respect to the Elk Grove Entities, which intend to pursue sales of the assets under Article 9 of the Uniform Commercial Code. The Elk Grove Entities are not debtors in these Chapter 11 Cases, are not borrowers under the DIP Loan Agreement, and are not subject to this Interim Order.

(a) *Termination Date*. Subject to the Remedies Notice Period (as defined below), on the Termination Date (as defined below) (i) all DIP Obligations shall be immediately due and payable and all DIP Commitments will terminate; (ii) the DIP Agent, on behalf of the DIP Lender, may terminate, reduce, or restrict the ability of the Debtors to use Cash Collateral other than Prepetition Secured Collateral or the proceeds thereof, and the Prepetition Secured Lenders may terminate, reduce, or restrict the ability of the Debtors to use Cash Collateral constituting

Prepetition Secured Collateral; *provided, however,* that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral solely to fund the Carve-Out, subject to paragraph 5 above, and pay payroll and other expenses critical to the administration of the Debtors' estates strictly in accordance with the Approved Budget; and (iii) the Prepetition Secured Lenders, the DIP Agent, or the DIP Lender shall be otherwise entitled to exercise rights and remedies under the Prepetition Secured Loan Documents or DIP Documents respectively, in accordance with this Interim Order, and subject to the terms of the Intercreditor Agreements.

(b) *Rights and Remedies Upon Event of Default*.

(i) Subject to the Remedies Notice Period (as defined below), upon an Event of Default, as set forth in the "Events of Default" section of the DIP Loan Agreement, notwithstanding the provisions of section 362 of the Bankruptcy Code and without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of the DIP Documents and this Interim Order: (A) the DIP Agent, acting at the direction of the DIP Lender, may declare, which declaration shall be in writing and delivered by email or overnight mail to the Debtors, the Prepetition Secured Agents, any Creditors' Committee, and the U.S. Trustee (any such declaration shall be referred to herein as a "**Termination Declaration**") (1) all DIP Loans (including principal of, and accrued interest on, any outstanding DIP Loans) to be immediately due and payable, (2) the termination of any further commitment to lend to the Debtors without affecting any of the DIP Liens or the DIP Obligations, and/or (3) that any obligations to fund the Carve-Out Reserve shall be triggered through the delivery of the Carve-Out Trigger Notice to the Debtors; (B) the DIP Agent, on behalf of the DIP Lender, may terminate, reduce, or restrict the ability of the Debtors to use Cash Collateral other than Prepetition Secured Collateral or the proceeds thereof, and the Prepetition Secured Lenders may terminate, reduce, or restrict the ability

of the Debtors to use Cash Collateral constituting Prepetition Secured Collateral; and/or (C) subject to the other provisions of this paragraph 8, the Prepetition Secured Parties may terminate, reduce or restrict the ability of the Debtors to use the Prepetition Secured Collateral (the date on which a Termination Declaration is delivered, the "**Termination Date**").

(ii) The Automatic Stay in the Chapter 11 Cases otherwise applicable to the DIP Agent, the DIP Lender, the Prepetition Secured Lenders, and the Bridge Loan Secured Parties is hereby modified so that five (5) business days after the Termination Date (the "**Remedies Notice Period**"): (A) the Prepetition Secured Lenders shall be entitled to exercise their rights and remedies to the extent available in accordance with the applicable Prepetition Secured Loan Documents and this Interim Order (subject to the terms of and any limitations contained in this Interim Order) to satisfy the Prepetition Secured Obligations, the Prepetition Secured 507(b) Claims, the other Prepetition Secured Adequate Protection Claims, the Prepetition Secured Adequate Protection Liens, and the Prepetition Secured Liens, including, but not limited to, freeze or sweep money balances and/or any and all amounts in accounts maintained by the Debtors with the Prepetition Secured Lenders, and take any and all other actions permitted by this Interim Order or the Prepetition Secured Loan Documents, *provided however* that the Prepetition Secured Lenders shall not without the written consent of the DIP Lender freeze, sweep, or otherwise obtain possession or restrict the use of funds in the DIP Loan Account; (B) subject to the foregoing clause (A), the DIP Agent, on behalf of the DIP Lender, subject to the Intercreditor Agreements with the respective Prepetition Secured Agent, shall be entitled to exercise all of its rights and remedies, including the right to credit bid, in accordance with the DIP Documents and this Interim Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, including but not limited to (subject to the funding of the Carve-Out Reserve in accordance with paragraph 5(c) hereof and

payment of all accrued but unpaid wages and benefits to the Debtors' employees) (1) freeze or sweep monies or balances in the Debtors' DIP Loan Account; (2) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Lender against the DIP Obligations; (3) enforce any and all rights against DIP Collateral, including, without limitation, foreclosure on all or any portion of the DIP Collateral, except to the extent that such DIP Collateral constitutes Prepetition Secured Collateral; and (4) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Documents or applicable law; (C) subject to the foregoing clauses (A) and (B), the Bridge Loan Secured Parties shall be entitled to exercise their rights and remedies to the extent available in accordance with the applicable Bridge Loan Documents and this Interim Order (subject to the terms of and any limitations contained in this Interim Order) to satisfy the Bridge Loan Obligations and the Bridge Loan Liens, and take any and all other actions permitted by this Interim Order or the applicable Bridge Loan Documents. Notwithstanding anything to the contrary herein, the disbursement, transfer and/or payment of funds or proceeds derived from the DIP Collateral, the Prepetition Secured Collateral and/or the Bridge Loan Collateral (including Cash Collateral) shall be subject to the respective Intercreditor Agreement, if any, between the respective Prepetition Secured Agent and the DIP Agent or the Bridge Loan Secured Parties, as applicable, governing the priority of payment between the DIP Lender, Prepetition Secured Lenders, and the Bridge Loan Secured Parties. During the Remedies Notice Period, the Debtors or any other party in interest shall be entitled to seek an emergency hearing with the Court to be held within the Remedies Notice Period for the purpose of determining whether an Event of Default has occurred or is continuing, and with respect to such other matters determined to be relevant by the Court. Unless the Court orders otherwise prior to the expiration of the Remedies Notice Period, the Automatic Stay, as to the DIP Agent, the DIP Lender, the

Prepetition Secured Lenders, and the Bridge Loan Secured Parties, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order. Upon expiration of the Remedies Notice Period, absent order of the Court to the contrary, the DIP Agent, the DIP Lender, the Prepetition Secured Lenders, and the Bridge Loan Secured Parties shall be permitted to exercise all remedies set forth herein, and in the DIP Documents, and as otherwise available at law without further order of or application or motion to this Court consistent with this Interim Order. Notwithstanding the foregoing, if the Debtors or any party in interest requests an emergency hearing during the Remedies Notice Period, but such hearing is scheduled for a later date by the Court (not requested by the Debtors), then the Remedies Notice Period shall be automatically extended, and no rights or remedies may be exercised pursuant to the foregoing paragraph, until after the Court has issued an order or other ruling following such hearing.

9. *Limitation on Charging Expenses Against Collateral*. Except to the extent of the Carve-Out, subject to and upon entry of a Final Order granting such relief, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral, Prepetition Secured Collateral, or Bridge Loan Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, Prepetition Secured Lenders, or the Bridge Loan Secured Parties, as applicable, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Lender, Prepetition Secured Lenders, or the Bridge Loan Secured Parties. Nothing contained in this Interim Order shall be deemed to be a consent by the DIP Lender, Prepetition Secured Lenders, or

the Bridge Loan Secured Parties to any charge, lien, assessment or claims against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.

10. *No Marshaling*. Subject to and upon entry of a Final Order granting such relief, in no event shall the DIP Lender or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, Prepetition Secured Loans, the Prepetition Secured Collateral, the Bridge Loans, or the Bridge Loan Collateral. Further, subject to and upon entry of a Final Order granting such relief, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Bridge Loan Secured Parties or the Prepetition Secured Lenders with respect to proceeds, products, offspring or profits of any Bridge Loan Collateral or Prepetition Secured Collateral.

11. *Payments Free and Clear*. Any and all payments or proceeds remitted to the DIP Agent by, through or on behalf of the DIP Lender pursuant to the provisions of this Interim Order and the DIP Documents (to the extent not inconsistent with this Interim Order) shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, whether asserted or assessed by, through, or on behalf of the Debtors, subject to the Prepetition Secured Lenders' liens and replacement liens on the Prepetition Secured Collateral, the Adequate Protection Liens, and the Carve-Out in all respects. Any and all payments or proceeds remitted to the Prepetition Secured Agents under their respective Prepetition Secured Loan Documents pursuant to the provisions of this Interim Order or such Prepetition Secured Loan Documents shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, whether asserted or assessed by through or on behalf of the Debtors.

12. *Use of Cash Collateral*. The Debtors are hereby authorized, subject to the terms and conditions of this Interim Order, to use Cash Collateral in accordance with the Approved

Budget; *provided that* (x) the Prepetition Secured Lenders are granted the Adequate Protection as forth in this Interim Order; (y) except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any times using Cash Collateral absent further order of the Court; *and* (z) the Debtors' authority to use, and the Prepetition Secured Lenders' consent to the use of, Cash Collateral shall be conditioned on the following:

(a) With respect to the White Oak Facility:

(i) The Debtors shall deliver to the White Oak Agent no later than Monday of each week, starting on September 28, 2026, following the Petition Date (the "**Borrowing Base Certificate Date**"), a US Borrowing Base Report (as defined in the White Oak Loan Agreement), in a form, and with supporting documentation, consistent with prepetition practices under the White Oak Loan Agreement, showing the US Revolver Borrowing Base (as defined in the White Oak Loan Agreement) as of the close of business on Friday of the preceding week.

(ii) The Debtors that are Prepetition Secured Obligors under the White Oak Facility (the "**White Oak Debtors**") shall deliver to the White Oak Agent no later than Monday of each week, starting on September 28, 2026, following the Petition Date (each such Monday being a "**Variance Report Date**"), a variance report certified as true and correct in all material respects by an officer of the White Oak Debtors (each such report, a "**Variance Report**") that includes (1) a reconciliation of the White Oak Debtors' actual performance for the one-week period ending the prior Friday to the projected performance for such week in the Approved Budget, including with respect to projected US Revolver Availability under the White Oak Loan Agreement, (2) a reconciliation of the White Oak Debtors' actual to budgeted performance for the entire period from the Petition Date through the prior Friday, and (3) a written explanation in

reasonable detail of the reasons for material line item variances during the applicable reconciliation periods.

(iii) The White Oak Debtors shall maintain, at all times, US Revolver Availability (as defined in the White Oak Loan Agreement) of not less than 85% of the amount set forth in the "Availability" line item of the "Flat Roll Group Forecast" portion of the Approved Budget (the "**White Oak Availability Line Item**"); provided that notwithstanding anything to the contrary in the White Oak Loan Documents, for purposes of calculating the US Revolver Availability (as defined in the White Oak Loan Agreement), at no time shall the US Specified Overadvance (as defined in the White Oak Loan Agreement) exceed $4,000,000; provided further that the US Revolver Availability (as defined in the White Oak Loan Agreement) shall be increased by the amount by which the aggregate Cash Collateral of the White Oak Agent and the other Prepetition Secured Lenders under the White Oak Facility (x) maintained in the White Oak Blocked Account or otherwise held by the White Oak Agent (excluding the Specified White Oak Collateral) and (y) held by the White Oak Debtors in their main operating account, exceeds $250,000.

(iv) If US Revolver Availability (as defined in the White Oak Loan Agreement) is less than 85% of the amount set forth in the White Oak Availability Line Item (taking into account the last proviso in Paragraph 12(a)(iii) above) (a "**Liquidity Shortfall**"), the Debtors' authorization to use, and White Oak Agent's consent to the use of, Cash Collateral shall terminate until after the Debtors cure such Liquidity Shortfall by payment in cash to White Oak Agent within two (2) business days after delivery of the Variance Report for the week in which such Liquidity Shortfall occurred; provided, however, that the Prepetition Secured Lenders may waive, in writing, such termination.

(v) The Debtors are authorized and directed to continue to deposit all Cash Collateral constituting assets of the Prepetition Secured Obligors under the White Oak Loan Documents now or hereafter in their possession or under their control into the deposit account numbers ending 7753, 8731, and 8607 maintained by BMO Bank N.A. or such other deposit account that White Oak Agent may subsequently agree to in writing (collectively, the "**White Oak Blocked Account**") (or to otherwise deliver all such Cash Collateral to White Oak Agent in a manner satisfactory to the White Oak Agent) promptly upon receipt thereof. Such Cash Collateral received by White Oak Agent shall be remitted daily by White Oak Agent to the White Oak Debtors, up to an aggregate amount each week equal to an amount that, after giving effect to such remittance, would not cause the US Revolver Availability (as defined in the White Oak Loan Agreement) to fall below 85% of the amount set forth in the White Oak Availability Line Item for such week (the "**Minimum Availability Threshold**"), to be used by Debtors to pay expenses that are due and payable in accordance with the Approved Budget that are incurred prior to the Termination Date. For the avoidance of doubt, in no event shall White Oak Agent be required to remit such Cash Collateral to the White Oak Debtors to the extent such remittance would cause US Revolver Availability to fall below the Minimum Availability Threshold. All such other Cash Collateral received by White Oak Agent but not required to be remitted to the Debtors in accordance with the foregoing shall be retained by White Oak Agent but shall not be applied to the White Oak Obligations until the earlier to occur of Termination Date or the sale of all or substantially all of the assets of the White Oak Debtors. Such Cash Collateral in White Oak Agent's possession shall be deemed Collateral of the White Oak Agent securing the White Oak Obligations. Notwithstanding anything to the contrary in this Interim Order (including, without limitation, this Paragraph 12(a)(v)) or any of the White Oak Documents, the Debtors are authorize and are

required to promptly remit to the White Oak Agent the following Cash Collateral upon receipt thereof: (x) all proceeds of that certain Seller Lender Promissory Note, dated September 26, 2024, in the original principal amount of $2,000,000.00, executed by Grand Steel Products, Inc. in favor of Maksteel-Chattanooga, LLC, as amended, restated, supplemented or otherwise modified from time to time, together with any and all documents, agreements and instruments executed and delivered in connection therewith (including that certain Security Agreement referenced therein), and (y) the payment of $500,000, subject to reductions, under the Settlement and Termination Agreement dated August 21, 2026 between Nucor Warehouse Systems, Inc. and MAK Steel USA LLC (such Cash Collateral in the foregoing clause (x) and (y), collectively, the "**Specified White Oak Collateral**"). The White Oak Agent shall apply the Specified White Oak Collateral against the White Oak Obligations to reduce and/or satisfy the White Oak Obligations in accordance with the Approved Budget and the Intercreditor Agreement between the White Oak Agent and the DIP Agent, provided, however, that such application shall not be taken into account for purposes of calculating the White Oak Availability Line Item. White Oak Agent is authorized to collect upon, convert to cash and enforce checks, drafts, instruments and other forms of payment now or hereafter coming into the possession or control of the White Oak Agent or any lender under the White Oak Loan Documents that constitute assets of the Prepetition Secured Obligors under the White Oak Loan Documents (subject to the proceeds thereof being otherwise treated in accordance with the provisions of this Order).

(b) With respect to the Wintrust Loans:

(i) The Debtors shall deliver to the Wintrust Agent no later than Monday of each week, starting on the Borrowing Base Certificate Date, a Borrowing Base Certificate (as defined in the Wintrust Loan Agreement), in a form, and with supporting

documentation, consistent with prepetition practices under the Wintrust Loan Agreement and signed by an Authorized Officer (as defined in the Wintrust Loan Agreement), showing the Borrowing Base Amount (as defined in the Wintrust Loan Agreement) as of the close of business on Friday of the preceding week.

(ii) The Debtors that are Prepetition Secured Obligors under the Wintrust Loan (the "**Wintrust Debtors**") shall deliver to the Wintrust Agent no later than each Variance Report Date, a Variance Report certified as true and correct in all material respects by an Authorized Officer that includes (1) a reconciliation of the Wintrust Debtors' actual performance for the one-week period ending the prior Friday to the projected performance for such week in the Approved Budget, including with respect to projected Excess Availability under the Wintrust Loan Agreement, (2) a reconciliation of the Wintrust Debtors' actual to budgeted performance for the entire period from the Petition Date through the prior Friday, and (3) a written explanation in reasonable detail of the reasons for material line item variances during the applicable reconciliation periods.

(iii) The Wintrust Debtors shall maintain, at all times, excess Availability (as defined in the Wintrust Loan Agreement) of not less than 85% of the amount set forth in the "Availability" line item of the "Fabrication Group Forecast" portion of the Approved Budget (the "**Wintrust Availability Line Item**"); provided that the Excess Availability shall be increased by the amount by which the aggregate Cash Collateral of the Wintrust Agent and the other Prepetition Secured Lenders under the Wintrust Loan (x) maintained in the Wintrust Blocked Account (as defined below) or otherwise held by the Wintrust Agent and (y) held by the Wintrust Debtors in their main operating account.

(iv) If the Excess Availability is less than 85% of the amount set forth in the Wintrust Availability Line Item (taking into account the last proviso in Paragraph 12(b)(iii) above) (a "**Wintrust Liquidity Shortfall**"), the Debtors' authorization to use, and Wintrust Agent's consent to the use of, Cash Collateral shall terminate until after the Debtors cure such Wintrust Liquidity Shortfall by payment in cash to Wintrust Agent within two (2) business days after delivery of the Variance Report for the week in which such Wintrust Liquidity Shortfall occurred; provided, however, that the Prepetition Secured Lenders may waive, in writing, such termination.

(v) The Debtors are authorized and directed to continue to deposit all Cash Collateral constituting assets of the Prepetition Secured Obligors under the Wintrust Loan Documents now or hereafter in their possession or under their control into the deposit account numbers ending in 1223 and 4597 maintained by Wintrust or such other deposit account that Wintrust Agent may subsequently agree to in writing (collectively, the "**Wintrust Blocked Account**") (or to otherwise deliver all such Cash Collateral to Wintrust Agent in a manner satisfactory to the Wintrust Agent) promptly upon receipt thereof. Such Cash Collateral received by Wintrust Agent shall be remitted daily by Wintrust Agent to the Wintrust Debtors, up to an aggregate amount each week equal to an amount that, after giving effect to such remittance, would not cause the Excess Availability to fall below 85% of the amount set forth in the Wintrust Availability Line Item for such week (the "**Wintrust Minimum Availability Threshold**"), to be used by Debtors to pay expenses that are due and payable in accordance with the Approved Budget that are incurred prior to the Termination Date. For the avoidance of doubt, in no event shall Wintrust Agent be required to remit such Cash Collateral to the Wintrust Debtors to the extent such remittance would cause Excess Availability to fall below the Wintrust Minimum Availability

Threshold. All such other Cash Collateral received by Wintrust Agent but not required to be remitted to the Debtors in accordance with the foregoing shall be retained by Wintrust Agent but shall not be applied to the Wintrust Obligations until the earlier to occur of Termination Date or the sale of all or substantially all of the assets of the Wintrust Debtors. Such Cash Collateral in Wintrust Agent's possession shall be deemed Collateral of the Wintrust Agent securing the Wintrust Obligations. Wintrust Agent is authorized to collect upon, convert to cash and enforce checks, drafts, instruments and other forms of payment now or hereafter coming into the possession or control of the Wintrust Agent or any lender under the Wintrust Loan Documents that constitute assets of the Prepetition Secured Obligors under the Wintrust Loan Documents (subject to the proceeds thereof being otherwise treated in accordance with the provisions of this Order).

(c) Notwithstanding anything to the contrary in any Intercreditor Agreement, payments and proceeds of Collateral subject to the Prepetition Secured Liens will be applied in the following order of priority (the "**Payment Priority**"):

1. first, to pay the Prepetition Secured Obligations secured by such Collateral;

2. second, to pay the Carve-Out;

3. third, to pay an amount equal to the amount due and owing on the New Money DIP Loans;

4. fourth, to pay the Roll-Up DIP Loan (if permitted in the Final Order) or Promissory Note, as applicable; and

5. last, the balance, if any, after all of the DIP Obligations have been paid in full, to the Debtors subject in all respects to the rights, liens and claims of other creditors or other stakeholders in the Chapter 11 Cases.

13. *Disposition of DIP Collateral*. The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as otherwise provided for in the

DIP Documents or an order of the Court; provided that, to the extent such DIP Collateral constitutes Prepetition Secured Collateral, then the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of such Collateral without the prior written consent of such Prepetition Secured Agent or an order of this Court.

14. *Adequate Protection*.

(a) *Adequate Protection of the Prepetition Secured Lenders*. The Prepetition Secured Agents, for themselves and on behalf of the Prepetition Secured Lenders under the respective Prepetition Secured Loan Documents, are entitled, pursuant to sections 361, 362, 363(e), 364, and 507 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Secured Collateral to the extent of any diminution in the value of their respective Prepetition Secured Liens, including from the use of all Cash Collateral constituting Prepetition Secured Collateral, from and after the Petition Date ("**Diminution**"), for any reason provided for under the Bankruptcy Code, including, without limitation, any Diminution resulting from the sale, lease or use by the Debtors of the Prepetition Secured Collateral, the grant of any other lien under section 364 of the Bankruptcy Code or the imposition of the Automatic Stay (the "**Prepetition Secured Adequate Protection Claims**" and, for purposes of this Interim Order, the "**Adequate Protection Claims**"). In consideration of the foregoing, the Prepetition Secured Lenders are hereby granted the following as Adequate Protection for, and to secure repayment of an amount equal to, such Prepetition Secured Adequate Protection Claims (collectively, the "**Prepetition Secured Adequate Protection Obligations**" and, for purposes of this Interim Order, the "**Adequate Protection Obligations**"):

(i) *Prepetition Adequate Protection Liens*. The Prepetition Secured Lenders are hereby granted (effective and perfected upon the date of this Interim Order and without

the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements) in the amount of the Prepetition Secured Adequate Protection Claims, a valid, binding, enforceable, non-avoidable and perfected replacement and additional postpetition security interest in and lien upon all of the Prepetition Secured Collateral and all Collateral constituting assets of Prepetition Secured Obligors, including subject to and upon entry of the Final Order, Avoidance Actions and Avoidance Action Proceeds (the "**Prepetition Secured Adequate Protection Liens**" and, for purposes of this Interim Order, the "**Adequate Protection Liens**"), in each case senior to all other liens. The Adequate Protection Liens granted to the Prepetition Secured Agents shall secure the respective Prepetition Secured Obligations. For the avoidance of doubt, the Prepetition Secured Adequate Protection Liens shall not extend to Avoidance Actions or Avoidance Action Proceeds until entry of a Final Order, if any, granting such relief. Until all of the Prepetition Secured Obligations are paid in full in accordance with the respective Prepetition Secured Loan Documents, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases.

(ii) *Prepetition Secured Section 507(b) Claims*. The Prepetition Secured Lenders are hereby, subject to the Carve-Out (to the extent set forth in this Interim Order), granted an allowed superpriority administrative expense claim against the applicable Debtors that are borrowers or obligors under the respective Prepetition Secured Loan Documents in the Chapter 11 Cases as provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition Secured Adequate Protection Claims, with, to the fullest extent permitted under the Bankruptcy Code, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Prepetition Secured 507(b) Claims**" and,

for purposes of this Interim Order, the "**507(b) Claims**"), which Prepetition Secured 507(b) Claims shall be payable from all prepetition and postpetition property of the applicable Debtors subject to the liens of the applicable Prepetition Secured Lenders asserting such Prepetition Secured 507(b) Claim and all proceeds thereof (including, subject to and upon entry of the Final Order, Avoidance Action Proceeds). The Prepetition Secured 507(b) Claims shall be subject and subordinate only to the Carve-Out (to the extent set forth in this Interim Order) and shall have priority in payment over the DIP Superpriority Claims.

(iii) *Prepetition Secured Lenders Interest Payments*. Subject to paragraph 19, interest shall continue to accrue on the White Oak Loans at the applicable default rate of interest under the White Oak Loan Documents, on the Wintrust Loans at the applicable default rate of interest under the Wintrust Loan Documents, which shall be paid in cash when due in accordance with the applicable Prepetition Secured Loan Documents pursuant to the Approved Budget.

(iv) *Prepetition Secured Lenders Fees and Expenses*. The Debtors shall provide the Prepetition Secured Lenders cash payments of all reasonable and documented prepetition and postpetition fees and expenses, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses relating to the exercise of remedies in connection with the Prepetition Secured Loan Documents and incurred by primary, special and local counsel (in each applicable jurisdiction) and financial advisors to the Prepetition Secured Lenders, and any other advisor retained by or on behalf of the Prepetition Secured Lenders (the "**Prepetition Secured Adequate Protection Fees and Expenses**" and, for purposes of this Interim Order, the "**Adequate Protection Fees and Expenses**"), subject to the review procedures set forth in paragraph 17 of this Interim Order, and provided that, prior to closing of the sale of all or

substantially all of the assets of the respective Debtors under the White Oak Loan Documents and the Wintrust Loan Documents, the amounts paid to the White Oak Agent and the Wintrust Agent, as applicable, may not exceed the amounts set forth in the Approved Budget with respect to such party. Upon entry of this Interim Order, the Debtors are authorized to use proceeds of the DIP Loans to pay the Prepetition Secured Adequate Protection Fees and Expenses, including but not limited to, making payments to the Prepetition Secured Advisors.

(v) *Prepetition Secured Lenders Adequate Protection Information Rights*. Unless otherwise agreed by the Prepetition Secured Lenders, the Debtors shall promptly provide the Prepetition Secured Lenders and, to the extent applicable, counsel to such party (and subject to applicable confidentiality restrictions contained in any of the Prepetition Secured Loan Documents), with all reporting that the Debtors were responsible to provide the Prepetition Secured Lenders under the applicable Prepetition Secured Loan Documents immediately prior to the Petition Date. As further adequate protection of the interests of the Prepetition Secured Lenders, the Prepetition Secured Lenders shall be entitled to: (i) receive copies of all financial reporting as and when the same is provided to the DIP Agent under the DIP Documents, including, without limitation, copies of any borrowing base reports; (ii) receive monthly financial statements in respect of the Debtors; (iii) receive a rolling 13-week cash flow forecast from the Debtors, together with variance reports comparing budgeted to actual performance for each prior week; and (iv) periodic conferences with Debtors' management regarding operational and collateral matters and sale process updates.

(vi) *Maintenance of Collateral*. The Debtors shall maintain and insure the Prepetition Secured Collateral in amounts and for the risks, and by the entities, to any extent required under the Prepetition Secured Loan Documents.

(b) *Bridge Loan Rights*. The Bridge Loan Secured Parties are not granted separate Adequate Protection under this Interim Order because Firehorse Capital LLC is the DIP Lender and DIP Agent; *provided that* the Bridge Loan Secured Parties retain their rights under the Bridge Loan Documents with respect to the Bridge Loan Obligations, Bridge Loan Liens, and Bridge Loan Collateral, including the automatic exchange and satisfaction of the Promissory Note as the Roll-Up DIP Loan subject to and upon entry of a Final Order, if any, granting such relief.

(i) *Bridge Loan Secured Parties' Information Rights*. Unless otherwise agreed by the Bridge Loan Secured Parties, the Debtors shall promptly provide the Bridge Loan Secured Parties and, to the extent applicable, counsel to such party (and subject to applicable confidentiality restrictions contained in any of the Bridge Loan Documents), with all reporting that the Debtors were responsible to provide the Bridge Loan Secured Parties under the applicable Bridge Loan Documents immediately prior to the Petition Date.

15. *Reservation of Rights of Prepetition Secured Lenders and Bridge Loan Secured Parties*. Under the circumstances and given that the above-described Adequate Protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the Adequate Protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Lenders; provided that all rights of each of the Prepetition Secured Agents and Prepetition Secured Lenders in connection therewith are hereby reserved. Nothing herein shall impair the rights of the Bridge Loan Secured Parties under the Bridge Loan Documents, subject to and upon entry of a Final Order, if any, the automatic exchange and satisfaction of the Promissory Note as the Roll-Up DIP Loan pursuant to a final order granting such relief and the DIP Loan Agreement.

16. *Perfection of DIP Liens and Adequate Protection Liens*.

(a) Without in any way limiting the automatic validity and effective perfection of the DIP Liens granted pursuant to paragraph 7 hereof and the Adequate Protection Liens granted pursuant to paragraph 14 hereof, the DIP Agent, the Prepetition Secured Lenders, and the Bridge Loan Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, Prepetition Secured Lenders, and Bridge Loan Secured Parties (as applicable), as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, including as may be reasonably required or deemed appropriate by the DIP Agent, or take possession of or control over cash or securities, or to amend or modify security documents, or enter into, amend or modify intercreditor agreements, or to subordinate existing liens and any other similar action or action in connection therewith or take any other action in order to document, validate and perfect the liens and security interests granted to them hereunder the ("**Perfection Actions**"). Subject to paragraph 19 of this Interim Order, whether or not the DIP Agent (on behalf of the DIP Lender), the Prepetition Secured Lenders, or the Bridge Loan Secured Parties shall take such Perfection Actions, the liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order. Upon the request of the DIP Agent, the Bridge Loan Secured Parties and the Debtors, without any further consent of any party and at the sole cost of the Debtors as set forth herein, are authorized and such direction is hereby deemed to constitute required direction under the applicable DIP Documents or Bridge Loan Documents, to take, execute, deliver and file such actions, instruments and agreements (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens in all

jurisdictions required under the DIP Loan Agreement, including all local law documentation therefor determined to be reasonably necessary by the DIP Agent; *provided, however,* that no action need be taken in a foreign jurisdiction that would jeopardize the validity and enforceability of the Bridge Loan Liens. All such documents will be deemed to have been recorded and filed as of the Petition Date. To the extent necessary to effectuate the terms of this Interim Order and the DIP Documents, Firehorse Capital LLC, in its capacities as DIP Agent, DIP Lender, and bridge loan lender, shall have all powers expressly delegated to it under the DIP Documents and Bridge Loan Documents, together with such other powers as are reasonably incidental thereto.

(b) A certified copy of this Interim Order may, in the discretion of the DIP Agent, Prepetition Secured Lenders, or the Bridge Loan Secured Parties, as applicable, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept a certified copy of this Interim Order for filing and/or recording, as applicable. The Automatic Stay shall be modified to the extent necessary to permit the DIP Agent, the Prepetition Secured Lenders, and the Bridge Loan Secured Parties to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

17. *Preservation of Rights Granted Under this Interim Order*.

(a) Other than the Carve-Out and the Prepetition Permitted Prior Liens, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Lender, Prepetition Secured Lenders, or the Bridge Loan Secured Parties shall be permitted while any of the DIP Obligations, the Prepetition Secured Obligations, or the Adequate Protection Obligations remain outstanding, and, except as otherwise expressly provided in or permitted under this Interim Order, the DIP Liens and the Adequate Protection Liens shall not be:

(i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the Debtors.

(b) Unless the DIP Agent and the Prepetition Secured Agents shall have provided their prior written consent, or all DIP Obligations, all Prepetition Secured Loans, all Adequate Protection Obligations, and all Bridge Loans (excluding contingent indemnification obligations for which no claim has been asserted) have been indefeasibly paid in full (including indefeasible payment in full of all DIP Obligations), the DIP Commitments have terminated, and the DIP Agent has agreed in writing thereto, it shall be an Event of Default if any order is entered in these Chapter 11 Cases or any potential successor case (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral, Prepetition Secured Collateral, or Bridge Loan Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Prepetition Secured Liens, the Bridge Loan Liens, the Adequate Protection Liens, the Adequate Protection Obligations, and/or the Adequate Protection Claims; (ii) the use of Cash Collateral for any purpose other than as permitted in this Interim Order; (iii) the return of goods pursuant to section 546(h) of the

Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of the Debtors or any creditor's taking any setoff or recoupment against any of its prepetition indebtedness based upon any such return of goods pursuant to section 553 of the Bankruptcy Code or otherwise; or (iv) any modification of any rights of the DIP Agent, the DIP Lender, or the Bridge Loan Secured Parties under this Interim Order, the DIP Documents or the Prepetition Loan Documents, as applicable, with respect to any DIP Obligations or Prepetition Obligations. It shall also be an Event of Default if the Debtors seek to confirm a plan of reorganization or liquidation in these Chapter 11 Cases that does not provide for the indefeasible payment in full, in cash, of all Prepetition Secured Obligations and Adequate Protection Obligations on or before the effective date of such plan (unless the applicable Prepetition Secured Agent otherwise agrees in advance in writing).

(c) Interest, including default interest where applicable upon the occurrence of any Event of Default, shall accrue and be paid as set forth in the DIP Loan Agreement; provided that the Debtors shall first make all payments to the Prepetition Secured Parties due hereunder, including but not limited to interest, before they may make any payments of interest under the DIP Loan Agreement. Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code: (i) the DIP Superpriority Claims, the 507(b) Claims and the other Prepetition Secured Adequate Protection Claims, the DIP Liens, and the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been paid in full (and that such DIP Superpriority Claims, 507(b) Claims and other Prepetition Secured Adequate Protection Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in

interest); (ii) the other rights granted by this Interim Order, including with respect to the Carve-Out, shall not be affected and (iii) this Court shall, to the fullest extent permitted under applicable law, retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(d) If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, then, to the maximum extent permitted by law, such reversal, modification, vacatur or stay shall not affect the validity of any debt incurred, or any priority or lien granted, to the extent set forth in section 364(e) of the Bankruptcy Code.

(e) Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, the 507(b) Claims and the other Prepetition Secured Adequate Protection Claims, and all other rights and remedies of the DIP Lender, Prepetition Secured Lenders, and the Bridge Loan Secured Parties granted by the provisions of this Interim Order and the DIP Documents and the Carve-Out shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases or terminating the joint administration of the Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases. The terms and provisions of this Interim Order and the DIP Documents shall continue in the Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered and in any subsequent chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection

Obligations, and all other rights and remedies of the DIP Lender, Prepetition Secured Lenders, and the Bridge Loan Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the DIP Commitments have been terminated (and in the case of rights and remedies of the Bridge Loan Secured Parties, shall remain in full force and effect thereafter, subject to the terms of this Interim Order), and the Carve-Out shall continue in full force and effect.

18. *Payment of Fees and Expenses*. The Debtors are authorized to and shall pay the DIP Fees and Expenses and the Adequate Protection Fees and Expenses; provided that the Debtors shall first pay all outstanding Adequate Protection Fees and Expenses before paying any DIP Fees and Expenses. Subject to the review of the Debtors, the U.S. Trustee, and counsel to any statutory committee appointed in the Chapter 11 Cases, including the Creditors' Committee (if any) (together, the "**Review Parties**"), payment of all DIP Fees and Expenses and Adequate Protection Fees and Expenses shall not be subject to allowance or review by the Court. Professionals for the DIP Lender, Prepetition Secured Lenders, and the Bridge Loan Secured Parties shall not be required to comply with the U.S. Trustee fee guidelines nor to submit invoices in any particular format, however, any time that such professionals seek payment of fees and expenses from the Debtors prior to the effective date of a chapter 11 plan, each professional shall provide summary copies of its invoices with aggregate amounts of fees and expenses and total time on a per-professional basis (which shall include a general description of the nature of the matters worked on, a list of professionals who worked on the matter, their hourly rate (if such professionals bill at an hourly rate), the number of hours each professional billed and, with respect to the invoices of law firms, the year of law school graduation of each attorney, but shall not be required to contain

time detail and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of attorney-client privilege or of any benefits of the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law. Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) calendar days after the receipt of any such invoice by the Review Parties (the "**Review Period**"). If no written objection is received by 12:00 p.m. prevailing Central Time on the end date of the Review Period, the Debtors shall promptly pay such invoices within five (5) calendar days. If an objection to a professional's invoice is received within the Review Period, the Debtors shall promptly pay the undisputed amount of the invoice (without further order of, or application to, the Court or notice to any other party) and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually. Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the closing date of the DIP Facility, the DIP Fees and Expenses and Adequate Protection Fees and Expenses incurred on or prior to such date without the need for any professional engaged by, or on behalf of, the DIP Lender, Prepetition Secured Lenders, or the Bridge Loan Secured Parties to first deliver a copy of its invoice or other supporting documentation to the Review Parties (other than the Debtors). No attorney or advisor to the DIP Lender, Prepetition Secured Lenders, or the Bridge Loan Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court. Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the (i) the DIP Lender in connection with or with respect to

the DIP Facility, (ii) Prepetition Secured Lenders in connection with the Prepetition Secured Loan Documents, and (iii) the Bridge Loan Secured Parties in connection with or with respect to these matters, shall not be subject to recharacterization, avoidance, subordination, disgorgement or any similar form of recovery by the Debtors or any other person.

19. *Effect of Stipulations on Third Parties*.

(a) Subject to and upon entry of a Final Order, if any, the Debtors' stipulations, admissions, agreements and releases contained in paragraph G of this Interim Order (the "**Stipulations**") shall be binding upon the Debtors, any successor thereto, the Debtors' estates and all parties in interest in all circumstances and for all purposes, unless:

(i) a Creditors' Committee (if any) or another party in interest with requisite standing (in each case, to the extent requisite standing is obtained pursuant to an order of this Court entered prior to the expiration of the Challenge Period (as defined herein)) timely files an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia,* in this paragraph) by no later than the earlier of (A) 75 calendar days after entry of this Interim Order in the case of a party in interest, (B) in the case of a Creditors' Committee, 60 days from the date of its formation, or (C) any such later date agreed to in writing by the applicable Prepetition Secured Party(ies) (the time period established by the foregoing clauses (A) and (B), the "**Challenge Period**"), either (X) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Loans or the Prepetition Liens, or (Y) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, a "**Challenge**" or the "**Challenges**") against the Prepetition Secured Parties or their respective subsidiaries, affiliates, officers, directors, managers, principals,

employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each, a "**Representative**" and, collectively, the "**Representatives**") in connection with matters related to the Prepetition Loan Documents, the Prepetition Loans, the Prepetition Liens and the Prepetition Secured Collateral; *provided*, *however*, in the event the Debtors compromise or settle the potential claims relating to the Stipulations prior to the entry of the Final Order, such settlement shall be binding on the Debtors' estates and all parties in interest, and no statutory committee or other party in interest shall thereafter have any right to pursue a Challenge relating to such settled matters; and

(ii) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided, however,* that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim, and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred, including any amended or additional claims that may or could have been asserted thereafter through an amended complaint under Fed. R. Civ. P. 15 or otherwise (except to the extent such amendment would "relate back" to the original filed complaint under applicable law).

(b) In the event that a chapter 7 or chapter 11 trustee is appointed prior to the end of the Challenge Period, the Challenge Period solely for such chapter 7 or chapter 11 trustee shall be extended (unless and until an order confirming a plan is entered by the Court) to the longer of (i) the remaining Challenge Period or (ii) the date that is fourteen (14) calendar days following the appointment of such trustee. For the avoidance of doubt, any trustee appointed or elected in these Chapter 11 Cases shall, until the expiration of the period provided herein for asserting

Challenges, and thereafter for the duration of any adversary proceeding or contested matter commenced pursuant to the Challenge procedures (whether commenced by such trustee or by any other party in interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgements, admissions, confirmations and stipulations of the Debtors in this Interim Order.

(c) If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such Challenge proceeding then, upon entry of the Final Order: (i) the Debtors' Stipulations contained in this Interim Order shall be binding on all parties in interest; (ii) the obligations of the Debtors under the Prepetition Loan Documents, including the Prepetition Loans, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, recoupment, offset or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s); (iii) the Prepetition Liens on the Prepetition Secured Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected, security interests and liens, not subject to recharacterization, subordination (whether equitable, contractual or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, avoidance or other defense; and (iv) the Prepetition Loans and the Prepetition Liens on the Prepetition Secured Collateral shall not be subject to any other or further claim or challenge by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims, causes of action,

counterclaims and offsets by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Loan Documents, the Prepetition Loans, the Prepetition Liens and the Prepetition Secured Collateral shall be deemed forever waived, released and barred.

(d) Upon entry of the Final Order, if any such Challenge is timely filed during the Challenge Period, the Stipulations contained in this Interim Order shall nonetheless remain binding and preclusive (as provided in subparagraph (c)) on any statutory or non-statutory committee appointed or formed in the Chapter 11 Cases and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction; provided, that this provision shall not limit other persons or entities from benefitting from any successful Challenge brought by any statutory committee or chapter 7 or 11 trustee.

(e) The timely filing of a motion seeking standing to file a Challenge Action before the expiration of the Challenge Period, which attaches a proposed Challenge Action, shall extend the Challenge Period with respect to that party (and only that party) and only with respect to those causes of action and/or claims specifically identified in the Challenge Action, until two business days after the Court approves the standing motion, or such other time period ordered by

the Court in approving the standing motion, provided that the Challenge Period shall immediately expire if the Court denies such standing motion.

(f) Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Loan Documents, the Prepetition Loans or the Prepetition Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay the Chapter 11 Cases, confirmation of any plan of reorganization or consummation of any sale of all or substantially all assets of the Debtors; provided, however, that nothing in this paragraph shall limit a party's rights pursuant to Bankruptcy Rule 8007.

20. *Limitation on Use of Cash Collateral and DIP Collateral*.

(a) Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Cash Collateral (including the DIP Loan Proceeds), Prepetition Secured Collateral, or Bridge Loan Collateral or any portion of the Carve-Out, may be used directly or indirectly, including without limitation through reimbursement of professional fees of any non-Debtor party:

(i) in connection with the investigation, threatened initiation, or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against the DIP Lender, the Bridge Loan Secured Parties, the Prepetition Secured Lenders, or their respective predecessors-in-interest, equityholders, agents, affiliates, representatives, attorneys, or advisors, in each case in their respective capacity as such, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, DIP Superpriority Claims, Prepetition

Loans, and/or the Adequate Protection Obligations and Adequate Protection Liens granted to the Prepetition Secured Parties, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, Prepetition Obligations, Adequate Protection Obligations, and/or the liens, claims, rights, or security interests securing or supporting the DIP Obligations or Adequate Protection Obligations granted under this Interim Order, the Final Order, the DIP Documents or Prepetition Loan Documents in respect of the Prepetition Loans, including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; *provided that,* notwithstanding anything to the contrary herein, the proceeds of the DIP Loans and/or DIP Collateral (including Cash Collateral and the DIP Loan Proceeds), to the extent that the DIP Collateral does not constitute Prepetition Secured Collateral, may be used by the Debtors and the Creditors' Committee to investigate (but not to prosecute or initiate the prosecution of, including the preparation of any complaint or motion on account of) (A) the claims and liens (including the validity and priority thereof whether by legal, equitable or other means) of the Bridge Loan Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Bridge Loan Secured Parties; provided, however, that such investigation shall only be until entry of a Final Order as to the Debtors (in accordance with the paragraph 19(b) herein), and, after entry of the Final Order, only up to an aggregate cap of no more than $25,000 as to the Creditors' Committee; provided, further, that in no event shall any amounts permitted to be used for investigation pursuant to this proviso be used, directly or indirectly, to investigate, challenge, contest, or support any challenge to the DIP Obligations, the DIP Liens, or the DIP Superpriority Claims;

(ii) to prevent, hinder, or otherwise delay or interfere with the Prepetition Secured Parties' or the DIP Lender's, as applicable, enforcement or realization on the Prepetition Loans, Bridge Loan Collateral, Prepetition Secured Collateral, DIP Obligations, DIP Collateral, Adequate Protection Obligations, and the liens, claims and rights granted to such parties under the Interim Order or Final Order, as applicable, each in accordance with the DIP Documents, the Prepetition Loan Documents or this Interim Order;

(iii) to seek to modify any of the rights and remedies granted to the Bridge Loan Secured Parties, the Prepetition Secured Lenders, or the DIP Lender under this Interim Order, the Prepetition Loan Documents, the Bridge Loan Documents or the DIP Documents, as applicable;

(iv) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, the Prepetition Secured Obligations, the Prepetition Liens, Adequate Protection Liens and 507(b) Claims and other Prepetition Secured Adequate Protection Claims;

(v) to pay administrative expense claims under section 503(b)(9) of the Bankruptcy Code except as specifically approved in writing by the DIP Agent; or

(vi) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved or authorized by the Court, agreed to in writing by the DIP Lender, expressly permitted under this Interim Order, or permitted under the DIP Documents (including the Approved Budget, subject to permitted variances), in each case unless all DIP Obligations, Prepetition Secured Obligations, Bridge Loans, Adequate Protection Obligations, and claims granted to the DIP Lender and the Prepetition Secured Parties under this

Interim Order have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit).

(b) For the avoidance of doubt, (i) the Debtors' consensual use of the Prepetition Secured Lenders' cash collateral shall terminate upon the earlier of a Maturity Date (as defined in the DIP Loan Agreement), the termination of the DIP Facility in accordance with its terms, or as otherwise set forth herein; and (ii) this paragraph 20 shall not limit the Debtors' right to use DIP Collateral to contest whether an Event of Default has occurred hereunder pursuant to and consistent with paragraph 8 of this Interim Order.

21. *Indemnification*. The Prepetition Secured Parties and the DIP Lender have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility and the use of the Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, the DIP Documents, and all other documents related to and all transactions contemplated by the foregoing. Accordingly, without limitation to any other right to indemnification, the Prepetition Secured Parties, and the DIP Lender shall be and hereby are indemnified (as applicable) as provided in the Prepetition Loan Documents and DIP Documents, as applicable, including, without limitation, the "Indemnity" section of the DIP Loan Agreement (subject only to the Carve-Out). The Debtors agree that no exception or defense in contract, law, or equity exists as of the date of this Interim Order to any obligation set forth, as the case may be, in this paragraph 21 or otherwise in the DIP Documents, or in the Prepetition Loan Documents to indemnify and/or hold harmless the DIP Lender or any Prepetition Secured Party, as the case may be, and any such defenses that may be in existence as

of the date of this Interim Order are hereby waived. Notwithstanding the foregoing, the Debtors shall not indemnify the Prepetition Secured Parties for any costs or fees (including without limitation attorneys' fees) incurred by the Prepetition Secured Parties directly related to an unsuccessful defense against portion of an ultimately successful Challenge.

22. *Interim Order Governs*. In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents (including, but not limited to, with respect to the Adequate Protection Obligations and any provisions of the DIP Loan Agreement) or any other order entered by this Court, the provisions of this Interim Order shall govern. Notwithstanding the relief granted in any other order by this Court, (a) all payments and actions by any of the Debtors pursuant to the authority granted therein shall be subject to this Interim Order, including compliance with the Approved Budget (subject to permitted variances) and all other terms and conditions hereof, and (b) to the extent there is any inconsistency between the terms of such other order and this Interim Order, this Interim Order shall control, in each case, except to the extent expressly provided otherwise in such other order.

23. *Binding Effect; Successors and Assigns*. The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including, without limitation, the DIP Lender, the Prepetition Secured Lenders, the Bridge Loan Secured Parties, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), and shall inure to the benefit of the DIP Lender, the Prepetition

Secured Lenders, the Bridge Loan Secured Parties, and the Debtors and their respective successors and assigns; *provided* that the DIP Lender, Prepetition Secured Lenders, and the Bridge Loan Secured Parties shall have no obligation to permit the use of the DIP Collateral, Prepetition Secured Collateral, or the Bridge Loan Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

24. *Limitation on Liability*. Nothing in this Interim Order, the DIP Documents, the Prepetition Loan Documents, or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lender, or the Prepetition Secured Parties any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts. The DIP Agent, the DIP Lender, and the Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (a) the safekeeping of the DIP Collateral, the Prepetition Secured Collateral, or Bridge Loan Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in the value thereof or (d) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and all risk of loss, damage or destruction of the DIP Collateral, Prepetition Secured Collateral or Bridge Loan Collateral shall be borne by the Debtors. By virtue of making any loan or other extension of credit under the DIP Documents, to permit the use of the DIP Collateral or the Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, neither the DIP Agent nor the DIP Lender shall (x) have any liability to any third party or be deemed to be in "control" of the operations of the Debtors; (y) owe any fiduciary duty to the Debtors, their respective creditors,

shareholders or estates; or (z) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.,* as amended, or any other federal or state statute, including the Internal Revenue Code). Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lender, or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

25. *Insurance*. To the extent that the Bridge Loan Secured Parties are listed as loss payee under the Debtors' insurance policies, the DIP Agent is also deemed to be the loss payee under the insurance policies (in any such case with the same priority of liens and claims thereunder relative to the priority of the Bridge Loan Liens and the Prepetition Secured Adequate Protection Liens as set forth herein, subject to the respective Intercreditor Agreement), and shall act in that capacity and distribute any proceeds recovered or received in respect of the insurance policies, subject to Paragraph 12(d), first, subject to the respective Intercreditor Agreement, to the indefeasible payment in full of the Prepetition Secured Obligations, second, to the indefeasible payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and termination of the DIP Commitments, and third, to the payment of the applicable Bridge Loans and Bridge Loan Obligations.

26. *Credit Bidding*. The DIP Agent (at the direction of the DIP Lender) shall have the right to credit bid (either directly or through one or more acquisition vehicles) up to the full amount of the Bridge Loan Obligations and the DIP Obligations incurred under this Interim Order and,

subject to and upon entry of a Final Order, if any, the full amount of the DIP Obligations, and each of the Prepetition Secured Agents shall have the right to credit bid (either directly or through one or more acquisition vehicles) up to the full amount of the applicable Prepetition Secured Loans, in connection with any sale of all or any portion of the DIP Collateral or applicable Prepetition Secured Collateral, including (without limitation) any sale occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, without the need for further Court order authorizing the same and whether any such sale is effectuated through sections 363(k), 1123, or 1129(b) of the Bankruptcy Code. The DIP Lender and each of the Prepetition Secured Agents shall automatically be deemed a "qualified bidder" with respect to any disposition of DIP Collateral or applicable Prepetition Secured Collateral under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code, or otherwise. No Debtor shall object to: (A) the DIP Lender credit bidding up to the full amount of the applicable outstanding DIP Obligations, including the Roll-Up DIP Loan and any DIP Superpriority Claims, or (B) any of the Prepetition Secured Agents credit bidding up to the full amount of the applicable Prepetition Secured Loans, including the Adequate Protection Obligations, in each case including any accrued interest, fees, and expenses, in any sale of any DIP Collateral, Bridge Loan Collateral, or Prepetition Secured Collateral, as applicable, whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise. For the avoidance of doubt, any such credit bid by the DIP Lender or DIP Agent with respect to any Prepetition Secured Collateral must

provide for the indefeasible payment in full in cash of all Prepetition Secured Obligations at the closing of such sale (unless the applicable Prepetition Secured Agent agrees in advance in writing to different treatment). In the event that any Avoidance Actions or other claims or causes of action held by the Debtors' estates are sold, assigned, or otherwise disposed of (whether by the Debtors, a chapter 7 or chapter 11 trustee, or otherwise), the DIP Agent (at the direction of the DIP Lender), directly or through one or more acquisition vehicles, shall have the right to credit bid up to the full amount of the DIP Obligations in connection with any such sale or disposition, without the need for further Court order authorizing the same.

27. *Effectiveness*. This Interim Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

28. *Modification of DIP Documents and Approved Budget*. The Debtors are hereby authorized, without further order of this Court, to enter into agreements with the DIP Lender providing for any consensual non-material modifications to the Approved Budget or the DIP Documents, or of any other modifications to the DIP Documents necessary to conform the terms of the DIP Documents to this Interim Order, in each case consistent with the amendment provisions of the DIP Documents, which agreements and amendments with respect to the DIP Documents shall be subject to written notice to the Prepetition Secured Lenders; *provided, however,* that any modification or amendment to the Approved Budget shall require the prior written consent of the

Prepetition Secured Agents; *provided further, however*, that notice of any material modification or amendment to the Approved Budget or the DIP Documents shall be filed on the docket and also provided to the U.S. Trustee, any statutory committee, the Prepetition Secured Agents, and parties in interest requesting notice pursuant to Rule 2002, which shall have three (3) business days from the date of receipt of such notice within which to object, in writing, to the modification or amendment. If the U.S. Trustee, any statutory committee, or any party in interest timely objects to any material modification or amendment to the DIP Documents, the modification or amendment shall only be permitted pursuant to an order of the Court. The foregoing shall be without prejudice to the Debtors' right to seek approval from the Court of a material modification on an expedited basis. The Debtors will provide notice to the U.S. Trustee, any statutory committee, and the Prepetition Secured Agents of any other amendment or modification as soon as reasonably practicable.

29. *Headings*. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

30. *Payments Held in Trust*. Except as expressly permitted in this Interim Order or the DIP Documents and except with respect to the Debtors, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations and termination of all DIP Commitments, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Lender and the Prepetition Secured Lenders, as applicable, and shall immediately turn over the proceeds to the DIP Agent, the Prepetition Secured Agents (as applicable), or as otherwise instructed by this

Court, subject to the lien and claim priorities set forth in this Interim Order, for application in accordance with the DIP Documents and this Interim Order.

31. *Bankruptcy Rules*. The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

32. *No Third-Party Rights*. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

33. *Necessary Action*. The Debtors, the DIP Lender and the Bridge Loan Secured Parties are authorized to take all actions as are necessary or appropriate to implement the terms of this Interim Order. In addition, the Automatic Stay is modified to permit affiliates of the Debtors who are not debtors in the Chapter 11 Cases to take all actions as are necessary or appropriate to implement the terms of this Interim Order.

34. *Interim Order Controls*. To the extent of any inconsistency between this Interim Order and any of the DIP Documents, this Interim Order shall control.

35. *Retention of Jurisdiction*. The Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

36. *Final Hearing*. A final hearing to consider the relief requested in the DIP Motion shall be held on **October 20, 2026 at 2:00 p.m. (prevailing Central Time)**. Any objections or responses to the DIP Motion shall be filed on or prior to **October 13, 2026 at 4:00 p.m. (prevailing Central Time)** and served on the following parties: (a) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Malcolm M. Bates, Esq.

(Malcolm.M.Bates@usdoj.gov@usdoj.gov); (b) the Debtors, UPG Enterprises LLC, 1400 16th Street, Suite 250, Oak Brook, IL 60523; (c) proposed counsel to the Debtors, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, P.O. Box 1347, Wilmington, DE 19899-1347, Attn: Derek C. Abbott (dabbott@morrisnichols.com); Matthew O. Talmo (mtalmo@morrisnichols.com); Tamara K. Mann (tmann@morrisnichols.com); and Liam Davis (ldavis@morrisnichols.com); (d) counsel to the DIP Lender and DIP Agent, DLA Piper LLP (US), 444 West Lake Street, Suite 900, Chicago, IL 60606-0089, Attn: John K. Lyons (john.lyons@us.dlapiper.com), DLA Piper LLP (US), 51 John F. Kennedy Parkway, Suite 120, Short Hills, NJ 07078-2704, Attn: Kira Mineroff (kira.mineroff@us.dlapiper.com), and DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020-1104, Attn: Gregory Juell (gregory.juell@us.dlapiper.com); (e) counsel to the Prepetition Secured Lenders, (A) Goldberg Kohn Ltd., 55 E Monroe St, Suite 3300, Chicago, IL 60603, Attn: Dimitri G. Karcazes (Dimitri.Karcazes@goldbergkohn.com) and Eva D. Gadzheva (Eva.Gadzheva@goldbergkohn.com), (B) Seyfarth Shaw LLP, 233 S Wacker Dr #8000, Chicago, IL 60606, Attn: Gus Paloian (GPaloian@seyfarth.com) and Nicholas Marcus (NMarcus@seyfarth.com); (f) counsel to any committee appointed in these Chapter 11 Cases; (g) the Securities and Exchange Commission; (h) the U.S. Attorney's Office for the Northern District of Illinois; and (i) Illinois Attorney General. Notwithstanding anything to the contrary in this Interim Order, all parties' rights are reserved with respect to entry of a Final Order.

Dated: September 28, 2026

Daniel R. Fine
United States Bankruptcy Judge

# Exhibit 1

## DIP Credit and Security Agreement

*EXECUTION VERSION*

**CREDIT AND SECURITY AGREEMENT**

Dated as of September 22, 2026

by and among

**UPG ENTERPRISES LLC**

and

the other Borrowers from time to time party hereto,

*as Borrowers*,

**FIREHORSE CAPITAL LLC,**

*as a Lender*,

and

**FIREHORSE CAPITAL LLC,**

*as Administrative Agent*

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBORDINATE IN THE MANNER AND TO THE EXTENT SET FORTH IN THAT CERTAIN SUBORDINATION AND INTERCREDITOR AGREEMENT DATED AS OF SEPTEMBER 22, 2026 (AS AMENDED, RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "***WHITE OAK SUBORDINATION AGREEMENT***"), AMONG FIREHORSE CAPITAL LLC, A DELAWARE LIMITED LIABILITY COMPANY, AS SUBORDINATED AGENT, THE OTHER SUBORDINATED CREDITORS (AS DEFINED IN THE WHITE OAK SUBORDINATION AGREEMENT) PARTY THERETO, AND WHITE OAK COMMERCIAL FINANCE, LLC, A DELAWARE LIMITED LIABILITY COMPANY ("***WHITE OAK SENIOR AGENT***"), AND ACKNOWLEDGED AND AGREED TO BY THE COMPANIES (AS DEFINED THEREIN) PARTY THERETO, TO ALL OF THE SENIOR DEBT (AS DEFINED IN THE WHITE OAK SUBORDINATION AGREEMENT), INCLUDING, WITHOUT LIMITATION, ALL OF THE INDEBTEDNESS (INCLUDING INTEREST) OWED BY BORROWERS PURSUANT TO THAT CERTAIN LOAN AND SECURITY AGREEMENT DATED AS OF DECEMBER 31, 2024, AMONG COMPANIES, SENIOR AGENT AND THE LENDERS FROM TIME TO TIME PARTY THERETO AND THE OTHER SENIOR DEBT DOCUMENTS (AS DEFINED IN THE WHITE OAK SUBORDINATION AGREEMENT), AS SUCH LOAN AND SECURITY AGREEMENT AND OTHER SENIOR DEBT DOCUMENTS HAVE BEEN AND HEREAFTER MAY BE AMENDED, RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME AND TO INDEBTEDNESS REFINANCING THE INDEBTEDNESS UNDER THOSE AGREEMENTS AS CONTEMPLATED BY THE WHITE OAK SUBORDINATION AGREEMENT; AND EACH HOLDER OF THIS INSTRUMENT, BY ITS ACCEPTANCE HEREOF, IRREVOCABLY AGREES TO BE BOUND BY THE PROVISIONS OF THE WHITE OAK SUBORDINATION AGREEMENT.

**Table of Contents**

Page


**ARTICLE I DEFINITIONS .......... 2**
SECTION 1.01. Defined Terms .......... 2
SECTION 1.02. Classification .......... 17
SECTION 1.03. Interpretation .......... 18
SECTION 1.04. Accounting Terms; GAAP .......... 18

**ARTICLE II THE CREDITS .......... 18**
SECTION 2.01. The Commitments .......... 18
SECTION 2.02. Requests for Borrowings .......... 19
SECTION 2.03. Appointment of Borrower Agent .......... 19
SECTION 2.04. [Reserved] .......... 20
SECTION 2.05. [Reserved]. .......... 20
SECTION 2.06. [Reserved]. .......... 20
SECTION 2.07. Termination and Reduction of Commitments .......... 20
SECTION 2.08. Repayment of Loans; Evidence of Debt .......... 20
SECTION 2.09. Prepayment of Loans .......... 21
SECTION 2.10. Fees .......... 21
SECTION 2.11. Interest .......... 22
SECTION 2.12. Taxes .......... 22
SECTION 2.13. Payments Generally; Pro Rata Treatment; Sharing of Set-offs .......... 25

**ARTICLE III REPRESENTATIONS AND WARRANTIES .......... 27**
SECTION 3.01. Name, Organization and Qualification to do Business .......... 27
SECTION 3.02. Power and Authority .......... 27
SECTION 3.03. Execution, Delivery and Enforceability .......... 27
SECTION 3.04. No Conflicts .......... 27
SECTION 3.05. Compliance with Applicable Laws .......... 27
SECTION 3.06. Investment Company Status .......... 27
SECTION 3.07. OFAC .......... 28
SECTION 3.08. USA PATRIOT Act .......... 28
SECTION 3.09. Margin Stock .......... 28
SECTION 3.10. Security and Priority .......... 28
SECTION 3.11. DIP Order .......... 29
SECTION 3.12. Bankruptcy Cases .......... 29
SECTION 3.13. Approved Budget .......... 30

**ARTICLE IV CONDITIONS PRECEDENT .......... 30**
SECTION 4.01. Effective Date .......... 30
SECTION 4.02. Conditions to each Borrowing Request .......... 31

**ARTICLE V AFFIRMATIVE COVENANTS .......... 32**
SECTION 5.01. Financial Statements and Other Information .......... 32
SECTION 5.02. Notices of Material Events .......... 33
SECTION 5.03. Existence; Conduct of Business .......... 34
SECTION 5.04. Payment of Obligations .......... 34
SECTION 5.05. Maintenance of Properties; Insurance .......... 34
SECTION 5.06. Books and Records; Inspection Rights .......... 34
SECTION 5.07. Compliance with Laws .......... 35
SECTION 5.08. Certain Obligations Respecting Subsidiaries .......... 35
SECTION 5.09. Further Assurances .......... 35
SECTION 5.10. [Reserved] .......... 36
SECTION 5.11. Approved Budget .......... 36
SECTION 5.12. Agreement to Deliver Security Documents .......... 37
SECTION 5.13. Milestones .......... 37

SECTION 5.14. Weekly Meetings ... 37
SECTION 5.15. Deposit Accounts ... 38
SECTION 5.16. Post-Closing Deliverables ... 38

**ARTICLE VI NEGATIVE COVENANTS ... 38**
SECTION 6.01. Indebtedness ... 38
SECTION 6.02. Liens ... 39
SECTION 6.03. Fundamental Changes; Lines of Business; Subsidiaries ... 39
SECTION 6.04. Dispositions ... 39
SECTION 6.05. Investments ... 40
SECTION 6.06. Restricted Payments ... 40
SECTION 6.07. Transactions with Affiliates ... 40
SECTION 6.08. Restrictive Agreements ... 41
SECTION 6.09. Modifications of Certain Documents ... 41
SECTION 6.10. Accounting Changes ... 41
SECTION 6.11. Hedging Agreements ... 41
SECTION 6.12. Sale Lease Back ... 41
SECTION 6.13. Use of Proceeds ... 41
SECTION 6.14. Prepayments of Certain Indebtedness ... 42

**ARTICLE VII INTERCREDITOR AND SUBORDINATION PROVISIONS ... 42**

**ARTICLE VIII EVENTS OF DEFAULT; REMEDIES ... 42**
SECTION 8.01. Event of Default ... 42
SECTION 8.02. Application of Payment ... 46
SECTION 8.03. Performance by Administrative Agent ... 47

**ARTICLE IX ADMINISTRATIVE AGENT ... 48**
SECTION 9.01. Authorization and Action ... 48
SECTION 9.02. Administrative Agent and its Affiliates ... 48
SECTION 9.03. Duties ... 49
SECTION 9.04. Reliance, Lender Representations, Etc ... 49
SECTION 9.05. Sub-Agents ... 51
SECTION 9.06. Resignation ... 51
SECTION 9.07. Lender Credit Decision ... 52
SECTION 9.08. [Reserved] ... 52
SECTION 9.09. Agent May File Proofs of Claim; Bankruptcy Events. ... 52
SECTION 9.10. Collateral ... 52
SECTION 9.11. Bailee for Perfection ... 54

**ARTICLE X MISCELLANEOUS ... 54**
SECTION 10.01. Notices ... 54
SECTION 10.02. Waivers; Amendments ... 56
SECTION 10.03. Expenses; Indemnity; Damage Waiver ... 56
SECTION 10.04. Successors and Assigns ... 57
SECTION 10.05. Survival ... 59
SECTION 10.06. Counterparts; Integration; Effectiveness ... 60
SECTION 10.07. Severability ... 60
SECTION 10.08. Right of Setoff ... 60
SECTION 10.09. Governing Law; Jurisdiction; Etc ... 60
SECTION 10.10. WAIVER OF JURY TRIAL ... 61
SECTION 10.11. Treatment of Certain Information; Confidentiality; Independence of Covenants ... 61
SECTION 10.12. Interest Rate Limitation ... 62
SECTION 10.13. USA Patriot Act ... 63
SECTION 10.14. Press Release and Related Matters ... 63
SECTION 10.15. No Duty ... 63

SECTION 10.16. No Fiduciary Relationship ........ 63
SECTION 10.17. Construction ........ 63
SECTION 10.18. Payments Set Aside ........ 63
SECTION 10.19. Benefits of Agreement ........ 64
SECTION 10.20. [Reserved] ........ 64
SECTION 10.21. Release of Claims ........ 64
SECTION 10.22. [Reserved] ........ 64
SECTION 10.23. Joint and Several Obligations ........ 64
SECTION 10.24. Acknowledgement Regarding Any Supported QFCs ........ 66
SECTION 10.25. DIP Order ........ 67
SECTION 10.26. INTERCREDITOR AGREEMENTS. ........ 67

**ARTICLE XI SECURITY AGREEMENT ........ 68**
SECTION 11.01. Grant of Security Interest.. ........ 68
SECTION 11.02. Perfection of Security Interest. ........ 68



ACTIVE\1633971339.21

## LIST OF SCHEDULES AND EXHIBITS


| | |
|---|---|
| Schedule 6.02 | Existing Liens |
| Schedule 8.01(r) | Enforcement Actions; Lawsuits or Investigations |
| | |
| Exhibit 2.02 | Form of Borrowing Request |
| Exhibits 2.12-1 to 2.12-4 | US. Tax Compliance Certificates |
| Exhibit 3.13 | Approved Budget |
| Exhibit 5.01 | Form of Compliance Certificate |
| Exhibit 10.04(b)(ii) | Form of Assignment and Assumption |

This CREDIT AND SECURITY AGREEMENT (including all schedules and exhibits hereto, this "***Agreement***") dated as of September 22, 2026, is by and among (i) UPG ENTERPRISES LLC, a Delaware limited liability company (the "***Company***" or "***Borrower Agent***"), (ii) each other Person listed on the signature pages hereto as a "Borrower" and each other Person joined hereto as a Borrower from time to time (together with the Company, each, individually, a "***Borrower***", and collectively, "***Borrowers***"), and (iii) Firehorse Capital LLC, a Delaware limited liability company ("***Firehorse***"), as a Lender and (iv) Firehorse, as Administrative Agent.

**WITNESSETH**

WHEREAS, the Borrowers have filed voluntary cases, jointly administered, under chapter 11 of the Bankruptcy Code (the "***Bankruptcy Cases***") in the United States Bankruptcy Court for the Northern District of Illinois (Eastern Division) (the "***Bankruptcy Court***") pursuant to which the Borrowers may pursue one or more sales of their assets or equity interests pursuant to section 363 of the Bankruptcy Code;

WHEREAS, prior to the Effective Date, the Lender provided financing to the Borrowers pursuant to that certain Fourth Amended and Restated Promissory Note dated September 17, 2026, in the original principal amount of $4,984,214.59, issued by the Borrowers, the Monroe Entities (as defined below) and the Elk Grove Entities (as defined below) in favor of Firehorse (the "***Secured Promissory Note***" and the financing thereunder, the "***Bridge Loans***") each in order to sustain the Borrowers' operations while the Borrowers pursued additional necessary financing and considered strategic options;

WHEREAS, to provide the Borrowers with the necessary liquidity to fund the administration of the Bankruptcy Cases and sustain their operations for the duration of the Bankruptcy Cases, subject to the terms of this Agreement, the Borrowers have requested that the Lenders make available a secured credit facility, pursuant to which (i) the Lenders will provide a "new money" term loan facility in the form of post-petition debtor-in-possession financing under section 364 of the Bankruptcy Code in an aggregate principal amount of up to $6,083,000.00, subject to the terms set forth in this Agreement and the DIP Order and (ii) the Bridge Loans will be deemed exchanged into post-petition term loans hereunder;

WHEREAS, the Lenders are willing to make such financing available to the Borrowers only if, subject to the entry of the DIP Order, upon the occurrence of the Petition Date, all of the Obligations under the Loan Documents owing to the Administrative Agent and the Lenders will (i) constitute allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in the Bankruptcy Cases with priority over any and all other administrative expense claims of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, subject only to the Carve-Out and Prepetition Senior Secured Obligations (and any adequate protection claims granted on account thereof or any superpriority administrative expense claims resulting therefrom) and (ii) be secured by Liens on the Collateral, including DIP Collateral (as defined below), pursuant to section 364(c) of the Bankruptcy Code, with the priorities set forth herein, in the other Loan Documents and in the DIP Order;

WHEREAS, the Borrowers believe that the loans and other financial accommodations provided to Borrowers under this Agreement will preserve the value of the Borrowers' business and assets during the Bankruptcy Cases;

WHEREAS, each Borrower acknowledges that it and the other Borrowers will receive substantial direct and indirect benefits from the making of loans and other financial accommodations to the Borrowers as provided in this Agreement and the other Loan Documents; and

WHEREAS, the Lenders' willingness to extend financial accommodations to Borrowers as more fully set forth in this Agreement and the other Loan Documents is done solely as an accommodation to Borrowers and at Borrowers' request and in furtherance of Borrowers' mutual and collective enterprise.

**AGREEMENT**

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE I **DEFINITIONS**

**SECTION 1.01. Defined Terms**. As used in this Agreement (including the foregoing preamble and recitals), the following terms have the meanings specified below:

"***363 Sale***" means one or more sales, pursuant to section 363 of the Bankruptcy Code or otherwise, of all or a portion of the assets or equity of the Company and/or certain of its Subsidiaries, on terms and conditions acceptable to Firehorse.

"***Acceptable Plan***" means any chapter 11 plan for each of the Bankruptcy Cases, the provisions of which are in form and substance satisfactory to Firehorse in its sole discretion and which contain market standard exculpations, indemnities and releases in favor of the Administrative Agent, the Lenders, the Prepetition Senior Secured Parties, and their respective Related Parties in such capacities (as reasonably determined by Firehorse in its sole discretion).

"***Administrative Agent***" means Firehorse, in its capacity as administrative agent for the Lenders under the Loan Documents, and any successor Administrative Agent appointed pursuant to Article IX.

"***Administrative Questionnaire***" means an administrative questionnaire delivered by each Lender upon request of the Administrative Agent in a form supplied by Administrative Agent.

"***Affiliate***" means, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise. Firehorse shall be deemed not to be an "Affiliate" of any Loan Party or any Subsidiary thereof.

"***Agent's Group***" has the meaning assigned to such term in Section 9.02(b).

"***Anti-Corruption Laws***" means the laws, rules, and regulations of the jurisdictions applicable to any Borrower or its Subsidiaries from time to time concerning or relating to bribery or corruption, including the U.S. Foreign Corrupt Practices Act of 1977, as amended.

"***Anti-Terrorism Laws***" means any applicable laws, regulations, or orders of any Governmental Authority of any applicable jurisdiction, including the United States, the United Nations, United Kingdom, European Union, Canada, or the Netherlands relating to terrorism financing, or money laundering, including, but not limited to, the International Emergency Economic Powers Act (50 U.S.C. § 1701 et seq.), the Trading With the Enemy Act (50 U.S.C. § 5 et seq.), the International Security Development and Cooperation Act (22 U.S.C. § 2349aa-9 et seq.), the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (the "***USA Patriot Act***"), and any rules or regulations promulgated pursuant to or under the authority of any of the foregoing.

"***Applicable Laws***" means, as to any Person, any Laws applicable to or binding upon (i) such Person, (ii) any Property of such Person, or (iii) any business or activity of such Person.

"***Approved Budget***" means a customary 13-week rolling budget and cash flow forecast for the Borrowers showing in reasonable line-item detail receipts and disbursements (including all professional fees) broken down by week (including anticipated uses of the New Money DIP Loans for such period and projected capital expenditures for such period), prepared by the Borrowers in the form attached

hereto as Exhibit 3.13 and approved by Firehorse as the same shall be updated, modified or supplemented from time to time as provided in Section 5.11.

"***Approved Budget Variance Report***" means a weekly report (i) provided by Borrowers to the Administrative Agent (a) setting forth in reasonable detail actual operating receipts, operating disbursements and non-operating disbursements for the applicable Budget Period and all budget variances, in each case, on both an individual line item basis and an aggregate basis, as compared to the projected amounts set forth in the then applicable Approved Budget (which budget variances shall be tested such that in week 1 of each then applicable Budget Period, only week 1 variances are tested; in week 2 of each then applicable Budget Period, weeks 1 and 2 variances are tested on a cumulative basis; in week 3 of each then applicable Budget Period, weeks 1 through 3 variances are tested on a cumulative basis; and in week 4 of each then applicable Budget Period, weeks 1 through 4 variances are tested on a cumulative basis) and including indications as to whether each variance therein is temporary or permanent and an explanation, in reasonable detail, of any material variance, and (b) an analysis demonstrating that the Company is in compliance with the budget covenants set forth in Section 5.11, and (ii) certified by a Responsible Officer of Borrowers. The Approved Budget Variance Report shall be in a form, and shall contain supporting information, satisfactory to Firehorse.

"***Assignment and Assumption***" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of each party whose consent is required by Section 10.04), and accepted by Administrative Agent, substantially in the form attached hereto as Exhibit 10.04(b)(ii).

"***Avoidance Actions***" means, on or after the Petition Date, all of the Borrowers' rights, claims and causes of action under sections 502(d), 506(d), 542, 543, 544, 545, 547, 548, 549, 550, 553 and 724(a) of the Bankruptcy Code, and any other avoidance or similar action under the Bankruptcy Code or similar state law.

"***Avoidance Action Proceeds***" means any and all proceeds of any Avoidance Action.

"***Bankruptcy Cases***" has the meaning specified in the recitals to this Agreement.

"***Bankruptcy Code***" means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended, modified, succeeded, or replaced from time to time.

"***Bankruptcy Court***" has the meaning specified in the recitals to this Agreement.

"***Beneficial Ownership Certification***" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"***Beneficial Ownership Regulation***" means 31 C.F.R. § 1010.230.

"***Benefit Plan***" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"***Board***" means the Board of Governors of the Federal Reserve System of the United States.

"***Borrowers***" has the meaning set forth in the preamble to this Agreement.

"***Borrowing***" means Loans of the same Class made on the same date.

"***Borrowing Request***" means a request by any Borrower for a Borrowing in accordance with Section 2.02.

"***Bridge Loans***" has the meaning specified in the recitals to this Agreement.

"***Budget Period***" means the four-week period beginning September 19, 2026, and each successive four-week period that corresponds to the applicable Approved Budget (for example, full

calendar weeks 1 through 4 ending October 17, 2026, shall be the first Budget Period and weeks 5 through 8 ending November 14, 2026, shall be the second Budget Period).

"***Business Day***" means any day that is not a Saturday, Sunday, or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"***Capital Lease Obligations***" of any Person means the obligations of such Person which are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof determined in accordance with GAAP.

"***Carve-Out***" means the specified fees and expenses which, following an event of default and termination notice delivered to the Borrowers by the Administrative Agent, may be paid from cash (including any professionals fees to be held in escrow and any Cash Collateral and proceeds of the New Money DIP Loans) prior to the satisfaction of the Obligations hereunder; provided, however, that the specific amount and terms of the Carve-Out will be set forth in, and in all respects subject to, the DIP Order and agreed to by Firehorse in its discretion.

"***Cash Collateral***" has the meaning assigned to such term in section 363(a) of the Bankruptcy Code.

"***Cash Equivalents***" means:

(a) securities issued or directly and fully and unconditionally guaranteed or insured by the U.S. government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 12 months or less from the date of acquisition;

(b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("***S&P***") or Moody's Investors Service, Inc. ("***Moody's***");

(c) commercial paper maturing within 24 months from the date of acquisition thereof and having, at such date of acquisition, a rating of not less than A-1 from S&P or a rating of not less than P-1 from Moody's (or, if at any time neither of such services shall be rating such obligations, then from another nationally recognized rating service);

(d) certificates of deposit, banker's acceptances and time deposits maturing within 12 months from the date of acquisition thereof issued or guaranteed by or placed with, and money market Deposit Accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States or any state thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) of this definition, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation;

(f) Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA or better by S&P or Aaa3 or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another rating agency); and

(g) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (f) above.

"***Cash Management Order***" means any order of the Bankruptcy Court entered in the Bankruptcy Cases, together with all extensions, modifications and amendments thereto, consistent with the DIP Order and in form and substance satisfactory to Firehorse, which (among other matters) authorizes Borrowers to maintain their existing treasury, depository, purchase card, and other cash management arrangements or such other arrangements as shall be acceptable to Firehorse.

"***Change in Control***" means: (i) the Persons who are the ultimate "beneficial owners" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act) of the Equity Interests of the Company on the Effective Date shall cease to have the power, directly or indirectly, to vote or direct the voting of securities having at least 75% of the ordinary voting power for the election of directors (or equivalent governing body) of the Company; (ii) the Company fails to own and control, beneficially and of record, directly and indirectly, 100% of the issued and outstanding Equity Interests of each other Borrower and of each Subsidiary Guarantor; or (iii) the occurrence of any "change of control" or similar event under the documents evidencing any Material Indebtedness.

"***Change in Law***" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule or regulation or treaty or in the administration, interpretation, implementation, or application thereof by any Governmental Authority, or (c) the making or issuance of any request, rule, guideline, or directive (whether or not having the force of law) by any Governmental Authority; **provided** that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"***Claim***" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against the Borrowers or the estates created for the Borrowers in the Bankruptcy Cases pursuant to section 541 of the Bankruptcy Code.

"***Class***", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loan comprising such Borrowing, is a New Money DIP Loan or Roll-Up DIP Loan.

"***Code***" means the Internal Revenue Code of 1986, as amended from time to time.

"***Collateral***" has the meaning assigned to such term in Section 11.01 and includes the DIP Collateral.

"***Communication***" has the meaning assigned to such term in Section 10.01(a).

"***Company***" has the meaning set forth in the preamble to this Agreement.

"***Compliance Certificate***" has the meaning assigned to such term in Section 5.01(a).

"***Debtor Relief Laws***" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"***Default***" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"***Default Rate***" means, in the case of any Loans or other Obligations, a per annum interest rate equal to 2.00% as provided in Section 2.11(b).

"***Deposit Account***" means a demand, time, savings, passbook, or similar account maintained with an organization engaged in the business of banking, including savings banks, savings and loan

associations, credit unions, and trust companies. Neither investment property nor accounts evidenced by an instrument shall constitute a Deposit Account for purposes of this Agreement.

"***DIP Account***" means an account to be established by the Loan Parties and approved by the Office of the United States Trustee and the Administrative Agent.

"***DIP Collateral***" means all current or hereafter acquired assets, interests, rights, and property of any nature whatsoever, whether real or personal, of the Borrowers and/or their estates following the commencement of the Bankruptcy Cases, including, without limitation, all assets, interests, rights, and property pledged hereunder, and all cash, any investment of such cash, inventory, accounts receivable, including intercompany accounts (and all rights associated therewith), other rights to payment whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, investment property, inventory, deposit accounts, "core concentration accounts," "cash collateral accounts," and any bank accounts and in each case all amounts on deposit therein (or credited thereto), equity interests, securities accounts, securities entitlements, securities, commercial tort claims, including all direct and derivative causes of action, books, records, plants, equipment, farm products, general intangibles, documents, instruments, interests in leases and leaseholds, interests in real property, fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copyrights, trademarks, tradenames, other intellectual property, all licenses therefor, interests of any Borrower in any foreign subsidiary, and all proceeds, rents, issues, profits, offspring, products and substitutions, if any, of any of the foregoing and, subject to the entry of the Final DIP Order, Avoidance Actions and Avoidance Action Proceeds, whether received by judgment, settlement or otherwise. "DIP Collateral" shall also include, upon the entry of the Final DIP Order granting such relief, Avoidance Actions and Avoidance Action Proceeds.

"***DIP Draw Conditions***" has the meaning assigned to such term in Section 4.01.

"***DIP Draw Date***" has the meaning assigned to such term in Section 4.01.

"***DIP Order***" means, as the context may require, the Interim DIP Order or the Final DIP Order, whichever is then applicable.

"***DIP Super-Priority Claim***" has the meaning set forth in Section 3.10(a)(i).

"***Disposition***" means any sale, assignment, lease, license, transfer or other disposition of any property or assets (whether now owned or hereafter acquired) by Borrowers or any of their Subsidiaries to any other Person. The terms "***Dispose***" and "***Disposed***" as a verb has a corresponding meaning.

"***Disqualified Equity Interests***" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event are subject to the prior Full Satisfaction of the Obligations), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 180 days after the Maturity Date.

"***Dollars***" or "***$***" refers to lawful money of the United States.

"***Draw Date***" means, as the context may require, the Effective Date and each DIP Draw Date.

"***Effective Date***" means the date on which the conditions set forth in Section 4.01 are satisfied (or waived in accordance with Section 4.01).

"***Elk Grove Entities***" means Mapes & Sprowl Steel LLC, an Illinois limited liability company, Cortran LLC, an Illinois limited liability company, and Mapes Holdings LLC, an Illinois limited liability company.

"***Eligible Assignee***" means any Person that meets the requirements to be an assignee under Section 10.04(b)(iii) (subject to such consents, if any, as may be required under Section 10.04(b)(iii)).

"***Environmental Laws***" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, or binding agreements issued, promulgated or entered into by any Governmental Authority, relating to the protection of the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters with respect to Hazardous Materials.

"***Environmental Liability***" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) in favor of any Governmental Authority, of any Borrower or any Subsidiary resulting from or based upon (a) any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment, or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"***Equity Interests***" means shares of the capital stock (including common and preferred shares), partnership interests, membership interest in a limited liability company, beneficial interests in a trust, or other equity interests.

"***Equity Rights***" means, with respect to any Person, any subscriptions, options, warrants, commitments, preemptive rights or agreements of any kind (including any shareholders' or voting trust agreements) for the issuance, sale, registration or voting of, or securities convertible into, any additional Equity Interests in such Person.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder and any successor thereto.

"***ERISA Affiliate***" means any trade or business (whether or not incorporated) that together with any Borrower or Guarantor is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Sections 412 and 430 of the Code, is treated as a single employer under Section 414(m) of the Code.

"***ERISA Event***" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Specified Plan (other than an event for which the 30-day notice period is waived), (b) the failure of any Borrower or any ERISA Affiliate to meet all applicable requirements of Section 412 of the Code, Section 430 of the Code or Section 303 of ERISA with respect to any Specified Plan, (c) the existence with respect to any Multiemployer Plan of an "accumulated funding deficiency" (as defined in Section 431 of the Code or Section 304 of ERISA), whether or not waived, (d) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (e) the incurrence by any Borrower or any ERISA Affiliate of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, (f) the receipt by any Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Specified Plan or Multiemployer Plan or to appoint a trustee to administer any Specified Plan, (g) the incurrence of Withdrawal Liability by any Borrower, any of their Subsidiaries, or any ERISA Affiliate, (h) the receipt by any Borrower, any of their Subsidiaries, or any ERISA Affiliate of any notice concerning the imposition of Withdrawal Liability, or a determination that a Multiemployer Plan is, or is expected to be, "insolvent" (within the meaning of Section 4245 of ERISA), or in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA), (i) the determination that any Specified Plan is in "at-risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA), (j) the incurrence by any Borrower or any ERISA

Affiliate of any liability pursuant to Section 4063 or 4064 of ERISA or a substantial cessation of operations with respect to a Specified Plan within the meaning of Section 4062(e) of ERISA, (k) the filing of a notice of intent to terminate a Specified Plan under, or the treatment of a Specified Plan amendment as a termination under, Section 4041 of ERISA, (l) the imposition of a lien upon any Borrower or any ERISA Affiliate pursuant to Section 430(k) of the Code or Section 303(k) of ERISA, or (m) the engagement by any Borrower or any ERISA Affiliate in a transaction that would reasonably be expected to be subject to Section 4069 or Section 4212(c) of ERISA.

"***Event of Default***" has the meaning assigned to such term in Section 8.01.

"***Event of Loss***" means with respect to any asset of any Borrower or its Subsidiaries, any of the following: (a) any loss, destruction or damage of such asset or (b) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such asset, or confiscation of such asset or requisition of the use of such asset.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended from time to time.

"***Excluded Taxes***" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or New Money DIP Loan Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or New Money DIP Loan Commitment or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.12, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.12(g), and (d) any U.S. federal withholding Taxes imposed under FATCA.

"***FATCA***" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"***Federal Funds Effective Rate***" means, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by Administrative Agent from three federal funds brokers of recognized standing selected by it; **provided** that in no event shall the Federal Funds Effective Rate be less than zero.

"***Firehorse***" has the meaning set forth in the preamble to this Agreement.

"***Final DIP Order***" means the order of the Bankruptcy Court entered in the Bankruptcy Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, together with all extensions, modifications and amendments thereto, in each case in form and substance satisfactory to Firehorse, in its sole discretion.

"***Final DIP Order Date***" means the date on which the Final DIP Order is entered by the Bankruptcy Court.

"***Fiscal Quarter***" means each calendar quarter.

"***Fiscal Year***" means each calendar year.

"***Foreign Lender***" means any Lender or Participant that is not a U.S. Person.

"***Fully Satisfied***" or "***Full Satisfaction***" means, as of any date, that on or before such date: (i) the principal of and interest accrued to such date on the Loans shall have been paid in full in cash, (ii) all fees, expenses and other amounts then due and payable (other than contingent amounts for which a claim has not been made) shall have been paid in full in cash, and (iii) the New Money DIP Loan Commitments shall have expired or irrevocably been terminated.

"***GAAP***" means generally accepted accounting principles and practices set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the US accounting profession).

"***Governmental Authority***" means the government of the United States or any other nation, or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of or pertaining to government including any supra-national bodies (such as the European Union or the European Central Bank).

"***Guarantee***" of or by any Person (the ***guarantor***) means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation of any other Person (the ***primary obligor***) in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof or pledge any assets to secure the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other monetary obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation, (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or monetary obligation, or (e) entered into for the purpose of assuring in any other manner the holder of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such holder against loss in respect thereof (in whole or in part). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as reasonably determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning. Notwithstanding the foregoing, the term Guarantee shall not include endorsements for collection or deposit in the Ordinary Course of Business.

"***Guarantor***" means each Subsidiary Guarantor, and each other Person executing a Guaranty Agreement.

"***Guaranty Agreement***" means a guaranty agreement delivered to Administrative Agent from time to time by any Person providing a Guarantee of any of the Obligations, in form and substance reasonably acceptable to Administrative Agent.

"***Hazardous Materials***" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes, or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious, or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"***Hedging Agreement***" means any interest rate protection agreement, foreign currency exchange agreement, currency options, spot contracts, collar transactions, commodity price protection agreement, rate swap transactions, basis swaps, forward rate transactions, or other interest rate, currency exchange rate, or commodity price hedging arrangement, or any other similar transactions or any

combination of any of the foregoing (including any options to enter into any of the foregoing), designed to provide protection against fluctuations in interest rates, currency exchange rates, or commodity prices, whether or not any such transaction is governed by or subject to any master agreement.

"***Indebtedness***" of any Person (the "***Subject Person***") means, without duplication, (a) all indebtedness for borrowed money (including all obligations evidenced by bonds, debentures, notes or similar instruments, or upon which interest payments are customarily paid), (b) the deferred purchase price of assets or services which in accordance with GAAP would be shown to be a liability (on the liability side of a balance sheet), but specifically excluding accrued expenses and trade payables arising or incurred in the Ordinary Course of Business and, in connection with such trade payables, payable on trade terms customary in the industry, (c) the maximum stated amount of all letters of credit issued or acceptance facilities established for the account of such Subject Person and, without duplication, all drafts drawn thereunder, (d) all Capital Lease Obligations, (e) all Synthetic Lease Obligations and all obligations under any securitization facility or other similar off-balance sheet financing product to which such Subject Person is a party, where such transaction is considered borrowed money indebtedness for tax purposes, (f) any Disqualified Equity Interests of such Subject Person, valued, as of the date of determination, at the greater of (i) the maximum aggregate amount that would be payable upon maturity, redemption, repayment or repurchase thereof (or of Disqualified Equity Interests or Indebtedness into which such Disqualified Equity Interests are convertible or exchangeable) and (ii) the maximum liquidation preference of such Disqualified Equity Interests, (g) any obligations of such Subject Person under conditional sales contracts and similar title retention instruments with respect to property acquired, (h) all obligations under any Hedging Agreement (measured at the Termination Value thereof), (i) indebtedness owing by a partnership in which such Subject Person is a general partner to the extent of recourse to such Subject Person for the payment of such indebtedness, (j) all indebtedness referred to in clauses (a) through (i) of this definition of another Person secured by any Lien on any property of such Subject Person, whether or not such indebtedness has been assumed, in an amount not to exceed the fair market value of the property of such Subject Person securing such indebtedness, and (k) all Guarantees by such Subject Person of indebtedness referred to in clauses (a) through (i) of this definition of others.

"***Indemnified Taxes***" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Borrower under any Loan Document and (b) to the extent not otherwise described in clause (a) of this definition, Other Taxes.

"***Indemnitee***" has the meaning assigned to such term in Section 10.03(b).

"***Intercreditor Agreements***" means, collectively, (a) that certain Subordination and Intercreditor Agreement dated as of September 22, 2026 among White Oak Agent, Firehorse, Maksteel USA LLC, Chicago Steel Holdings LLC, Lexington Steel LLC, Maksteel Holdings ULC, Maksteel Holding Corp and UPG Flat Roll Group LLC and (b) any other intercreditor agreements or consents, subordination agreements or acknowledgements, including in the Interim DIP Order and Final DIP Order, relating to Firehorse and one or more other creditors of any of the Borrowers in respect of this Agreement and the Obligations hereunder, including the intercreditor and subordination provisions set forth in Article VII hereunder.

"***Interim DIP Order***" means the order of the Bankruptcy Court entered in the Bankruptcy Cases after an interim hearing in form and substance satisfactory to Firehorse, in its sole discretion, together with all extensions, modifications and amendments thereto, in each case in form and substance satisfactory to Firehorse, in its sole discretion, that, among other matters, (i) authorizes the Borrowers to execute and perform under the terms of this Agreement and the other Loan Documents, (ii) authorizes New Money DIP Loans to be incurred during the period after the Interim DIP Order Date and prior to the Final DIP Order Date in the amounts and on the terms set forth herein, (iii) approves the conversion of outstanding Bridge Loans to the Roll-Up DIP Loan as set forth herein, and (iv) grants the DIP Super-Priority Claims and the Liens on the assets of the Borrowers referred to herein and in the other Loan Documents.

"***Interim DIP Order Date***" means the date on which the Interim DIP Order is entered by the Bankruptcy Court.

"***Investment***" means, for any Person: (a) the acquisition (whether for cash, property, services, or securities or otherwise) of bonds, notes, debentures, or Equity Interests or other securities or substantially all the assets of, or any line of business or division of, any other Person, or the acquisition of assets of another Person that constitute a business unit (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such sale), whether direct or indirect or in one transaction or series of transactions; (b) the making of any advance, loan or other extension of credit or capital contribution to, any other Person (including the purchase of property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such property to such Person); (c) the entering into of any Guarantee or assumption of debt of, or other contingent obligation with respect to, Indebtedness or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person; (d) the entering into of any Hedging Agreement; or (e) the entering into any joint venture. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested (which, in the case of any Investment constituting the contribution of an asset or property, shall be based on the fair market value of such asset or property at the original time such Investment is made) ***plus*** the cost of all additions thereto, without adjustment for subsequent increases or decreases in the value of such Investment (other than adjustments for the repayment of, or the refund of capital with respect to, or the payment of interest or dividends on, the original principal amount of any such Investment).

"***Lenders***" means the Persons party hereto as a "***Lender***" and any other Person that shall have become a party hereto in such capacity pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party in such capacity hereto pursuant to an Assignment and Assumption.

"***Lien***" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, option, levy, execution, attachment, garnishment, hypothecation, assignment for security, deposit arrangement, encumbrance, charge, security interest or other preferential arrangement in the nature of a security interest of any kind or nature whatsoever, on or of such asset, and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"***Loan Documents***" means, collectively, this Agreement, any Guaranty Agreements, all Borrowing Requests, each Approved Budget, each Approved Budget Variance Report, the Interim DIP Order (and, on and after the Final DIP Order Date, the Final DIP Order) and all other documents, instruments, certificates, and agreements executed, delivered, or acknowledged by a Borrower (other than Organizational Documents) in connection with or contemplated by this Agreement.

"***Loan Parties***" means, collectively, the Borrowers and the Guarantors.

"***Loans***" mean the loans made by the Lenders to Borrowers pursuant to this Agreement in the form of a New Money DIP Loan or Roll-Up DIP Loan, in each case to the extent outstanding or in existence.

"***Margin Stock***" means "margin stock" within the meaning of Regulations U and X of the Board.

"***Material Adverse Effect***" means a material adverse change in, or any event or occurrence (other than (i) the events or occurrences disclosed to the Administrative Agent in writing prior to the Effective Date or (ii) the events or occurrences resulting from the commencement of the Bankruptcy Cases and the continuation and prosecution thereof, including but not limited to any defaults under prepetition agreements, so long as the exercise of remedies as a result of such defaults are stayed under the Bankruptcy Code (the "***Bankruptcy Events and Circumstances***")) which could reasonably be expected to result in a material adverse change in (a) the business, operations, financial condition, assets or liabilities of the Company and its Subsidiaries taken as a whole, (b) the ability of the Borrowers to perform their payment obligations under Loan Documents to which they are a party, (c) the legality,

validity, binding effect, or enforceability of this Agreement or any other Loan Document, or (d) the rights and remedies of or benefits available to the Administrative Agent or the Lenders under this Agreement or any of the other Loan Documents.

"***Material Contract***" means with respect to any Borrower, each contract to which such Borrower is now or at any time hereafter a party (other than the Loan Documents) for which breach, nonperformance, cancellation, or failure to renew could reasonably be expected to have a Material Adverse Effect.

"***Material Indebtedness***" means Indebtedness (other than the Loans) of any Company in an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) exceeding $50,000. For purposes of determining Material Indebtedness, the principal amount of the obligations of any Person in respect of any Hedging Agreement at any time shall be the Termination Value thereof.

"***Maturity Date***" means the earliest to occur of:

(a) the date of consummation of a sale of all or substantially all of the Borrowers' assets or equity in a single transaction or a series of transactions; provided, however, that in the event such assets are sold in partial sales involving a series of transactions, the "Maturity Date" shall refer to the consummation of the final sale in such series of transactions;

(b) the acceleration of the Obligations or termination by the Administrative Agent and/or the New Money DIP Lenders of the New Money DIP Loan Commitments (other than pursuant to Section 2.07);

(c) the Scheduled Maturity Date; and

(d) (i) the effective date of a plan of reorganization or liquidation filed in the Bankruptcy Cases that is confirmed pursuant to an order of the Bankruptcy Court, (ii) the date that is 14 days after the Petition Date if a Final DIP Order has not been entered by the Bankruptcy Court by such date, unless such date has been extended with the written consent of Firehorse not to be unreasonably withheld, (iii) the date the Interim DIP Order or the Final DIP Order, as applicable, ceases to be in full force and effect for any reason after being entered, (iv) the date of conversion or dismissal of any of the Bankruptcy Cases, and (v) the date any financing is incurred by the Borrowers under section 364 of the Bankruptcy Code other than the Loans and New Money DIP Loan Commitments hereunder that does not provide for the immediate payment in full in cash of the Prepetition Senior Secured Obligations and all Obligations hereunder;

*provided* that Firehorse may agree to extend the Maturity Date for any reason, including to allow the Loan Parties to pursue confirmation of an Acceptable Plan.

"***Monroe Entities***" means UPG Electrical LLC, a Tennessee limited liability company, Carter Motor Company, LLC, a Wisconsin limited liability company, and UPG Electrical Holdings LLC, a Delaware limited liability company.

"***Maximum Rate***" has the meaning assigned to such term in Section 10.12.

"***Multiemployer Plan***" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA in respect of which a Borrower or any ERISA Affiliate contributes, has any obligation to contribute or otherwise has any liability (including contingent liability).

"***Net Cash Proceeds***" means, (a) in connection with any Disposition or any Event of Loss, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or instalment receivable or purchase price adjustment receivable or return of funds held in escrow or otherwise, but only as and when received) of such Disposition or Event of Loss, net of the amount necessary to be paid to satisfy senior perfected lien claims, reasonable and customary attorneys' fees, accountants' fees, sales commissions, investment

banking fees, amounts required to be applied to the repayment of Indebtedness secured by a Lien permitted hereunder on any asset which is the subject of such Disposition or Event of Loss (other than any Lien pursuant to a Security Document) and other reasonable and customary fees and expenses actually incurred in connection therewith and the amount of cash reserves established to fund contingent liabilities reasonably estimated to be payable and attributable to such disposition or event and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), or (b) in connection with any incurrence of Indebtedness, the cash proceeds received from such incurrence, net of reasonable and customary attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions, upfront fees, placement fees and other customary fees and expenses actually incurred in connection therewith.

"***New Money DIP Loan***" has the meaning assigned to such term in Section 2.01(a).

"***New Money DIP Loan Availability Period***" means the period from and including the Petition Date through and including the Maturity Date.

"***New Money DIP Loan Commitment***" means, with respect to each Lender, its obligation to make a New Money DIP Loan to Borrowers from time to time during the New Money DIP Loan Availability Period in accordance with Section 2.01(a) in an aggregate principal amount up to, and not to exceed, the amount set forth on such Lender's signature page hereto under the caption "New Money DIP Loan Commitment", as such commitment may be reduced from time to time pursuant to Section 2.07.

"***Obligations***" means all of the obligations, indebtedness and liabilities of the Borrowers to the Lenders and Administrative Agent under this Agreement or any of the other Loan Documents, including principal, interest, fees, prepayment premiums (if any), expenses, reimbursements and indemnification obligations and other amounts, and including interests, fees and expenses that accrue after the Effective Date.

"***Ordinary Course Disposition***" means (i) any Disposition among the Borrowers and their Subsidiaries permitted hereunder and (ii) any Disposition permitted under clause (c), (d), (f) or (j) of Section 6.04.

"***Ordinary Course of Business***" means, in respect of any transaction or circumstance involving any of the Borrowers or their respective Subsidiaries, the ordinary course of such Borrower's or Subsidiary's business, as applicable, substantially as previously conducted by it or otherwise substantially consistent with past practice or industry practice.

"***Organizational Documents***" means, with respect to any Person (a) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such Person, (b) in the case of any limited liability company, the certificate or articles of formation and operating agreement (or similar documents) of such Person, (c) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (d) in the case of any general partnership, the partnership agreement (or similar document) of such Person, (e) in any other case, the functional equivalent of the foregoing, and (f) any shareholder, voting trust or similar agreement between or among any holders of Equity Interests of such Person.

"***Other Estate Actions***" means, on or after the Petition Date, all rights, claims, and causes of action of the Borrowers and/or their estates, other than Avoidance Actions, that are based upon or arise from the predicate liability of a debtor or a debtor's estate (including claims that are derivative of any such predicate liability), including (a) claims for breach of fiduciary duty, (b) alter ego, veil-piercing, and reverse veil-piercing claims (including single-enterprise liability theories), (c) successor liability claims (including product-line, continuity-of-enterprise, and de facto merger claims), and (d) any other claim based upon or arising from the predicate liability of a debtor or a debtor's estate, including any claims that are derivative of any such predicate liability, in each case whether known or unknown,

PRIVATE & CONFIDENTIAL
SUBJECT TO FRE 408 & ITS EQUIVALENTS

asserted or unasserted, matured or unmatured, contingent or non-contingent, and liquidated or unliquidated.

"***Other Connection Taxes***" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"***Other Taxes***" means all present or future stamp, court or documentary, intangible, recording, filing, or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"***Participant***" has the meaning assigned to such term in Section 10.04.

"***Participant Register***" has the meaning assigned to such term in Section 10.04.

"***PBGC***" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"***Permitted Encumbrances***" means (a) Liens for taxes or governmental charges or levies not yet delinquent for a period of more than thirty (30) days or which are delinquent for a period of more than thirty (30) days and being contested in good faith by appropriate proceedings for which adequate reserves determined in accordance with GAAP have been established (and as to which the property subject to such Lien is not yet subject to foreclosure or sale on account thereof); (b) Liens in respect of property imposed by law arising in the Ordinary Course of Business such as materialmen's, carrier's, mechanics', landlord's, warehousemen's, and other like Liens; **provided** that such Liens secure only amounts not more than 90 days past due or are being contested in good faith by appropriate proceedings for which adequate reserves determined in accordance with GAAP have been established (and as to which the property subject to such Lien is not yet subject to foreclosure, sale or loss on account thereof); (c) pledges or deposits made in the Ordinary Course of Business to secure payment of worker's compensation insurance, unemployment insurance, pensions or social security, property, casualty, or liability insurance, or other insurance programs; (d) Liens arising from good faith deposits in connection with or to secure performance of utilities, tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations incurred in the Ordinary Course of Business (other than obligations in respect of the payment of borrowed money); (e) easements, rights-of-way, servitudes, restrictions (including zoning restrictions), defects or irregularities in title and other similar charges or encumbrances not, in any material respect, impairing the use of such property for its intended purposes or interfering with the ordinary conduct of business of any Borrower; (f) Liens in favor of Administrative Agent or for the benefit of the Secured Parties granted pursuant to Loan Documents; (g) customary Liens (including the right of set-off) in favor of banking institutions encumbering deposits held by such banking institutions or in favor of collecting banks incurred in the Ordinary Course of Business (h) Liens set forth on Schedule 6.02; **provided** that to qualify as a Permitted Encumbrance, any such Lien shall only secure the Indebtedness that is secured by such Liens on the Effective Date and shall encumber only such assets as are encumbered by such Liens as of the Effective Date; (i) any Lien stayed in connection with the Bankruptcy Cases, if applicable; and (j) Liens existing on the Petition Date securing Prepetition secured obligations.

"***Person***" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority, or other entity.

"***Petition Date***" means the date of the filing of the Bankruptcy Cases, which such date is September 22, 2026.

"***Plan***" has the meaning specified in the recitals to this Agreement.

"***Prepetition***" means the time period ending immediately prior to the filing of the Bankruptcy Cases on the Petition Date.

"***Prepetition Senior Agents***" means, collectively, (i) so long as any obligations under the White Oak Financing remain outstanding, the White Oak Agent and (ii) so long as any obligations under the Wintrust Financing remain outstanding, the Wintrust Agent.

"***Prepetition Senior Secured Obligations***" means the secured obligations of the applicable Borrowers under each of the White Oak Financing and Wintrust Financing.

"***Prepetition Senior Secured Parties***" means the holders of the Prepetition Senior Secured Obligations.

"***Property***" means any property of any kind whatsoever, whether real, personal, or mixed, and whether tangible or intangible, and any right, title or interest therein.

"***Pro Rata Share***" means, with respect to any Lender in respect of any rights or obligations affecting or involving all Lenders (including any reimbursement obligations in respect of any indemnity claim arising out of an action or omission of Administrative Agent under this Agreement), the percentage (carried out to the ninth decimal place) of the Total New Money DIP Loan Commitments or aggregate principal amount of Loans outstanding, of all Classes hereunder represented by the aggregate amount of such Lender's New Money DIP Loan Commitments or Loans, as the case may be, of all Classes hereunder. If the New Money DIP Loan Commitments have terminated or expired, the Pro Rata Share with respect to such Class shall be determined based upon the outstanding principal amount of the New Money DIP Loans at such time.

"***PTE***" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"***Qualified Equity Interest***" means and refers to any Equity Interests issued by the Company (and not by one or more of its Subsidiaries) that is not a Disqualified Equity Interest.

"***Recipient***" means (a) Administrative Agent and (b) any Lender, as applicable.

"***Register***" has the meaning assigned to such term in Section 10.04.

"***Registered Loan***" has the meaning assigned to such term in Section 10.04.

"***Related Parties***" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, and advisors of such Person and of such Person's Affiliates, including, with respect to Firehorse, Chris Hutter and Paul Douglass.

"***Responsible Officer***" means the chief executive officer, president, chief restructuring officer, chief financial officer, principal accounting officer, treasurer, vice president of finance or controller of any Person. Any document delivered hereunder that is signed by a Responsible Officer of any Person shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Person.

"***Restricted Payment***" means, with respect to any Person, any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of or issued by such Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interest or Equity Right of or issued by such Person or any payment of management fees or consulting fees to any holder of Equity Interests of such Person.

"***Restrictive Agreement***" has the meaning assigned to such term in Section 6.08.

"***Roll-Up DIP Loan***" has the meaning assigned to such term in Section 2.01(b).

"***Sanctions***" has the meaning assigned to such term in Section 3.07.

"***Scheduled Maturity Date***" means the date that is December 18, 2026.

"***SEC***" means the Securities and Exchange Commission.

"***Secured Parties***" means the holders of the Obligations from time to time and shall include (i) each Lender in respect of its Loans, (ii) the Administrative Agent and the Lenders in respect of all other present and future obligations and liabilities of Borrowers of every type and description arising under or in connection with this Agreement or any other Loan Document, (iii) each indemnified party under Section 10.03 in respect of the obligations and liabilities of Borrowers to such Person hereunder and under the other Loan Documents, and (iv) their respective successors and (in the case of a Lender and the Administrative Agent, permitted) transferees and assigns.

"***Secured Promissory Note***" has the meaning specified in the recitals to this Agreement.

"***Securities Act***" means the Securities Act of 1933, as amended from time to time.

"***Security Documents***" means (a) this Agreement, (b) any Intercreditor Agreements, (c) the DIP Order, (d) each other agreement, instrument, mortgage, deed of trust or document that creates or purports to create a Lien securing the Obligations in favor of the Administrative Agent pursuant to or in connection with this Agreement and all UCC financing statements and fixture filings, or such other agreement, instrument, or document to be filed with respect to the Liens created pursuant thereto and each other security agreement or other document executed and delivered on or after the Effective Date to secure any of the Obligations and (e) any amendments, supplements, modifications, renewals, restatements, replacements, consolidations, substitutions and extensions of any of the foregoing in accordance with their respective terms.

"***Specified Plan***" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which a Borrower or any ERISA Affiliate (i) is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA or (ii) otherwise has any liability (including contingent liability).

"***Subsidiary***" means, with respect to any Person (the "***parent***") at any date, any other Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other Person (a) of which more than 50% of the Equity Interests or more than 50% of the ordinary voting power, are as of such date, owned, controlled or held by the parent (either directly or through one or more intermediaries or both) or (b) the management of which is, as of such date, otherwise controlled, by the parent (either directly or through one or more intermediaries or both). Unless otherwise specified, "***Subsidiary***" means a Subsidiary of the Company.

"***Subsidiary Guarantors***" means each Subsidiary that has executed a Guaranty Agreement. As of the Effective Date, there are no Subsidiary Guarantors.

"***Synthetic Lease Obligation***" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"***Taxes***" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"***Termination Value***" means, in respect of any Hedging Agreement, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreement, (a) for any date on or after the date such Hedging Agreement has been closed out and termination value determined in accordance therewith, such termination value, and (b) for any date prior to the date referenced in clause (a) of this definition the amount determined as the mark-to-market value for such Hedging Agreement, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreement (which may include any Lender or any Affiliate of any Lender).

"***Total New Money DIP Loan Commitment***" means, at any time, the sum of the New Money DIP Loan Commitments of the Lenders at such time. The Total New Money DIP Loan Commitment is $6,083,000.00 as of the Effective Date.

"***Transactions***" means the execution, delivery and performance by the Borrowers of the Loan Documents, the borrowing (or deemed borrowing) of Loans and other credit extensions and the use of proceeds thereof.

"***UCC***" means the New York Uniform Commercial Code as adopted in the State of New York; **provided** in connection with any Lien granted under any Security Document, if the laws of any other jurisdiction would govern the perfection or enforcement of such Lien, "***UCC***" means the Uniform Commercial Code as in effect in such jurisdiction with respect to such Lien.

"***United States***" and "***U.S.***" mean the United States of America.

"***U.S. Person***" means any Person that is a "***United States Person***" as defined in Section 7701(a)(30) of the Code.

"***U.S. Tax Compliance Certificate***" has the meaning assigned to such term in Section 2.12(g).

"***USA Patriot Act***" has the meaning assigned to such term in the definition of "Anti-Terrorism Laws".

"***Withdrawal Liability***" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part 1 of Subtitle E of Title IV of ERISA.

"***Withholding Agent***" means any Borrower and Administrative Agent.

"***White Oak Agent***" means White Oak Commercial Finance, LLC, as administrative agent under the White Oak Financing.

"***White Oak Financing***" means the financing pursuant to that certain Loan and Security Agreement, dated as of December 31, 2024, by and among Maksteel USA LLC, Chicago Steel Holdings LLC, Lexington Steel LLC, Maksteel Holdings ULC, Maksteel Holding Corp, UPG Flat Roll Group LLC, the entities from time to time party thereto and the White Oak Agent, as amended, supplemented, or otherwise modified prior to the Effective Date or, with the prior written consent of Firehorse, on or after the Effective Date.

"***Wintrust Agent***" means Schaumburg Bank & Trust Company, N.A., a subsidiary of Wintrust Financial Corporation, as administrative agent under the Wintrust Financing.

"***Wintrust Financing***" means the financing pursuant to that certain Loan and Security Agreement, dated as of August 22, 2022, by and among Metalex, LLC, National Metalwares, L.P., UPG Fabrication LLC, National Metalwares Holdings LLC, Sidecar NM LLC and the Wintrust Agent, as amended, supplemented, or otherwise modified prior to the Effective Date or, with the prior written consent of Firehorse, on or after the Effective Date.

**SECTION 1.02. Classification**. For purposes of this Agreement, Loans, Borrowings, Lenders and Claims may be classified and referred to by Class (*e.g.*, a New Money DIP Loan Borrowing).

**SECTION 1.03. Interpretation**. With reference to this Agreement and each other Loan Document, unless other specified herein or in such other Loan Document:

(a) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (ii) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns, (iii) the words "herein", "hereof" and "hereunder", and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) unless otherwise specified, all references in any Loan Document to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, (vi) any table of contents, captions and headings are for convenience of reference only and shall not affect the construction of this Agreement or any other Loan Document, (vii) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, and (viii) unless otherwise explicitly provided herein, any reference to the consent or approval of Firehorse shall mean the consent or approval of Firehorse in its capacity as the Administrative Agent and a Lender hereunder and (ix) unless otherwise explicitly provided herein, any reference to the consent or approval of Firehorse, the Administrative Agent or any applicable Lenders, as applicable, shall be construed to mean the consent or approval of Firehorse, the Administrative Agent or such Lenders, as applicable in its or their sole discretion and in writing.

(b) In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c) For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

**SECTION 1.04. Accounting Terms; GAAP**. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed, and all accounting determinations and computations required under the Loan Documents shall be made, in accordance with GAAP, as in effect from time to time, consistently applied.

## ARTICLE II **THE CREDITS**

**SECTION 2.01. The Commitments**.

(a) New Money DIP Loans. Subject to the terms and conditions set forth herein and in the DIP Order, each Lender with a New Money DIP Loan Commitment severally and not jointly agrees to make one or more term loans (each, a "***New Money DIP Loan***") to Borrowers from time to time on each DIP Draw Date, in aggregate principal amounts not to exceed at any time outstanding the amount of such Lender's New Money DIP Loan Commitment, consistent with the Approved Budget and

subject to the satisfaction (or waiver) of the DIP Draw Conditions; provided that, in any case, that the aggregate principal amount of all New Money DIP Loans outstanding at any time shall not exceed the Total New Money DIP Loan Commitment then in effect; provided further, however, that no more than $2,000,000 in the aggregate shall be made available or drawn prior to the entry of the Final DIP Order (the "***Interim Availability***"); provided further, however, that an additional $4,200,000 in principal amount (the "***Additional Availability***") shall be made available or drawn following entry of the Final DIP Order upon satisfaction of the DIP Draw Conditions (including for the avoidance of doubt, the condition set forth in Section 4.02(i)); **provided** that, in any case, the aggregate principal amount of borrowings of New Money DIP Loans hereunder shall not exceed the aggregate amount of the Lenders' New Money DIP Loan Commitments then in effect. Proceeds of the New Money DIP Loans, net of payment of any amounts required to be paid to other Persons pursuant to the DIP Draw Conditions, shall be deposited in the DIP Account. Amounts repaid in respect of New Money DIP Loans may not be reborrowed. If, from the date a Borrowing Request is submitted until the date of such Borrowing, an event arises that would require a mandatory prepayment be made pursuant to Section 2.09(b), then, at the option of the Lenders in their sole discretion, the Lenders may net the amount of such prepayment from such Borrowing (subject to the Intercreditor Agreements).

(b) Roll-Up DIP Loan. Immediately on the Final DIP Order Date, the Bridge Loans shall automatically be deemed exchanged for and converted into (without the need for a Borrowing Request) a term loan to the Borrowers hereunder (the "***Roll-Up DIP Loan***") in a principal amount equal to the outstanding principal amount and accrued and unpaid interest of the Bridge Loans as of the Final DIP Order Date and, upon such exchange and conversion, the Bridge Loans shall automatically be deemed fully satisfied. Such exchange and conversion shall not constitute a novation, and such Roll-Up DIP Loan shall constitute Obligations for all purposes hereunder and under the Loan Documents and in the DIP Order. Amounts of the Roll-Up DIP Loan repaid may not be reborrowed. Notwithstanding the Roll-Up, the Secured Promissory Note shall remain in full force and effect with respect to the Monroe Entities and the Elk Grove Entities.

**SECTION 2.02. Requests for Borrowings**. From time to time (but no more than once per calendar week unless otherwise consented to by the Administrative Agent), by delivery to the Administrative Agent and applicable Lender (by e-mail or facsimile) of a Borrowing Request, the Borrowers may request a Borrowing of the New Money DIP Loans consistent with the Approved Budget (subject to variances permitted under Section 5.11(b)). Such Borrowing Request must be received by Administrative Agent and such Lender not later than 1:00 p.m., New York City time, three (3) Business Days before the date of the proposed Borrowing (or such shorter notice as agreed to by the Administrative Agent and such Lender in their sole discretion). Each such Borrowing Request shall be irrevocable and shall be in the form attached hereto as Exhibit 2.02 and signed by a Responsible Officer of the Company on behalf of the Borrowers. Each Borrowing Request shall specify (a) the aggregate amount of the requested Borrowing and (b) the date of such Borrowing, which shall be a Business Day. The execution by the Borrowers of this Agreement shall be deemed to be a request for the Roll-Up DIP Loan on the Final DIP Order Date, and no separate Borrowing Request shall be required for the Borrowing of the Roll-Up DIP Loan.

**SECTION 2.03. Appointment of Borrower Agent**. Each of the Borrowers and the Guarantors (by its execution of the Loan Documents to which it is a party), hereby appoints the Company to act as its agent (in such capacity, the "Borrower Agent") for all purposes of this Agreement and the other Loan Documents and all other documents and electronic platforms entered into in connection herewith and agrees that (a) the Borrower Agent may execute such documents and provide such authorizations on behalf of such Borrower or Guarantor, as applicable, as the Borrower Agent deems appropriate in its sole discretion and each Borrower and each Guarantor shall be obligated by all of the terms of any such document and/or authorization executed on its behalf, (b) any notice or communication delivered by the Administrative Agent or the Lenders to the Borrower Agent shall be deemed delivered to each other Borrower and each Guarantor and (c) the Administrative Agent or the Lenders may accept, and be permitted to rely on, any document,

authorization, instrument or agreement executed by the Borrower Agent on behalf of each other Borrower and each Guarantor.

**SECTION 2.04. [Reserved]**.

**SECTION 2.05. [Reserved].**

**SECTION 2.06. [Reserved].**

**SECTION 2.07. Termination and Reduction of Commitments**.

(a) Unless previously terminated in accordance with the terms hereof, the New Money DIP Loan Commitments shall terminate on the last day of the New Money DIP Loan Availability Period (after giving effect to the Borrowing on such date).

(b) Each of the New Money DIP Loan Commitments shall be reduced on each date on which the applicable New Money DIP Loans are incurred (after giving effect to any Borrowing on such date) in an amount equal to the aggregate principal amount of New Money DIP Loans incurred on such date. For the avoidance of doubt, the payment in kind of the unused line fee contemplated by Section 2.10(a) shall not reduce any New Money DIP Loan Commitments.

(c) In the event Borrowers are offered financing on terms Borrowers reasonably determine in their business judgment are more favorable to Borrowers and result in the payment of all amounts under the New Money DIP Loans then outstanding, the Borrowers shall have the right, without premium or penalty, on any day, permanently to terminate or reduce the New Money DIP Loan Commitments, in whole or in part.

**SECTION 2.08. Repayment of Loans; Evidence of Debt**.

(a) Repayment. Subject to any Intercreditor Agreements, each Borrower, jointly and severally, hereby unconditionally promises to pay the Loans to Administrative Agent for the account of the Lenders, on the Maturity Date or any earlier date of termination of this Agreement or acceleration of the Loans due hereunder in accordance with the terms hereof, the remaining unpaid principal amount of the Loans in cash; **provided**, however, that the Lenders may consent and agree to other treatment in connection with an Acceptable Plan.

(b) Manner of Payment. Notwithstanding anything herein to the contrary (but subject to Section 8.02), each repayment of Loans shall be applied, on a pro rata basis, to the Loans and subject to the Intercreditor Agreements.

(c) Maintenance of Loan Accounts by Lenders and Administrative Agent. Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder. Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder and the Class thereof, (ii) the amount of any principal or interest due and payable or to become due and payable from Borrowers to each Lender hereunder, and (iii) the amount of any sum received by Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d) Effect of Entries. The entries made in the accounts maintained pursuant to Section 2.08(c) shall be conclusive evidence of the existence and amounts of the obligations recorded therein; **provided** that the failure of any Lender or Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of Borrowers to repay the Loans in accordance with the terms of this Agreement. In the event of any conflict between the accounts maintained by any Lender and the accounts of Administrative Agent in respect of such matters, the accounts of Administrative Agent shall control in the absence of manifest error.

**SECTION 2.09. Prepayment of Loans.**

(a) Optional Prepayments. Borrowers shall not have the right to prepay any Loans in whole or in part if prohibited by the Intercreditor Agreements and otherwise without the consent of Firehorse; provided, however, that Borrowers shall have the right, without premium or penalty, to prepay the Loans in full in connection with a refinancing of the Loans.

(b) Mandatory Prepayments. Subject to the Intercreditor Agreements and Section 2.01(a), including any priority to payments thereunder, except as may be otherwise consented to by Firehorse from time to time in writing, Borrowers will prepay the Loans, as follows:

(i) Sale of Assets or Events of Loss. If on any date a Borrower shall receive Net Cash Proceeds from (x) any Disposition (excluding any Ordinary Course Disposition) or (y) any Event of Loss, then, within two (2) Business Days of the date of receipt by a Borrower of such Net Cash Proceeds, the Borrowers shall prepay the Loans in an amount equal to (A) in connection with any Event of Loss, 100% of the amount of such Net Cash Proceeds, (B) in connection with all such Dispositions, 100% of such Net Cash Proceeds, with such prepayment being applied to the Loans as set forth in Section 2.09(c). The provisions of this Section do not constitute consent to the consummation of any Disposition not permitted by Section 6.04.

(ii) Indebtedness Issuance. Without limiting the obligation of Borrowers to obtain the consent of Firehorse pursuant to Section 6.01 to the incurrence of any Indebtedness not otherwise permitted hereunder, upon the incurrence of any Indebtedness (other than Indebtedness permitted under this Agreement), Borrowers shall prepay the Loans in an aggregate amount equal to 100% of the Net Cash Proceeds thereof within two (2) Business Days of receipt thereof, such prepayment to be effected in the manner and to the extent specified in Section 2.09(c).

(c) Application to Loans. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.11 and shall be made in the manner specified in Sections 2.08(b) and 8.02.

(d) Notices, Etc.

(i) One (1) Business Day prior to any prepayment under Section 2.09(b) (or such shorter period as Firehorse may agree in its sole discretion), Borrowers shall deliver to Administrative Agent a certificate signed by a Responsible Officer of Borrowers containing a reasonably detailed calculation of the amount of such prepayment.

(ii) Promptly following receipt of any prepayment notice relating to a Borrowing or such certificate relating to a prepayment, Administrative Agent shall advise the relevant Lenders of the contents thereof and of the amount of such Lender’s portion of such prepayment.

**SECTION 2.10. Fees.**

(a) [Reserved].

(b) Exit Fee. Each Borrower, jointly and severally, agrees to pay to each Lender an exit fee (the “***Exit Fee***”) in an amount equal to 4.00% of the initial aggregate principal amount of such Lender’s New Money DIP Loan Commitments, which Exit Fee shall be fully earned on the Effective Date and due and payable on the Maturity Date. The Exit Fee will be added to the aggregate principal balance of the New Money DIP Loans due upon repayment or prepayment.

(c) Legal Fees and Expenses. Subject to the provisions of the DIP Order, each Borrower, jointly and severally, agrees promptly but in any event within 15 days following receipt of an invoice, to pay all legal fees and expenses of DLA Piper LLP (US), as counsel to Firehorse; **provided** that any invoice delivered to the Borrowers on or before the Effective Date shall be fully earned, due and

payable on the Effective Date and may be paid with the proceeds of the New Money DIP Loans (and the New Money DIP Loans may be net funded on the Effective Date to account for such invoice).

(d) Payment of Fees. All fees payable hereunder shall be paid on the dates due, in immediately available funds in Dollars, to Administrative Agent for distribution, other than in the case of fees payable solely for the account of Administrative Agent, to the Lenders entitled thereto. The fees described in this Section 2.10 shall not be refundable under any circumstances, shall not be creditable against any other fee payable in connection with the Loan Documents or otherwise, and shall constitute Obligations under the Loan Documents. The fees payable hereunder shall be due and payable in full without setoff or counterclaim, in immediately available funds and shall be in addition to reimbursement of Firehorse's out-of-pocket expenses. Notwithstanding the foregoing, the fees hereunder shall be paid in-kind and added to the outstanding principal amount of the Loans, as set forth in this Agreement. All fees payable hereunder shall be paid without deduction for any taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any national, state or local taxing authority, or shall be grossed up by Borrowers for such amounts.

(e) Intercreditor Agreements. All payments pursuant to this Section 2.10 shall be subject to the Intercreditor Agreements.

**SECTION 2.11. Interest**.

(a) Interest Rate. The Loans comprising shall bear interest at a rate per annum equal to 10 %.

(b) Default Interest. Upon and following the occurrence of any Event of Default and for so long as such Event of Default is continuing, in addition to the interest set forth in clause (a) above, Borrowers shall pay interest on the principal amount of all outstanding Loans and, to the fullest extent permitted by law, the outstanding amount of all interest, fees and other Obligations, at a rate per annum equal to the Default Rate.

(c) Payment of Interest. Accrued interest on each Loan shall be added on the last day of each month to the outstanding principal amount of such Loans (and thereafter bear interest at the rate set forth in clauses (a) and (b) above, as applicable); **provided** that upon the occurrence of an Event of Default, the interest set forth in clauses (a) and (b) shall be payable on demand in cash. In the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable in cash on the date of such repayment or prepayment.

(d) Computation. All interest hereunder shall be computed on the basis of a year of 360 days, and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(e) Intercreditor Agreements. All payments pursuant to this Section 2.11 shall be subject to the Intercreditor Agreements.

**SECTION 2.12. Taxes**.

(a) Defined Terms. For purposes of this Section 2.12, the term "applicable law" includes FATCA.

(b) Payments Free of Taxes. Any and all payments by or on account of any obligation of any Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to

additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c) Payment of Other Taxes by the Borrowers. The Borrowers shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d) Indemnification by the Borrowers. The Borrowers shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to Borrowers by a Lender (with a copy to Administrative Agent), or by Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e) Indemnification by the Lenders. Each Lender shall severally indemnify Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Borrower has not already indemnified Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrowers to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.04(e) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by Administrative Agent to the Lender from any other source against any amount due to Administrative Agent under this Section 2.12(e).

(f) Evidence of Payments. As soon as practicable after any payment of Taxes by any Borrower to a Governmental Authority pursuant to this Section 2.12(f), such Borrower shall deliver to Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Administrative Agent.

(g) Status of Lenders.

(i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to Borrowers and Administrative Agent, at the time or times reasonably requested by Borrowers or Administrative Agent, such properly completed and executed documentation reasonably requested by Borrowers or Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by Borrowers or Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrowers or Administrative Agent as will enable Borrowers or Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution, and submission of such documentation (other than such documentation set forth in clauses (A), (B), and (D) of Section 2.12(g)(ii)) shall not be required if in the Lender's reasonable judgment such completion, execution, or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing,

(A) any Lender that is a U.S. Person shall deliver to Borrowers and Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrowers or Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrowers and Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrowers or Administrative Agent), whichever of the following is applicable:

(a) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (1) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (2) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(b) executed originals of IRS Form W-8ECI;

(c) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (1) a certificate substantially in the form attached hereto as Exhibit 2.12-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrowers within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "***U.S. Tax Compliance Certificate***") and (2) executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable; or

(d) to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by any required IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form attached hereto as Exhibit 2.12-2 or Exhibit 2.12-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; **provided** that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form attached hereto as Exhibit 2.12-4 on behalf of each such direct and indirect partner;

(C) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrowers and Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrowers or Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit

Borrowers or Administrative Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrowers and Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by Borrowers or Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrowers or Administrative Agent as may be necessary for Borrowers and Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrowers and Administrative Agent in writing of its legal inability to do so.

(h) Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.12 (including by the payment of additional amounts pursuant to this Section 2.12), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 2.12(h) (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 2.12(h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 2.12(h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 2.12(h) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i) Survival. Each party's obligations under this Section 2.12 shall survive the resignation or replacement of Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the New Money DIP Loan Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(j) Intercreditor Agreements. All payments pursuant to this Section 2.12 shall be subject to the Intercreditor Agreements.

**SECTION 2.13. Payments Generally; Pro Rata Treatment; Sharing of Set-offs**.

(a) Each Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees, under Section 10.03 or otherwise) or under any other Loan Document (except to the extent otherwise provided therein) prior to 11:00 a.m., New York City time, on the date when due, in immediately available funds, without counterclaim, set-off, or other deduction or condition. Any amounts received after such time on any date may, in the discretion of Administrative

Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to Administrative Agent, for the account of the respective Lenders to which such payment is owed, at such account as Administrative Agent may designate to Borrowers in writing from time to time, except (i) as otherwise expressly provided in the relevant Loan Document, (ii) that payments pursuant to Section 10.03 shall be made directly to the Persons entitled thereto and (iii) as expressly consented to by the Administrative Agent in writing. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof in like funds as received by wire transfer to such Lender's lending office as specified in its Administrative Questionnaire or such other office as notified in writing by such Lender to Administrative Agent. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder or under any other Loan Document shall be made in Dollars.

(b) Application of Insufficient Payments. If at any time insufficient funds are received by and available to Administrative Agent to pay fully all amounts of principal, interest, fees and expenses then due hereunder, then funds shall be applied in accordance with Section 8.02.

(c) Pro Rata Treatment. Except to the extent otherwise provided herein as of the date of this Agreement: (i) each Borrowing of Loans (including any deemed Borrowing of the Roll-Up DIP Loan on the Final DIP Order Date) in a particular Class shall be allocated pro rata among the relevant Lenders according to the amounts of their respective New Money DIP Loan Commitments of such Class (in the case of the making of New Money DIP Loans); (ii) each payment or prepayment of principal of Loans of any Class by Borrowers, shall be made for account of the relevant Lenders pro rata in accordance with the respective unpaid principal amounts of the Loans of such Class held by them; and (iii) each payment of interest on Loans of any Class by Borrowers shall be made for account of the relevant Lenders pro rata in accordance with the amounts of interest on the Loans of such Class then due and payable to the respective Lenders.

(d) Sharing of Payments by Lenders. If any Lender shall obtain payment in respect of any principal of or interest on any of its Loans not in accordance with the priority of payments set forth herein or in excess of its ratable share of the aggregate amount of outstanding Loans of the applicable Class and accrued interest thereon, then such Lender shall notify Administrative Agent of such fact and remit such excess payment to the Administrative Agent within two (2) Business Days.

(e) Presumptions of Payment. Unless Administrative Agent shall have received notice from Borrowers prior to the date on which any payment is due to Administrative Agent for the account of the Lenders that Borrowers will not make such payment, Administrative Agent may assume that Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption but without any obligation to do so, distribute to the Lenders the amount due. In such event, if Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to Administrative Agent at the greater of the Federal Funds Effective Rate and a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation. A notice of Administrative Agent to any Lender or Borrowers with respect to any amount owing under this Section 2.13(e) shall be conclusive, absent manifest error.

(f) Certain Deductions by Administrative Agent. If any Lender shall fail to make any payment required to be made by it pursuant to this Agreement, then Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

(g) Return of Proceeds. If at any time payment, in whole or in part, of any amount distributed by Administrative Agent hereunder is rescinded or must otherwise be restored or returned by Administrative Agent as a preference, fraudulent conveyance, or otherwise under any Debtor Relief Law, then each Person receiving any portion of such amount agrees, upon demand, to return the portion of such amount it has received to Administrative Agent together with a pro rata portion of any interest paid by or other charges imposed on Administrative Agent in connection with such rescinded or restored payment.

## ARTICLE III **REPRESENTATIONS AND WARRANTIES**

The Borrowers represent and warrant (with each representation and warranty being deemed in effect after giving effect to the Transactions and subject to the Bankruptcy Events and Circumstances) to Administrative Agent and the Lenders that on the Effective Date, on each Draw Date and on such other dates as such representations and warranties are required to be made:

**SECTION 3.01. Name, Organization and Qualification to do Business**. Each of the Loan Parties is (a) a limited liability company, corporation or limited partnership, as applicable, duly formed, validly existing, and in good standing, under the laws of the jurisdiction of its organization and (ii) qualified to do business in each jurisdiction where such qualification is necessary, except where the applicable Loan Party's failure to qualify to do business would not, individually or in the aggregate, have a Material Adverse Effect. Such Loan Party's name set forth on the signature page to this Agreement is the Loan Party's correct and complete legal name. Such Loan Party's mailing address as set forth in Section 10.01 is such Loan Party's mailing address.

**SECTION 3.02. Power and Authority**. Each Loan Party has the corporate, limited liability company, limited partnership or trust power and authority to execute, deliver and perform this Agreement and each other Loan Document to which it is or will be a party. The Loan Parties' execution, delivery and performance of this Agreement, and each Loan Document to which it is or will be a party, have been duly authorized by all requisite corporate, limited liability company, limited partnership or trust action on the part of such Loan Party.

**SECTION 3.03. Execution, Delivery and Enforceability**. This Agreement has been duly and validly executed and delivered by each of the Loan Parties and constitutes the Loan Parties' legal, valid and binding obligation, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting the rights of creditors generally and the exercise of judicial discretion in accordance with general principles of equity.

**SECTION 3.04. No Conflicts**. The execution, delivery and performance of this Agreement and any Loan Documents by the Loan Parties, and the Loan Parties' incurrence of the indebtedness and other Obligations evidenced by this Agreement or by any Loan Document, do not and will not (i) contravene any of the Loan Parties' Organizational Documents, (ii) contravene, be in conflict with, result in a breach of, or constitute (with due notice or lapse of time or both, as applicable) a default under, any indenture, agreement or other instrument binding upon each of the Loan Parties or any of the Loan Parties' Property (other than with respect to the Prepetition Senior Secured Obligations), (iii) result in the creation or imposition of any security interest, lien or encumbrance upon any of the Loan Parties' Property for the benefit or security of any obligation or Person, excepting any security interests, liens or encumbrances created or imposed solely for the benefit and security of the Administrative Agent, or (iv) contravene any provision of law or any order of any court or other agency of government.

**SECTION 3.05. Compliance with Applicable Laws**. Each Loan Party and its Subsidiary are in compliance with all Applicable Laws, except where failure to comply would not, individually or in the aggregate, have a Material Adverse Effect.

**SECTION 3.06. Investment Company Status**. No Loan Party is an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

**SECTION 3.07. OFAC**. No Loan Party is, and to the knowledge of the Loan Party, no director, officer, employee, agent or other Person acting on behalf of the Loan Party is, an individual or entity that is, or that is owned or controlled by Persons that are: (i) the subject or target of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("***OFAC***"), the U.S. Department of State, the United Nations Security Council, the European Union, His Majesty's Treasury of the United Kingdom, or other relevant sanctions authority (collectively, "***Sanctions***"); or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions including, without limitation, Cuba, Iran, North Korea, Sudan, Syria, and the Crimea Region of the Ukraine.

**SECTION 3.08. USA PATRIOT Act**. No Loan Party is a Person (i) described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or in Section 1 of Executive Order 13224 signed on September 23, 2001, as amended, or (ii) that engages in any dealings or transactions with any such Person.

**SECTION 3.09. Margin Stock**. No Loan Party nor any of its Subsidiaries is engaged in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying Margin Stock, and no amount of the proceeds of any Loan has been used, and no amount thereof will be used, to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock.

**SECTION 3.10. Security and Priority**.

(a) Subject to the entry and the terms of the Interim DIP Order (and the Final DIP Order, when applicable), all of the Obligations of each Loan Party are authorized by each DIP Order and shall at all times be subject to the Intercreditor Agreements and:

(i) pursuant to section 364(c)(1) of the Bankruptcy Code, constitute joint and several allowed superpriority administrative expense claims against the Borrowers (without the need to file any proof of claim) with priority over any and all other administrative expenses and all other unsecured claims asserted against any Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 363, 364, 365, 503, 506(b), 506(c) (subject to the entry of the Final DIP Order), 507(a), 507(b), 507(d), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "***DIP Super-Priority Claims***") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Super-Priority Claims shall be payable from and have recourse to all pre- and post-petition assets and property, whether existing on the Petition Date or thereafter acquired, of the Loan Parties and all proceeds thereof (including, subject to entry of the Final DIP Order, the Avoidance Actions and Other Estate Actions); provided, however, such DIP Super-Priority Claims shall be junior and subordinate to and subject to prior payment in full, in cash, of (x) the Carve-Out and (y) the Prepetition Senior Secured Obligations and any adequate protection and superpriority administrative expense claims granted to the Prepetition Senior Secured Parties to the extent provided under the DIP Order or other order entered by Bankruptcy Court. The DIP Super-Priority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim DIP Order (or, after entry thereof, the Final DIP Order) or any provision thereof is vacated, reversed, amended or otherwise modified, on appeal or otherwise;

(ii) pursuant to section 364(c)(2) of the Bankruptcy Code and the Security Documents, be secured by a valid, binding, perfected, continuing, enforceable, non-avoidable first priority security interest in and Lien on the Collateral of each Loan Party to the extent such Collateral is not subject to valid, enforceable, perfected and non-avoidable Liens as of the Petition Date, including, the Avoidance Actions Proceeds (subject to entry of the Final DIP Order), any proceeds of the Loans, and any accounts holding such proceeds of the Loans, which Obligations shall be secured by first

priority Liens and security interests, senior to all other Liens on such Collateral; **provided** that the Liens set forth in this paragraph shall be subject and subordinate to the Carve-Out and to any adequate protection liens granted to the Prepetition Senior Secured Parties to the extent provided under the DIP Order or other order entered by Bankruptcy Court; and

(iii) pursuant to section 364(c)(3) of the Bankruptcy Code and the Security Documents, also be secured by a valid, binding, perfected, continuing, enforceable, non-avoidable security interest and Lien on all other Collateral of each Loan Party (i.e., Collateral other than Collateral described in Section 3.10(a)(ii) above), which security interests and Liens on such Collateral shall in each case be junior only to any valid, binding, enforceable, perfected and unavoidable Liens in favor of third parties that were (x) in existence immediately prior to the Petition Date, including the Prepetition Senior Secured Obligations, and not subject to subordination to the New Money DIP Loans pursuant to any Intercreditor Agreement, or (y) perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; provided that the Lien set forth in this paragraph shall also be subject and subordinate to the Carve-Out and to any adequate protection liens granted to the Prepetition Senior Secured Parties to the extent provided under the DIP Order or other order entered by Bankruptcy Court.

(b) Upon (and at all times after) the entry, and subject to the terms, of each of the Interim DIP Order and the Final DIP Order, each such DIP Order is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid, enforceable and perfected security interest in the Collateral and proceeds thereof, without any further action being required by the Administrative Agent or any Lender.

(c) Upon (and at all times after) the entry, and subject to the terms, of each of the Interim DIP Order and the Final DIP Order, each such DIP Order and the Loan Documents is sufficient to provide the DIP Super-Priority Claims and security interests in and Liens on the Collateral described in, and with the priority provided in, Section 3.10(a) and the DIP Order, without any further action being required by the Administrative Agent.

**SECTION 3.11. DIP Order**. (a) From and after the Petition Date, the Loan Parties and their Subsidiaries, as applicable, are in compliance in all material respects with the terms and conditions of the Interim DIP Order or the Final DIP Order, as applicable.

(b) From and after the Interim DIP Order Date until the Final DIP Order Date, the Interim DIP Order, or at all times after the Final DIP Order Date, the Final DIP Order, is in full force and effect and has not been vacated, reversed, terminated, rescinded, or materially modified or amended without the prior written consent of Firehorse.

(c) From and after the Petition Date, no appeal or motion for reconsideration of the DIP Order shall have been filed, or, if the DIP Order is the subject of a pending appeal or motion for reconsideration in any respect, none of such order, the making of the Loans or the performance by any Loan Party of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal or reconsideration. The Loan Parties, the Administrative Agent and the Lenders shall be entitled to rely in good faith upon the DIP Order, notwithstanding objection thereto or appeal therefrom by any interested party. The Loan Parties, the Administrative Agent and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant DIP Order has been stayed by a court of competent jurisdiction.

**SECTION 3.12. Bankruptcy Cases**. (a) The Bankruptcy Cases were commenced on the Petition Date in accordance with applicable laws and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim DIP Order and Final DIP Order, (ii) the hearing for the entry of the Interim DIP Order and (iii) following the entry of the Interim DIP Order, the hearing for entry of the Final DIP Order. The Borrowers shall give, on a timely basis as specified in the Interim DIP Order or the Final DIP Order, as applicable, all notices required to be given under the Bankruptcy Code, the

Federal Rules of Bankruptcy Procedure, and Local Rules for the United States Bankruptcy Court for the Northern District of Illinois, and as specified in the Interim DIP Order or Final DIP Order, as applicable.

(b) No order has been entered in any of the Bankruptcy Cases (i) for the appointment of a Chapter 11 trustee, (ii) for the appointment of an examiner (other than a fee examiner) or receiver having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code or (iii) to convert any of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code or to dismiss any of the Bankruptcy Cases.

**SECTION 3.13. Approved Budget**. The initial Approved Budget attached hereto as Exhibit 3.13 and each subsequent Approved Budget delivered in accordance with Section 5.11 has been prepared in good faith, with due care and based upon assumptions the Borrowers believe to be reasonable assumptions on the date of delivery of the then-applicable Approved Budget. To the knowledge of the Borrowers, no facts exist that (individually or in the aggregate) could reasonably be expected to result in any material change in the Approved Budget, other than those disclosed to Firehorse.

## ARTICLE IV **CONDITIONS PRECEDENT.**

**SECTION 4.01. Effective Date**. The obligations of the Lenders to make the applicable Loans from time to time after the Effective Date is subject to the satisfaction (or waiver in writing) by Firehorse of the following conditions (the "***DIP Draw Conditions***") on or prior to such date (each such date, a "***DIP Draw Date***"):

(a) Executed Counterparts. From each party thereto, a counterpart of this Agreement and the other Loan Documents to be executed and delivered as of the Effective Date, signed and delivered on behalf of such party.

(b) Corporate Documents. Such documents and certificates as Firehorse may reasonably request relating to the organization, existence and good standing of each Loan Party, the authorization of the Transactions, the identity, authority and capacity of each Responsible Officer authorized to act on behalf of a Loan Party in connection with the Loan Documents and any other legal matters relating to the Loan Parties, this Agreement, the other Loan Documents or the Transactions.

(c) Security Documents. The DIP Order, upon entry thereof and subject to the terms thereof, and any other Security Documents shall be effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid, enforceable, perfected and unavoidable Liens on and security interests in the Collateral as set forth in Section 3.10 and the DIP Order, and subject in all respects to Section 10.25. The Loan Parties shall have delivered UCC financing statements required by law or reasonably requested by the Administrative Agent to be filed, registered or recorded to create or perfect the Liens intended to be created hereunder and/or the DIP Order, in suitable form for filing.

(d) Representations and Warranties. The representations and warranties of each Loan Party set forth in this Agreement and the other Loan Documents to which it is a party shall be true and correct in all material respects (unless any such representation or warranty is qualified as to materiality or Material Adverse Effect, in which case such representation and warranty shall be true and correct in all respects) on and as of the Effective Date, both before and immediately after giving effect to the Transactions and the Borrowings on such date, except the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (unless any such representation or warranty is qualified as to materiality or Material Adverse Effect, in which case such representation and warranty shall be true and correct in all respects) as of such earlier date.

(e) No Default. No Default shall have occurred and be continuing nor shall any Default arise from the making of the Loans hereunder.

(f) Officer's Certificate. A certificate of a Responsible Officer of each Loan Party, dated the Effective Date, certifying (i) either (x) all authorizations or approvals of any Governmental Authority and approvals or consents of any other Person, required in connection with the Transactions shall have been obtained, or (y) that no such authorizations, approvals, and consents are so required, and (ii) compliance with the conditions set forth in clauses (d) and (e) of this Section 4.01.

(g) Fees. Evidence that Borrowers shall have paid (or shall pay substantially concurrently with the funding of the initial Borrowings under this Agreement on the Effective Date) all accrued fees and expenses that are required to be paid on the Effective Date under Section 2.10, including, without limitation, fees and expenses of DLA Piper LLP (US).

(h) Approved Budget. Firehorse shall have received a copy of the Approved Budget, certified by a Responsible Officer of the Borrowers, and in form and substance satisfactory to Firehorse.

(i) Other Documents. Such other assurances, certificates, documents, consents, or opinions as Firehorse may reasonably request.

**SECTION 4.02. Conditions to each Borrowing Request**. The right of the Borrowers to make a Borrowing Request in accordance with Section 2.02 is subject to satisfaction of the following conditions precedent prior to or substantially concurrently with the applicable Borrowing:

(a) The Administrative Agent shall have received a fully executed Borrowing Request in accordance with Section 2.02.

(b) The Loan Documents shall be in full force and effect, as certified by a Responsible Officer of the Borrowers in the applicable Borrowing Request.

(c) The Interim DIP Order or, after entry thereof, the Final DIP Order, shall be in full force and effect, and shall not have been (i) vacated, reversed, stayed or terminated, or (ii) except as expressly permitted by the Loan Documents, amended or modified in any manner without the consent of Firehorse.

(d) There shall not have occurred a Material Adverse Effect since the Effective Date.

(e) Unless the funding of such Borrowing is made pursuant to Section 4.02(f): (i) the representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct in all material respects both before and immediately after giving effect to the incurrence of such Borrowing with the same effect as though such representations and warranties had been made on such date (or, with respect to any representation or warranty that is itself modified or qualified by materiality or a "Material Adverse Effect" standard, such representation or warranty shall be true and correct in all respects), except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date (or, with respect to any representation or warranty that is itself modified or qualified by materiality or a "Material Adverse Effect" standard, such representation or warranty shall be true and correct in all respects as of such earlier date)); (ii) at the time of, and immediately after, the funding of the applicable Loan contemplated by such Borrowing Request, no Event of Default shall have occurred and be continuing or would result therefrom; (iii) at the time of, and immediately after, the funding of the applicable Loan contemplated by such Borrowing Request and immediately after giving pro forma effect to the contemplated use and application of the proceeds of such funding in accordance with the Approved Budget, the Borrowers shall be in pro forma compliance with the covenant set forth in Section 5.11(b); and (iv) the amount of the Loan proceeds contemplated by such Borrowing Request shall not exceed 100% of the projected "DIP Budget" as set forth in the Approved Budget (subject to variances permitted under Section 5.11(b)) (A) with respect to the initial draw, for the period from the Effective Date until the Final DIP Order Date and (B) thereafter, the one (1) week period immediately following the week in which the requested Borrowing occurs.

(f) Firehorse shall have determined in its commercial business judgment that such funding is necessary or desirable (1) to preserve or protect the Collateral, or any portion thereof, or (2) to enhance the likelihood of repayment of the Obligations.

(g) The Borrowers shall have filed the Bankruptcy Cases in the Bankruptcy Court, and:

(i) with respect to the Interim Availability, the Interim DIP Order shall have been entered by the Bankruptcy Court at least one (1) Business Day prior to or by 1:00 pm (New York time) on the initial DIP Draw Date (or such later time as agreed by Firehorse) and shall be in full force and effect and shall not have been (i) stayed, vacated, reversed or rescinded, and any appeal of such order shall not have been timely filed and a stay of such order pending appeal shall not be presently effective or (ii) without the prior written consent of Firehorse in its discretion, materially revised, amended or modified and the Loan Parties shall be in compliance in all respects with the Interim DIP Order;

(ii) the Cash Management Order and all other "first day orders" or other orders to be entered on or prior to the initial DIP Draw Date, including all payments approved by the Bankruptcy Court in any such orders, shall be reasonably satisfactory in form and substance to Firehorse, shall have been entered by the Bankruptcy Court pursuant to orders reasonably acceptable to Firehorse, and shall not have been (i) stayed, vacated, reversed or rescinded or (ii) without the prior written consent of Firehorse, revised, amended or modified; and

(iii) with respect to any Loans in excess of the Interim Availability, the Final DIP Order shall have been entered by the Bankruptcy Court at least two (2) Business Days prior to such DIP Draw Date, and shall not have been vacated, reversed or stayed, appealed, or materially modified or amended without the prior written consent of Firehorse;

(h) the Borrowers shall be in compliance in all respects with the applicable Milestones that have occurred to date; and

(i) in the event the Borrowers request to draw New Money DIP Loans made available under the Additional Availability, in addition to satisfaction of the other DIP Draw Conditions set forth herein, Firehorse shall have received (i) a revised Approved Budget acceptable to in its sole discretion at least two (2) Business Days prior to such DIP Draw Date and (ii) a Borrowing Request in accordance with the requirements of this Agreement requesting Loans in accordance with such Approved Budget.

## ARTICLE V **AFFIRMATIVE COVENANTS**

So long as any New Money DIP Loan Commitment is outstanding and thereafter until all Obligations are Fully Satisfied, each Borrower covenants and agrees with Administrative Agent and the Lenders that:

**SECTION 5.01. Financial Statements and Other Information**. Borrowers will furnish to Administrative Agent (for distribution to each Lender):

(a) by no later than the date which occurs 30 days after the end of each fiscal month of the Company and its Subsidiaries, beginning with the fiscal month ending September 30, 2026, a certificate in substantially the form attached hereto as Exhibit 5.01 of a Responsible Officer of Borrowers (a "***Compliance Certificate***") (i) certifying as to (x) whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto and (y) that Borrowers are in compliance with the covenants contained in Section 5.11(b);

(b) by no later than 5:00 p.m. (New York City time) on Thursday of each calendar week occurring after the Effective Date, an Approved Budget Variance Report (which such delivery under this clause (b) may, unless the Administrative Agent requests executed originals, be by electronic

communication including fax or email and shall be deemed to be an original authentic counterpart thereof for all purposes);

(c) not later than two (2) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of all notices, written requests and other documents (including amendments, waivers and other modifications) regarding or related to any breach or default by any party to any Material Indebtedness or any other event relating to Material Indebtedness that could reasonably be expected to have a Material Adverse Effect;

(d) promptly after any request by Administrative Agent or any Lender (through Administrative Agent), certificates of Loan Parties' insurance brokers, evidencing all insurance required by Section 5.05 and showing Administrative Agent is named as lender's loss payee and additional insured with respect thereto;

(e) from and after the Petition Date, as soon as reasonably practicable, but in no event later than two (2) Business Days, in advance of filing, copies of all material pleadings, motions and applications to be filed by any of the Loan Parties in the Bankruptcy Cases;

(f) promptly upon the reasonable request of the Administrative Agent, an accounting of all monies deposited in, and the balances in, the Deposit Accounts of the Loan Parties; and

(g) promptly following any request therefor, such other information and reports regarding each Loan Party or any of its Subsidiaries, or compliance with the terms of this Agreement and the other Loan Documents, as Administrative Agent or any Lender (through Administrative Agent) may reasonably request.

**SECTION 5.02. Notices of Material Events**. Each Borrower will furnish to Administrative Agent and each Lender written notice of the following, within one (1) day after a Responsible Officer of any Loan Parties has obtained knowledge thereof:

(a) the occurrence of any Default;

(b) filing or commencement of, or any material development in, any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting any Loan Parties or any of its respective Subsidiaries;

(c) (i) the occurrence of any ERISA Event or (ii) any Loan Parties or any ERISA Affiliate (A) establishing, commencing contributions to, or becoming obligated to contribute to, any Specified Plan (or any plan that would be a Specified Plan if such action had been take prior to the date hereof) or (B) commencing contributions to, or becoming obligated to contribute to, a Multiemployer Plan (or any plan that would be a Multiemployer Plan if such action had been take prior to the date hereof);

(d) the assertion of any claim pursuant to applicable Environmental Law, including alleged violations of or non-compliance with permits, licenses or other authorizations issued pursuant to applicable Environmental Law, by any Person against, or with respect to the activities of, any Loan Party or any of its respective Subsidiaries;

(e) the occurrence of any Event of Loss with respect to the property or assets of any Loan Party aggregating $250,000 or more;

(f) any change in accounting policies or financial reporting practices by any Loan Party or any of its Subsidiaries other than any such change required by GAAP;

(g) any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect; and

(h) any communications of any Loan Party with: (A) any vendor or supplier of a Loan Party regarding any change in the terms of services provided by such vendor or supplier to any

Loan Party, (B) any creditor or purported creditor of any Loan Party (including any Prepetition Senior Secured Party) relating to the Bankruptcy Cases and/or any claims such Person may assert thereunder, and (C) any Person other than Firehorse regarding an alternative plan to the Plan or potential sale process in the Bankruptcy Cases.

Each notice delivered under this Section shall be accompanied by a statement of a Responsible Officer of Borrowers setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

**SECTION 5.03. Existence; Conduct of Business**. Each Borrower shall, and shall cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03 or dispositions under Section 6.04.

**SECTION 5.04. Payment of Obligations**. To the extent provided for in the Approved Budget, each Borrower shall, and shall cause each of its Subsidiaries to, pay its Tax liabilities, governmental charges and levies before the same shall become delinquent for a period of more than thirty (30) days or which are delinquent for a period of more than thirty (30) days and (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

**SECTION 5.05. Maintenance of Properties; Insurance**. Each Borrower shall, and shall cause each of its Subsidiaries to, (a) maintain all tangible property material to the conduct of its business in good working order and condition, ordinary wear, tear, casualty, condemnation and dispositions permitted under Section 6.04 excepted, and (b) maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by similarly sized companies engaged in the same or similar businesses operating in the same or similar locations including any flood insurance. Borrowers will furnish to Administrative Agent, upon request of Administrative Agent, information in reasonable detail as to the insurance so maintained. Subject to Section 5.16, each general liability insurance policy shall name Administrative Agent as additional insured. Subject to the terms of any Intercreditor Agreements and Section 5.16, each insurance policy covering Collateral shall name Administrative Agent as lender's loss payee and shall provide that such policy will not be cancelled without 30 days (10 days solely with respect to cancellation for nonpayment of premium) (or such shorter period as reasonably acceptable to Firehorse) prior written notice to Administrative Agent. Each Borrower shall use commercially reasonable efforts to cause each insurance policy covering Collateral to provide for 30 days written notice to Administrative Agent prior to any material changes to such policy.

**SECTION 5.06. Books and Records; Inspection Rights**.

(a) Each Borrower shall, and shall cause each of its Subsidiaries to, keep proper books of record and account in which full, true, and correct entries in accordance with GAAP are made of all dealings and transactions in relation to its business and activities. Each Borrower will, and will cause each of its Subsidiaries to, permit any representatives (including consultants, auditors, accountants and advisors) designated by Firehorse, upon reasonable prior notice if no Event of Default then exists during normal business hours, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its employees (**provided** an authorized representative of Borrowers shall be allowed, but not required, to be present during such discussion), independent accountants, or officers, all at such reasonable times and as often as reasonably requested. Each Borrower will, and will cause each of its Subsidiaries to, permit any representatives designated by Firehorse (including any consultants, accountants, collateral auditors and appraisers) to conduct inspections, audits, verifications, and appraisals of the Collateral at such times and intervals as reasonably designated by Firehorse.

(b) Borrowers shall, upon the request of Firehorse, hold a conference call once each Fiscal Quarter to which Firehorse shall be invited, in each case at such time as may be agreed to by Borrowers and Firehorse.

**SECTION 5.07. Compliance with Laws**. Each Borrower shall, and shall cause each of its Subsidiaries to, comply with all laws, rules, regulations, and orders of any Governmental Authority applicable to it or its property (including, from and after the Petition Date, without limitation, the Bankruptcy Code, the DIP Order and any other order of the Bankruptcy Court), except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. Borrowers will maintain in effect internal controls, policies and procedures reasonably designed to promote compliance by the Borrowers, their Subsidiaries and their respective directors, officers, employees and agents with applicable Anti-Terrorism Laws, Anti-Corruption Laws and Sanctions.

**SECTION 5.08. Certain Obligations Respecting Subsidiaries**. As set forth in Section 6.03, the Borrowers shall not have, form or acquire any Subsidiaries (other than the Subsidiaries as in effect on the Effective Date). However, if any new Subsidiary is so formed or acquired in contravention of the foregoing, Borrowers shall take such action, and shall cause each such new Subsidiary to take such action, from time to time as shall be necessary to ensure that all such new Subsidiaries are "Subsidiary Guarantors" hereunder. Without limiting the generality of the foregoing, in the event that Borrowers or any of their Subsidiaries shall form or acquire any new Subsidiary, Borrowers shall, and shall cause each of their Subsidiaries to, within 5 days (or such longer period as Firehorse may agree) after such formation or acquisition, take the following actions:

(a) such Subsidiary will become, at Firehorse's option, (i) a "Borrower" hereunder by executing and delivering a joinder hereto in form and substance satisfactory to Firehorse or (ii) a "Subsidiary Guarantor" under a Guaranty Agreement by executing and delivering a Guaranty Agreement (or joinder thereto) and executing a security agreement (or joinder thereto) in form and substance satisfactory to Firehorse;

(b) subject to the Intercreditor Agreements, Borrowers shall cause such Subsidiary (or any Guarantor that is the owner of the shares or other Equity Interests of such Subsidiary, as applicable) to take such action (including delivering certificates evidencing such Equity Interests, delivering such Uniform Commercial Code financing statements, and executing and delivering security agreements for filing and recording in the United States Patent and Trademark Office and the United States Copyright Office) as shall be necessary or advisable in the opinion of Administrative Agent, and in form and substance reasonably satisfactory to Firehorse, to create and perfect valid and enforceable first-priority Liens, subject to no other Liens except for Permitted Encumbrances, on the Collateral of such Subsidiary and all of the Equity Interests in such Subsidiary to the extent consisting Collateral as collateral security for the Obligations; and

(c) Borrowers shall cause such Subsidiary to deliver such proof of corporate action, incumbency of officers, customary opinions of counsel, "Know your customer" information and other documents as is consistent with those delivered by each Borrower pursuant to Section 4.01 on the Effective Date, in each case, as Firehorse shall have reasonably requested.

**SECTION 5.09. Further Assurances**.

(a) General Further Assurances. Subject to the terms of the Security Documents and the DIP Order, Borrowers shall, and shall cause each Guarantor to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), which Firehorse may reasonably request, to effectuate the transactions contemplated by the Loan Documents or, to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents and DIP Orders or the validity or priority of any such Lien, all at the expense of Borrowers.

(b) Real Property. Borrowers shall, no later than 30 days after the acquisition of any owned real property (or such longer period as Firehorse shall agree to in writing in its sole discretion), cause such owned real property to be subjected to a Lien securing the Obligations and shall take, and cause the other Loan Parties to take, such actions as are necessary or reasonably requested by Firehorse to grant and perfect such Liens and deliver such other documents (including the delivery of such mortgages, title insurance commitments, exception documents, surveys, flood hazard determination certificates (and related Borrower notices), evidence of flood insurance (if applicable), environmental indemnity agreements, environmental assessments, opinions of counsel and other documents, in each case, as may be requested by Administrative Agent), all at the expense of the Borrowers.

(c) Further Assurances Following Division of a Loan Party. Subject to the terms of the Security Documents and the DIP Order, Borrowers shall cause each Subsidiary resulting from a division of a Loan Party to execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), which may be required under any applicable law, or which Firehorse may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of Borrowers.

**SECTION 5.10. [Reserved]**.

**SECTION 5.11. Approved Budget**.

(a) The use of Loans and other credit extensions by Borrowers under this Agreement and the other Loan Documents shall be consistent with the Approved Budget (subject to variances permitted under Section 5.11(b)). The initial Approved Budget shall be in the form attached hereto as Exhibit 3.13 for the first thirteen (13) week period from the Effective Date, and such initial Approved Budget shall be approved by, and in form and substance reasonably satisfactory to Firehorse (it being acknowledged and agreed that the initial Approved Budget attached hereto as Exhibit 3.13 is approved by and reasonably satisfactory to Firehorse). Following the Effective Date, the Borrowers shall deliver an updated budget to Firehorse on the Thursday of every fourth calendar week thereafter. Any amendments, supplements, or modifications to the Approved Budget and any updated budgets shall be subject to the prior written approval of Firehorse prior to the implementation thereof; **provided** that in the event Firehorse on the one hand, and the Borrowers, on the other hand, cannot agree as to an updated, modified or supplemented budget, the prior Approved Budget shall continue in effect, with weekly details for any periods after the initial 13-week period to be derived in a manner reasonably satisfactory to Firehorse from the cash flow forecasts prepared by Borrowers; **provided**, **further**, that if an updated cash flow forecast is not approved by Firehorse, the most recently Approved Budget cash flow forecast shall remain the Approved Budget (but, for the avoidance of doubt, shall not satisfy the condition set forth in Section 4.02(i)). Each Approved Budget delivered to Firehorse shall be accompanied by such supporting documentation as reasonably requested by Firehorse. Each Approved Budget shall be prepared in good faith, with reasonable due care and based upon assumptions which the Borrowers believe to be reasonable at the time of delivery thereof. To the extent any such updated Approved Budget is approved pursuant to this Section 5.11(a), the line item amounts set forth therein shall be used to calculate the projected line items commencing with the week in which such updated Approved Budget is approved by Firehorse, as applicable and for subsequent weeks set forth therein, and any prior weeks tested as part of any then applicable Budget Period shall be calculated using the projected line items set forth in the previously Approved Budget in which such prior weeks were first forecasted.

(b) Commencing with the period from the Effective Date through the first Friday thereafter and each weekly period ended on a Friday thereafter, Borrowers shall not permit any of (A) cash receipts or (B) aggregate cash disbursements (excluding lender fees) for such period to vary by more than 10% from the Approved Budget for the applicable period set forth in the definition of "Approved Budget Variance Report"; **provided**, that nothing contained in any Approved Budget shall be construed as a limitation on the allowance of professional fees thereof in Bankruptcy Cases, **provided,**

PRIVATE & CONFIDENTIAL
SUBJECT TO FRE 408 & ITS EQUIVALENTS

**further, however**, that allowance of fees in excess of the budgeted amount shall not alter or increase the DIP Lenders' funding obligations which, as provided above, are limited to the Approved Budget subject to all other terms and conditions herein.

(c) The Administrative Agent and the Lenders (i) may assume that the Borrowers will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral or otherwise) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget. The line items in the Approved Budget for payment of interest, expenses and other amounts to the Administrative Agent and the Lenders are estimates only, and Borrowers remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable DIP Order regardless of whether such amounts exceed such estimates. Nothing in any Approved Budget shall constitute an amendment or other modification of any Loan Document or any of the borrowing restrictions or other lending limits set forth therein.

**SECTION 5.12. Agreement to Deliver Security Documents**. Subject to the terms, conditions and limitation of the Loan Documents, the Borrowers shall (a) cause all of the Collateral (including, without limitation, all owned and leased real and personal property and assets of each Loan Party) to be subject at all times to senior priority, perfected Liens (subject to Permitted Encumbrances) in favor of the Administrative Agent to secure the Obligations pursuant to the terms and conditions, and subject to the priorities, set forth herein and (x) in the Intercreditor Agreements and (y) in the Interim DIP Order and the Final DIP Order, as applicable, and (b) deliver, to the extent reasonably requested by Firehorse, security agreements, pledge agreements, recordations, filings, documents, mortgages, deeds of trust and other agreements and appropriate UCC-1 financing statements, in each case as expressly required by the terms of this Agreement and the Security Documents, in form and substance reasonably satisfactory to Firehorse.

**SECTION 5.13. Milestones**. The Borrowers shall ensure that each of the milestones set forth below (collectively, the "***Milestones***") is achieved in accordance with the applicable timing referred to below (or by such later time as approved in writing by Firehorse):

(a) By no later than September 24, 2026, the Bankruptcy Court shall have entered the Interim DIP Order and the Borrowers shall have filed a motion (in form and substance satisfactory to Firehorse) requesting an order from the Bankruptcy Court approving (x) bid procedures relating to the solicitations of qualified bids for a 363 Sale ("***Bidding Procedures***") and (y) a 363 Sale;

(b) By no later than October 21, 2026, the Bankruptcy Court shall have entered Final DIP Order and an order approving the Bidding Procedures in form and substance satisfactory to Firehorse;

(c) By no later than October 21, 2026, (x) $1,000,000 in Net Cash Proceeds shall have been deposited into the DIP Account and (y) either (i) an additional $1,000,000 in Net Cash Proceeds shall have been deposited into the DIP Account or (ii) one or more of the Borrowers shall have entered into one or more fully committed and enforceable asset purchase agreements with qualified and financially capable buyers without any contingencies, the consummation of which, in Firehorse's sole discretion, will result in the payment of additional Net Cash Proceeds in excess of $1,000,000;

(d) By no later than October 30, 2026, one or more of the Borrowers shall have entered into one or more fully committed and enforceable asset purchase agreements with qualified and financially capable buyers without any contingencies, the consummation of which, in Firehorse's sole discretion, will result in the payment of Net Cash Proceeds in excess of $2,000,000; and

(e) By no later than November 30, 2026, an additional $2,000,000 in Net Cash Proceeds shall have been deposited into the DIP Account.

**SECTION 5.14. Weekly Meetings**. The Borrowers shall ensure that, upon Firehorse's request, their advisors shall conduct and participate in weekly status calls or meetings with Firehorse (and its advisors) no earlier than 2:00 p.m. New York City time on Thursday of any calendar week to discuss (i)

the Approved Budget or the Approved Budget Variance Reports and/or any other reports or information delivered pursuant to Section 5.01 or Section 5.11 or otherwise, (ii) the financial operations and performance of the Loan Parties' business, and (iii) such other matters relating to the Loan Parties as Firehorse (or its agents or advisors) shall reasonably request (subject to limitations on confidentiality arrangements and/or to protect attorney-client privilege).

**SECTION 5.15. Deposit Accounts**. If the Loan Parties shall elect to close any Deposit Accounts that existed on the Effective Date or establish or otherwise acquire any new Deposit Accounts, then the Borrowers shall reasonably promptly provide notice to the Administrative Agent of such election. From and after the Petition Date, upon entry of the Interim DIP Order and the Cash Management Order (and except as otherwise provided in the Cash Management Order or the Interim DIP Order), Borrowers shall, and shall cause each Guarantor to, comply with the terms of the Cash Management Order and the DIP Order in all material respects.

**SECTION 5.16. Post-Closing Deliverables**. Borrowers shall deliver to Firehorse all documents set forth below in this Section 5.16 by the deadlines set forth herein; it being understood that, notwithstanding anything else set forth in this Agreement or the other Loan Documents to the contrary, such documents shall not be required to be delivered prior to such applicable deadline:

(a) By no later than thirty (30) days (or such later date as may be agreed by Firehorse in its sole discretion) after the Effective Date, (i) evidence that all insurance (including flood insurance to the extent applicable) required to be maintained under this Agreement and the Security Documents has been obtained and is in effect, together with the certificates of insurance, naming Administrative Agent, on behalf of the Lenders, as an additional insured and a lender's loss payee, as the case may be, under all insurance policies maintained with respect to the assets and properties of the Loan Parties that constitute Collateral and all endorsements thereto required under this Agreement and the Security Documents and (ii) a copy of the most recent insurance policies;

(b) [Reserved].

## ARTICLE VI **NEGATIVE COVENANTS**

So long as any New Money DIP Loan Commitment is outstanding and thereafter until all Obligations are Fully Satisfied, each Borrower covenants and agrees with Administrative Agent and the Lenders that, in each case, unless agreed to in writing by Firehorse (which may be by email):

**SECTION 6.01. Indebtedness**. No Borrower shall, nor shall it permit any of its Subsidiaries to, create, incur, assume, or permit to exist any Indebtedness, except:

(a) Indebtedness under this Agreement and the other Loan Documents;

(b) Indebtedness constituting Prepetition Senior Secured Obligations;

(c) the Indebtedness existing on the Effective Date;

(d) unsecured intercompany Indebtedness among any of the Borrowers permitted under Section 6.05;

(e) Indebtedness consisting of (i) Guarantees arising with respect to customary indemnification obligations to purchasers in connection with Dispositions permitted under clauses (a), (c) and (g) of Section 6.04; and (ii) Guarantees with respect to Indebtedness of any Company, to the extent that the Person that is obligated under such Guarantee could have incurred such underlying Indebtedness pursuant to this Agreement;

(f) Indebtedness incurred in the Ordinary Course of Business in respect of employee severance and employment agreements, workers' compensation claims, unemployment or

other insurance or self-insurance obligations, health, disability or other benefits to employees or former employees and their families;

(g) Indebtedness owed to any Person providing property, casualty, liability, or other insurance to the Company or any of its Subsidiaries, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year;

(h) endorsements of instruments or other payment items for deposit;

(i) customer deposits and advance payments received in the Ordinary Course of Business from customers for goods purchased;

(j) any other Indebtedness expressly contemplated to be incurred as Indebtedness by the Approved Budget (subject to variances permitted under Section 5.11(b)); and

(k) Indebtedness incurred in the Ordinary Course of Business in respect of trade payables and accrued expenses; provided that such Indebtedness is not more than 60 days past due.

**SECTION 6.02. Liens**. No Borrower shall, nor shall it permit any of its Subsidiaries to, create, incur, assume, or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, except for Permitted Encumbrances.

**SECTION 6.03. Fundamental Changes; Lines of Business; Subsidiaries**.

(a) No Borrower shall, nor shall it permit any of its Subsidiaries to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise Dispose of (in one transaction or in a series of transactions) all or substantially all of its assets (in each case, whether now owned or hereafter acquired), or liquidate, wind up, or dissolve, except that Borrowers may sell, transfer, lease or otherwise Dispose of their assets as permitted pursuant to Section 6.04; provided that, in each case, at the time thereof and immediately after giving effect thereto, no Event of Default shall have occurred and be continuing.

(b) No Borrower shall, nor shall it permit any of its Subsidiaries to, engage in any business other than businesses of the type conducted by Borrowers on the Effective Date.

(c) The Borrowers shall not have, form or acquire any Subsidiaries (other than the Subsidiaries as in effect on the Effective Date).

**SECTION 6.04. Dispositions**. No Borrower shall, nor shall it permit any of its Subsidiaries to, make any Disposition without the prior consent of the Lenders, except:

(a) Dispositions of equipment or inventory that is substantially worn, damaged, unnecessary, no longer used or useful, or obsolete in the Ordinary Course of Business;

(b) Dispositions or transactions expressly permitted by Section 6.05;

(c) Dispositions of inventory to buyers in the Ordinary Course of Business;

(d) licenses, sublicenses, leases, or subleases granted to third parties in the Ordinary Course of Business not interfering in any material respect with the business of Borrowers or any of their Subsidiaries;

(e) sales or exchanges of specific items of equipment solely to replace such equipment with replacement equipment of substantially equivalent or greater value;

(f) issuances of Equity Interests by a Subsidiary of Borrowers to a Borrower or any Subsidiary of Borrowers constituting an Investment permitted hereunder;

(g) the sale or discount, in each case without recourse, of accounts receivable arising in the Ordinary Course of Business, but only in connection with the compromise or collection thereof;

(h) any involuntary loss, damage or destruction of property;

(i) the making of Restricted Payments that are expressly permitted to be made pursuant to this Agreement; and

(j) the granting of Permitted Encumbrances.

**SECTION 6.05. Investments**. No Borrower shall, nor shall it permit any of its Subsidiaries to, make, or permit to remain outstanding any Investments except:

(a) the Investments outstanding on the Effective Date;

(b) Investments in cash and Cash Equivalents that are subject to a Lien in favor of Administrative Agent;

(c) Investments by any Borrower in or to any other Borrower;

(d) Investments consisting of deposits that constitute Permitted Encumbrances pursuant to clauses (c) and (d) of the definition thereof;

(e) Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers;

(f) Investments constituting (i) accounts receivable arising, (ii) trade debt granted, or (iii) deposits made by Borrowers or a Subsidiary in connection with the purchase price of goods or services, in each case in the Ordinary Course of Business;

(g) any Guarantee of, or assumption of Indebtedness of, any other Person in either case to the extent the Person incurring such Guarantee or assuming such Indebtedness would have been permitted to incur the underlying Indebtedness under Section 6.01;

(h) Investments in negotiable instruments deposited or to be deposited for collection in the Ordinary Course of Business; and

(i) any Investment expressly contemplated to be made as an Investment by the Approved Budget (subject to variances permitted under Section 5.11(b)).

For purposes of this Section 6.05 the aggregate amount of an Investment at any time shall be deemed to be equal to (i) the aggregate amount of cash, together with the aggregate fair market value of property, loaned, advanced, contributed, transferred or otherwise invested that gives rise to such Investment *minus* (ii) the aggregate amount of distributions or other repayments received in cash in respect of such Investment, and the refund of capital with respect to, and the payment of interest or dividends on, the original principal amount of any such Investment. The amount of an Investment shall not in any event be reduced by reason of any write-off of such Investment nor increased by any increase in the amount of earnings retained in the Person in which such Investment is made or by any increase in the value of such Investment.

**SECTION 6.06. Restricted Payments**. No Borrower shall, nor shall it permit any of its Subsidiaries to, declare or make, directly or indirectly, any Restricted Payment, other than (i) Restricted Payments by a Borrower to another Borrower and (ii) Restricted Payments by a Subsidiary that is not a Borrower to the Company or another wholly-owned Subsidiary.

**SECTION 6.07. Transactions with Affiliates**. No Borrower shall, nor shall it permit any of its Subsidiaries to, sell, lease or otherwise transfer any assets to, or purchase, lease or otherwise acquire

any assets from, or otherwise engage in any other transactions with, any of its Affiliates, except the Transactions or otherwise consistent with past practice in the ordinary course.

**SECTION 6.08. Restrictive Agreements**. No Borrower shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of such Borrower or any Subsidiary to create, incur or permit to exist any Lien upon, or to transfer to another Borrower, any of its assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any Equity Interests it has issued or to make or repay loans or advances to Borrowers or any other Subsidiary or to Guarantee Indebtedness of Borrowers or any other Subsidiary, or invest in any Borrower or any other Subsidiary (any such agreement or arrangement, a "***Restrictive Agreement***"); provided that:

(i) the foregoing shall not apply to (A) restrictions and conditions imposed by law or by the Loan Documents, (B) restrictions and conditions existing on the Effective Date (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), and (C) any restrictions and conditions expressly contemplated by the Approved Budget (subject to variances permitted under Section 5.11(b)); and

(ii) the foregoing shall not apply to (A) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement and (B) customary provisions in leases, licenses and other contracts entered into in the Ordinary Course of Business restricting the assignment thereof, or the transfer of or creation of Liens on assets subject thereto.

**SECTION 6.09. Modifications of Certain Documents**. No Borrower shall, nor shall it permit any of the Subsidiaries to consent to any modification, supplement or waiver of any of the provisions of (a) any Material Contract or (b) its Organizational Documents, other than in each case, modifications, supplements or waivers that are not materially adverse to Secured Parties and do not in any way limit, impair or adversely affect such Borrower's ability to pay its Obligations under the Loan Documents or otherwise limit, impair or adversely affect the creation, perfection or priority of any Lien granted by such Borrower pursuant to any Loan Document, the ability of such Borrower to perform its other non-payment obligations under any Loan Document, or the ability of the Secured Parties to enforce any rights or remedies under any Loan Document.

**SECTION 6.10. Accounting Changes**. No Borrower shall, nor shall it permit any of its Subsidiaries to, (a) make any significant change in accounting treatment or reporting practices, except as required or permitted by GAAP, or (b) change its Fiscal Year end date or the method for determining Fiscal Quarters of any Borrower or its Subsidiaries.

**SECTION 6.11. Hedging Agreements**. No Borrower shall, nor shall it permit any of its Subsidiaries to, enter into any Hedging Agreement.

**SECTION 6.12. Sale Lease Back**. No Borrower shall, nor shall it permit any of its Subsidiaries to, enter into any arrangement, directly or indirectly, with any Person whereby it shall Dispose of any property, whether now owned or hereafter acquired and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose as the property being Disposed of.

**SECTION 6.13. Use of Proceeds**. No Borrower shall, nor shall it permit any of its Subsidiaries to use the proceeds of the Loans for any purpose other than as is consistent with the Approved Budget (subject to variances permitted under Section 5.11(b)), the DIP Order and the Intercreditor Agreements and then only (a) to pay fees, interest, payments and expenses associated with this Agreement and the other Loan Documents, (b) to fund the cost of administering the Bankruptcy Cases (including, without limitation, professional fees and expenses), (c) to finance other Prepetition and pre-filing expenses that are approved by the Bankruptcy Court, (d) for working capital and general corporate purposes, and (e) adequate protection payments and the funding of the Carve-Out to the extent set forth in the DIP Order, in each case to the extent set forth in the Approved Budget (subject to variances permitted under Section

5.11(b)). In addition, the proceeds of the Roll-Up DIP Loan shall (and shall be deemed to) be used to refinance and replace on a dollar-for-dollar basis the obligations outstanding under the applicable Bridge Loans. Notwithstanding the foregoing, no portion of the proceeds of the Loans or other credit extensions under this Agreement and the other Loan Documents or the Carve-Out, any Cash Collateral or any other Collateral may be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation, including, without limitation, any proceeding to determine (x) the amount, validity, perfection or priority of any security interest in favor of the Secured Parties or Prepetition Senior Secured Parties or (y) the amount, validity or enforceability of the obligations of the Borrowers under the Loans or any guarantees thereof, or challenges (whether in accordance with the DIP Order or otherwise) against any of the Secured Parties or Prepetition Senior Secured Parties in respect of the Prepetition Senior Secured Obligations or any of the Liens securing such Prepetition Senior Secured Obligations, or to hinder, limit, delay or contest any of the Secured Parties' or Prepetition Senior Secured Parties' enforcement or realization upon any of the Collateral; provided that, within the challenge period set forth in the DIP Order, up to $25,000 may be used by an official committee of unsecured creditors, if any, solely in connection with the investigation of (and not the litigation or prosecution of) claims or causes of action against the Prepetition Senior Secured Parties solely concerning the validity, enforceability, perfection, priority or extent of the Prepetition Senior Secured Obligations and the liens securing such Prepetition Obligations in accordance with the terms of the DIP Order. Borrowers shall not (and shall procure that its Subsidiaries and its or their respective directors, officers and employees shall not) use the proceeds of the Loans directly or indirectly, for (1) the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any country or territory that is the subject of comprehensive country- or territory-wide Sanctions, or (2) in any other manner that would result in the violation of any Sanctions.

**SECTION 6.14. Prepayments of Certain Indebtedness**. No Borrower shall, nor shall it permit any of its Subsidiaries to, purchase, redeem, retire, or otherwise acquire for value, or set apart any money for a sinking, defeasance, or other analogous fund for the purchase, redemption, retirement, or other acquisition of, or make any voluntary payment or prepayment of the principal of or interest on, or any other amount owing in respect of, any unsecured indebtedness or indebtedness which is expressly subordinated in right of payment to the Obligations.

## ARTICLE VII **INTERCREDITOR AND SUBORDINATION PROVISIONS.**

So long as the Prepetition Senior Secured Obligations are outstanding, each of each Borrower, each Guarantor (by its execution of the Loan Documents to which it is a party), the Administrative Agent and each Lender acknowledges and agrees, for the benefit of the applicable Prepetition Senior Secured Parties, in each case, subject to any other Intercreditor Agreement with the Prepetition Senior Secured Parties, that the Obligations and all Liens securing the Obligations (including those created by the DIP Order) are hereby expressly subordinated, to the extent and in the manner set forth in this Article VII and in the other Intercreditor Agreements, in right of payment and collateral allocation to the prior payment in full of all of the secured obligations of the applicable Borrower under each of the Prepetition Senior Secured Obligations, and subject to any other Intercreditor Agreements. For all purposes hereof, the terms "paid in full" or "payment in full" shall exclude the payment of any contingent unasserted indemnification claims or other claims that customarily survive repayment and termination of indebtedness for borrowed money, subject to any other Intercreditor Agreements.

## ARTICLE VIII **EVENTS OF DEFAULT; REMEDIES.**

**SECTION 8.01. Event of Default**. If any of the following events (each such event, an "***Event of Default***") shall occur:

(a) Borrowers shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b) Loan Parties shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Section) payable under this Agreement or under any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) or more Business Days;

(c) any information contained in any Compliance Certificate or Approved Budget Variance Report or any certification, representation, or warranty made or deemed made by or on behalf of any Loan Party in or in connection with this Agreement or any other Loan Document or in any report, certificate, financial statement, or other document furnished pursuant to or in connection with this Agreement or any other Loan Document, shall prove to have been incorrect in any material respect when made or deemed made (unless any such certification, representation or warranty is qualified as to prove materiality or as to Material Adverse Effect, in which case such certification, representation and warranty shall to have been incorrect in any respect);

(d) any Borrower shall fail to observe or perform any covenant, condition or agreement contained in (i) Section 5.01 and such failure shall continue unremedied for a period of 5 or more Business Days, (ii) Section 5.10 or Section 5.14 and, in each case, such failure shall continue unremedied for a period of 10 or more Business Days, or (iii) Section 5.02, Section 5.03 (with respect to any Borrower's existence), Section 5.05, Section 5.11, Section 5.12 Section 5.13, Section 5.15, Section 5.16 or Article VI, or any Loan Party shall default in the performance of any of its material obligations contained in any of the Security Documents;

(e) any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in clause (a), (b), or (d) of this Section) or any other Loan Document and such failure shall continue unremedied for a period of 30 or more days;

(f) [reserved];

(g) any event or condition occurs that results in any Material Indebtedness (other than the Obligations) becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any such Material Indebtedness or any trustee or agent on its or their behalf to cause any such Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity (after giving effect to any applicable notice requirement or grace period); **provided** that this clause (g) shall not apply to (i) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property securing such Indebtedness in a transaction permitted hereunder and permitted by the DIP Order and (ii) any defaults that occurred prior to the Petition Date with respect to the Prepetition loans or that occur solely as a result of the commencement of the Bankruptcy Cases;

(h) [reserved];

(i) [reserved];

(j) there is entered against any Loan Party or its Subsidiary (i) one or more judgments or orders for the payment of money in an aggregate amount in excess of $250,000 (exclusive of amounts covered by insurance provided by a financially sound insurance company and for which such insurer has accepted liability) or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, with respect to which either (A) the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed (including pursuant to the Bankruptcy Code) or (B) any action (that is not in violation of the automatic stay applicable under section 362 of the Bankruptcy Code) shall be legally taken by a judgment creditor to attach or levy upon any assets of any Loan Party or its Subsidiary or otherwise enforce any such judgment;

(k) an ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, would reasonably be expected to result in liability of any Loan Party and its Subsidiaries in an aggregate amount that could have a Material Adverse Effect;

(l) a Change in Control shall occur;

(m) the Liens created by the DIP Order and the Security Documents shall at any time not constitute valid and perfected Liens (with the priorities as set forth herein) on the collateral intended to be covered thereby (other than any Collateral released under Section 9.10) in favor of the Administrative Agent, free and clear of all other Liens (other than Permitted Encumbrances), or any of the Loan Documents shall for whatever reason be terminated or cease to be in full force and effect, or enforceability thereof shall be contested by any Loan Party, or any Loan Party or any Person acting by or on behalf of any Loan Party shall deny or disaffirm any Loan Party's obligations under Section 10.23;

(n) any Loan Party or any Subsidiary thereof voluntarily or involuntarily dissolves or is dissolved, liquidates or is liquidated or files a motion with the Bankruptcy Court seeking (or supports or consents to any Person seeking) authorization to so dissolve or liquidate (including, without limitation, under any Debtor Relief Law);

(o) any order is entered by the Bankruptcy Court approving a sale under section 363 of the Bankruptcy Code or otherwise without the prior written consent of Firehorse;

(p) any of the following occurs:

(i) an order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court (or any of the Loan Parties shall file an application or motion or pleading for entry of or in support of an order) (i) appointing a Chapter 7 trustee, or a Chapter 11 trustee under section 1104 of the Bankruptcy Code, (ii) appointing an examiner (other than a fee examiner) or a receiver with enlarged powers (beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business under section 1106(b) of the Bankruptcy Code, (iii) dismissing any of the Bankruptcy Cases or converting any of the Bankruptcy Cases under section 1112 of the Bankruptcy Code or otherwise to a case under chapter 7 of the Bankruptcy Code or (iv) providing for the disposition without the Lender's prior written consent of all or any material portion of any of the assets of any Loan Party or any other Subsidiary of the Loan Parties, any Equity Interest of any Loan Party or any other Subsidiary of the Loan Parties, or any material business line of the Loan Parties and their Subsidiaries either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Bankruptcy Cases or otherwise except (I) as permitted by this Agreement (subject to any mandatory prepayment obligations) and the DIP Order; or (II) with the prior written consent of Firehorse; or (III) pursuant to a transaction that provides for the Full Satisfaction of all Obligations and the payment in full in cash of all obligations under this Agreement;

(ii) any Loan Party or any Subsidiary of the Loan Parties fails to comply in all respects with any provision of the DIP Order;

(iii) the period pursuant to section 1121 of the Bankruptcy Code during which the Loan Parties have the exclusive right to file a plan of reorganization or solicit acceptance thereof shall have been terminated or reduced pursuant to an order entered by the Bankruptcy Court, unless such termination or reduction is consented to by Firehorse (or in each case any of the Loan Parties shall seek to, or shall support (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by any Loan Party) any other Person's motion to, have such an order entered, in each case unless Firehorse consents to such action);

(iv) an order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court, or any of the Loan Parties or any other Subsidiary of Loan Parties shall have filed or supported a motion or other pleading for entry of an order, (i) to revoke, reverse, stay, vacate, terminate, extend, rescind or seek reconsideration of any provision of the Cash Management Order, (ii) to revoke, reverse, stay, vacate, terminate, modify, supplement or amend any provision of the Interim DIP Order, the Final DIP Order or this Agreement without

the prior written consent of Firehorse, or (iii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any of the Loan Parties, equal or superior to the priority of the Lenders in respect of the Obligations, subject only to the Carve-Out, the Prepetition Senior Secured Obligations, and the adequate protection claims granted to holders of Prepetition Senior Secured Obligations pursuant to the DIP Order, or (iv) to grant or permit the grant of a Lien on the Collateral (other than a Permitted Encumbrance), (v) to permit charging of any of the Collateral under section 506(c) of the Bankruptcy Code against the Secured Parties or the Prepetition Senior Secured Parties, (vi) without the prior written consent of the Lender, to authorize the use of Cash Collateral under section 363 of the Bankruptcy Code or to obtain financing for any of the Loan Parties under section 364 of the Bankruptcy Code (other than the transactions contemplated by the Loan Documents or any such financing that provides for the payment in full in cash of the Obligations); or (vii) to take any other action or actions materially adverse to any of the Secured Parties or their rights and remedies hereunder or under any of the Loan Documents or the DIP Order, or any Secured Party's interest in any of the Collateral;

(v) an order shall be entered by the Bankruptcy Court confirming a plan of reorganization or liquidation in any of the Bankruptcy Cases (or an order shall be entered by the Bankruptcy Court approving a disclosure statement related to such plan) other than an Acceptable Plan or a chapter 11 plan that contemplates the payment in full in cash of the Obligations and the Prepetition Senior Secured Obligations, or any of the Loan Parties or any of their Subsidiaries shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan;

(vi) the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to a holder or holders of any Lien (other than a holder or holders of a Lien ranking senior in priority to the Liens securing the Loans) or a Lien on any part of the Collateral securing the Loans to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any such Collateral or the Equity Interests in any Loan Party or any Subsidiary whose Equity Interest (or portion thereof) has been pledged as security for the Obligations (unless constituting a sale or other disposition permitted by Section 6.04) or permit any such third parties to exercise other remedies that would have a Material Adverse Effect);

(vii) any termination of the use of Cash Collateral pursuant to the DIP Order;

(viii) any material provision of the DIP Order shall for any reason cease to be valid or binding or enforceable against any of the Loan Parties, or any of the Loan Parties or any other Subsidiary of the Loan Parties shall so state in writing; or any of the Loan Parties or any other Subsidiary of Loan Parties shall commence or join in any legal proceeding to contest in any manner that the DIP Order constitutes a valid and enforceable agreement, or to assert that it has no further obligation or liability under the DIP Order;

(ix) any of the Loan Parties or any other Subsidiary of Loan Parties shall seek to, join or support (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by any Loan Party or by oral argument) any other person in seeking to: (i) contest or disallow in whole or in part any of the Obligations arising under this Agreement or any other Loan Document (or any such order is entered) or (ii) challenge the validity, enforceability or perfection of the Liens or security interests granted or confirmed herein or in the Interim DIP Order or the Final DIP Order and the other Security Documents in favor of the Secured Parties;

(x) any of Loan Parties or any of their Subsidiaries shall make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or debt arising prior to the Petition Date other than payments expressly authorized by the

Bankruptcy Court in the Interim DIP Order, the Final DIP Order or by any other orders entered by the Bankruptcy Court in amounts consistent with the Approved Budget (subject to variances permitted under Section 5.11(b));

(xi) if any Loan Party is enjoined, restrained or in any way prevented by an order of a court of competent jurisdiction (other than an order of the Bankruptcy Court approved by the Lender) from continuing to conduct all or any material part of its business or affairs for a period exceeding five (5) consecutive Business Days; or

(xii) any Loan Party or any other Subsidiary of Loan Parties shall consolidate or combine with any other Person except to the extent expressly permitted by Section 6.03 or pursuant to a confirmed Acceptable Plan; or

(q) the occurrence of (a) Material Adverse Effect or (b) any riot, act of war or terrorism, epidemic or pandemic, insurrection, revolution, nuclear or natural disaster, catastrophe, or similar interruption that has a material impact on the operations and/or financial condition of the Loan Parties;

(r) except as set forth on Schedule 8.01(r), a Loan Party, or any director, officer or employee thereof shall (a) have committed, been convicted of, pleaded no contest or nolo contendere to, or have had imposed an unadjudicated probation for any felony or crime, or (b) be under civil or criminal indictment or investigation, or be a defendant or respondent in, or the subject of an enforcement action, proceeding, lawsuit or investigation brought against it by any governmental authority with the authority to impose criminal penalties or by any self-regulatory organization with the authority to impose penalties; or

(s) any Loan Party or any Subsidiary shall fail to meet any Milestone set forth in Section 5.13, in each case as such Milestone may be extended with the consent of the Firehorse;

then, subject to the provisions of the DIP Order, in every such event, and at any time thereafter during the continuance of such event, Firehorse may take any or all of the following actions, at the same or different times: (i) terminate the New Money DIP Loan Commitments, and thereupon the New Money DIP Loan Commitments and obligations shall terminate immediately, (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Loan Parties accrued hereunder and under the other Loan Documents, shall become due and payable immediately, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by each Loan Party, and (iii) exercise on behalf of the Lenders all rights and remedies available to the Administrative Agent and the Lenders under the Loan Documents and applicable law. In addition, if any Event of Default shall exist, Administrative Agent may foreclose or otherwise enforce any Lien granted to it (including any Lien granted in the DIP Order), for the benefit of the Secured Parties, to secure payment and performance of the Obligations in accordance with the terms of the Loan Documents and exercise any and all rights and remedies afforded by applicable law, by any of the Loan Documents, by equity, or otherwise, subject in to the terms of the DIP Order and any applicable Intercreditor Agreement.

**SECTION 8.02. Application of Payment**.

(a) If the Interim DIP Order has been entered at the time of such Application of Payments, then subject to the provisions of the DIP Order and any Intercreditor Agreements, after the exercise of remedies provided for in Section 8.01 (or after the Loans have automatically become immediately due and payable and as set forth in the proviso to Section 8.01), or upon the consummation of the sale of all or substantially all of the Company's assets or equity, payments and prepayments with respect to the Obligations made to the Administrative Agent, the Lenders or otherwise (including setoff rights) received by the Administrative Agent or any Lender (from realization on Collateral or otherwise) shall be distributed in the following order of priority:

(i) **FIRST**, to the fees, indemnities, expenses and other amounts (including attorneys' fees and expenses), if any, payable to the Administrative Agent in its capacities as such;

(ii) **SECOND**, to the fees, indemnities and other amounts with respect to the New Money DIP Loans (other than principal and interest) payable to the applicable Lenders on a pro rata basis (including attorneys' fees and expenses) arising under the Loan Documents;

(iii) **THIRD**, to the payment of interest then due and payable on any outstanding New Money DIP Loans on a pro rata basis;

(iv) **FOURTH**, to the payment of principal of the New Money DIP Loans on a pro rata basis until each of the foregoing Obligations are Fully Satisfied;

(v) **FIFTH**, to any other Obligations with respect to New Money DIP Loans on a pro rata basis not otherwise referred to in this Section;

(vi) **SIXTH**, to the fees, indemnities and other amounts with respect to the Roll-Up DIP Loan (other than principal and interest) payable to the applicable Lenders on a pro rata basis (including attorneys' fees and expenses) arising under the Loan Documents;

(vii) **SEVENTH**, to the payment of interest then due and payable on any outstanding Roll-Up DIP Loan on a pro rata basis;

(viii) **EIGHTH**, to the payment of principal of the Roll-Up DIP Loan on a pro rata basis until each of the foregoing Obligations are Fully Satisfied;

(ix) **NINTH**, to any other Obligations with respect to the Roll-Up DIP Loan on a pro rata basis not otherwise referred to in this Section; and

(x) **TENTH**, to the applicable Loan Parties' estates, or as the Bankruptcy Court may otherwise direct.

(b) The Administrative Agent shall have absolute discretion as to the time of application of any such proceeds, moneys, or balances in accordance with this Agreement. Upon any sale of Collateral by the Administrative Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the purchase money by the Administrative Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Administrative Agent or such officer or be answerable in any way for the misapplication thereof.

(c) Notwithstanding anything to the contrary herein, the enforcement of Liens or remedies with respect to the Collateral and the exercise of all other remedies provided for in this Agreement and the other Loan Documents, shall be subject to the provisions of the DIP.

**SECTION 8.03. Performance by Administrative Agent**. If any Loan Party shall fail to perform any covenant or agreement in accordance with the terms of the Loan Documents, if an Event of Default has occurred and is continuing, subject to the DIP Order, the Administrative Agent may perform or attempt to perform such covenant or agreement on behalf of the applicable Loan Party. In such event, Borrowers shall, at the request of Administrative Agent and subject to the DIP Order, promptly pay any amount expended by Administrative Agent in connection with such performance or attempted performance to Administrative Agent, together with interest thereon at the interest rate provided for in Section 2.11(b) from and including the date of such expenditure to but excluding the date such expenditure is paid in full. Notwithstanding the foregoing, it is expressly agreed that neither Administrative Agent nor any Lender shall

PRIVATE & CONFIDENTIAL
SUBJECT TO FRE 408 & ITS EQUIVALENTS

have any liability or responsibility for the performance of any obligation of any Loan Party under any Loan Documents.

## ARTICLE IX **ADMINISTRATIVE AGENT**

### **SECTION 9.01. Authorization and Action**.

(a) Each of the Lenders hereby irrevocably appoints Administrative Agent to act on its behalf as administrative agent and collateral agent hereunder and under the other Loan Documents and authorizes Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article IX (other than Section 9.01) are solely for the benefit of Administrative Agent and the Lenders, and no Loan Party has rights as a third-party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(b) Each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Administrative Agent, as collateral agent, and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents or the DIP Order (or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article IX as if set forth in full herein with respect thereto. The Administrative Agent is authorized on behalf of all the Lenders, without the necessity of any notice to or further consent from the Lenders, from time to time to take any action with respect to any Collateral or the Loan Documents which may be necessary or advisable to perfect and maintain perfected the Liens upon any Collateral granted pursuant to any Security Document or the DIP Order.

### **SECTION 9.02. Administrative Agent and its Affiliates**.

(a) The Person serving as Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender (as set forth herein) and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, own securities of, lend money to, act as the financial advisor or in any advisory capacity for and generally engage in any kind of business with Loan Parties or any Subsidiary or other Affiliate thereof as if it were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

(b) Each of the Lenders understands that the Administrative Agent, acting in its individual capacity, and its Affiliates (collectively, the "***Agent's Group***") may be engaged in a wide range of financial services and businesses (including investment management, financing, securities trading, corporate and investment banking and research) (such services and businesses are collectively referred to in this Article IX as "***Activities***") and may engage in the Activities with or on behalf of one or more of the Loan Parties or their respective Affiliates. Furthermore, the Agent's Group may, in undertaking the Activities, engage in trading in financial products or undertake other investment businesses for its own account or on behalf of others (including the Loan Parties and their Affiliates and including holding, for its own account or on behalf of others, equity, debt and similar positions in Loan Parties or their Affiliates), including trading in or holding long, short or derivative positions in securities,

PRIVATE & CONFIDENTIAL
SUBJECT TO FRE 408 & ITS EQUIVALENTS

loans, or other financial products of one or more of the Loan Parties or their Affiliates. Each Lender understands and agree that in engaging in the Activities, the Agent's Group may receive or otherwise obtain information concerning the Loan Parties or their Affiliates (including information concerning the ability of the Loan Parties to perform their respective obligations hereunder and under the other Loan Documents) which information may not be available to any of the Lenders that are not members of the Agent's Group. Neither the Administrative Agent nor any other member of the Agent's Group shall have any duty to disclose to any Lender or use on behalf of the Lenders, nor be liable for the failure to so disclose or use, any information whatsoever about or derived from the Activities or otherwise (including any information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Loan Party or any Affiliate of any Loan Party) or to account for any revenue or profits obtained in connection with the Activities, except that Administrative Agent shall deliver or otherwise make available to each Lender such documents as are expressly required by any Loan Document to be transmitted by Administrative Agent to the Lenders.

(c) Each Lender further understands that there may be situations where members of the Agent's Group or their respective customers (including the Loan Parties and their Affiliates) either now have or may in the future have interests or take actions that may conflict with the interests of any one or more of the Lenders (including the interests of the Lenders hereunder and under the other Loan Documents). Each Lender agrees that no member of the Agent's Group is or shall be required to restrict its activities as a result of any Person serving as the Administrative Agent being a member of the Agent's Group, and that each member of the Agent's Group may undertake any Activities without further consultation with or notification of any Lender. None of (i) this Agreement nor any other Loan Document, (ii) the receipt by the Agent's Group of information (including information concerning the ability of the Loan Parties to perform their respective obligations hereunder and under the other Loan Documents), or (iii) any other matter, shall give rise to any fiduciary, equitable, or contractual duties (including any duty of trust or confidence) owing by the Administrative Agent or any member of the Agent's Group to any Lender including any such duty that would prevent or restrict the Agent's Group from acting on behalf of customers (including the Loan Parties or their Affiliates) or for its own account.

**SECTION 9.03. Duties**. Neither the Administrative Agent nor Firehorse in its capacity as a Lender shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, neither the Administrative Agent nor Firehorse in its capacity as a Lender:

(a) shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b) shall have any duty to take any discretionary action or exercise any discretionary powers, and neither the Administrative Agent nor Firehorse shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose such Person to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law; and

(c) shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, or shall be liable for the failure to disclose, any information relating to any Loan Party or any of their respective Affiliates that is communicated to or obtained by any Person serving as Administrative Agent, Firehorse or any of their respective Affiliates in any capacity.

**SECTION 9.04. Reliance, Lender Representations, Etc**.

(a) Neither the Administrative Agent nor Firehorse in its capacity as a Lender shall be liable for any action taken or not taken by it in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment. Neither the Administrative Agent nor Firehorse in its capacity as a Lender shall be deemed to have knowledge of any Default unless and until written notice describing such Default is given to Administrative Agent by a Loan Party, or a Lender. Neither the Administrative Agent nor Firehorse in its capacity as a Lender shall be responsible for or have any duty to ascertain or inquire into (i) any

statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein or therein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or Firehorse in its capacity as a Lender.

(b) The Administrative Agent and Firehorse in its capacity as a Lender shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document, or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent and Firehorse in its capacity as a Lender also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, Administrative Agent may presume that such condition is satisfactory to such Lender unless Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. Administrative Agent and Firehorse in its capacity as a Lender may consult with legal counsel (who may be counsel for a Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

(c) Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of any Loan Party, that at least one of the following is and will be true:

(i) such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans or the New Money DIP Loan Commitments,

(ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the New Money DIP Loan Commitments and this Agreement,

*(iii)* (A) such Lender is an investment fund managed by a "qualified professional asset manager" (within the meaning of Part VI of PTE 84-14), (B) such qualified professional asset manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the New Money DIP Loan Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the New Money DIP Loan Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the New Money DIP Loan Commitments and this Agreement, or

(iv) such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(d) In addition, unless either (1) sub-clause (i) in the immediately preceding clause (c) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (c), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of Loan Parties, that none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the New Money DIP Loan Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto.

**SECTION 9.05. Sub-Agents**. Administrative Agent may perform any and all its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by Administrative Agent. Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties. The Administrative Agent is authorized on behalf of all the Lenders, without the necessity of any notice to or further consent from the Lenders, from time to time to permit any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent to take any action with respect to any Collateral or the Loan Documents which may be necessary to perfect and maintain perfected the Liens upon any Collateral granted pursuant to any Security Document. The exculpatory provisions of this Article IX, as well as all other indemnity and expense reimbursement provisions of this Agreement (including, without limitation, Section 10.03), shall apply to any such sub-agent and to the Related Parties of such Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as though such co-agents, sub-agents and attorneys-in-fact were a "collateral agent" under the Loan Documents. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agent except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

**SECTION 9.06. Resignation**.

(a) The Administrative Agent may resign at any time by giving notice of its resignation to the Lenders and a Loan Party. Upon receipt of any such notice of resignation, Firehorse shall have the right to appoint a successor. If no successor shall have been so appointed by Firehorse and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Lender) (the "***Resignation Effective Date***"), then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b) With effect from the Resignation Effective Date (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (b) except for any indemnity payments owed to the retiring Administrative Agent, all payments, communications and determinations provided to be made by, to or through Administrative Agent shall instead be made by or to each Lender directly, until such time as the applicable Lenders appoint a successor Administrative Agent, as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Administrative Agent, as applicable (other than any rights to indemnity payments owed to the retiring Administrative Agent) and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents. The fees payable by Borrowers to a successor Administrative Agent shall be the

same as those payable to its predecessor unless otherwise agreed among Borrowers and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and Section 10.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

**SECTION 9.07. Lender Credit Decision**. Each Lender acknowledges that it has, independently and without reliance upon Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. In this regard, each Lender further acknowledges that DLA Piper LLP (US) is acting in this transaction as special counsel to Firehorse only. Each other party hereto will consult with its own legal counsel to the extent that it deems necessary in connection with the Loan Documents and the matters contemplated therein.

**SECTION 9.08. [Reserved]**.

**SECTION 9.09. Agent May File Proofs of Claim; Bankruptcy Events.** In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party or any Subsidiary, Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand any Loan Party or any other Person primarily or secondarily liable) shall be entitled and empowered (but not obligated), by intervention in such proceeding or otherwise:

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and Administrative Agent under Article II and Section 10.03) allowed in such judicial proceeding; and

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same in accordance with this Agreement;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent under Article II and Section 10.03. Nothing contained herein shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt in each case on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations in any proceeding under any Debtor Relief Law.

**SECTION 9.10. Collateral**.

(a) The Secured Parties irrevocably authorize the Administrative Agent, at its option and in its discretion:

(i) to release any Lien (A) on all Collateral upon Full Satisfaction of all the Obligations and termination of the New Money DIP Loan Commitments, (B) with respect to

any Collateral that is sold or otherwise Disposed of to a Person other than a Loan Party pursuant to a Disposition permitted by Section 6.04 (other than any Disposition permitted by clause (f) of Section 6.04), (C) on Collateral owned by a Subsidiary that is a Guarantor upon release of such Guarantor from its obligations under its Guaranty Agreement pursuant to clause (iii) below, (D) as required by the terms of the Intercreditor Agreements or (E) subject to Section 10.02, as may be approved, authorized, or ratified in writing by Firehorse;

(ii) to release any Guarantor from its obligations under any Guaranty Agreement if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents; and

(iii) to enter into Intercreditor Agreements and perform all obligations thereunder and to enter into any amendments of such document which do not materially modify the rights of the Secured Parties thereunder, and the Secured Parties agree to be bound by the terms thereof (including with respect to the release of Liens thereunder and the turn over of proceeds required thereby).

(b) Upon request by Administrative Agent at any time, the Secured Parties will confirm in writing Administrative Agent's authority to release or subordinate its interest in particular types or items of property or to release any Guarantor from its obligations under the Guaranty Agreement pursuant to this Section 9.10.

(c) The Administrative Agent, at the sole expense of Borrowers, shall execute and deliver to the Borrowers all releases or other documents reasonably necessary or desirable to evidence or effect any release of Liens or release of Guaranty Agreement authorized under Section 9.10(a), in each case, without recourse to, or representation or warranty from, the Administrative Agent; **provided** that (i) Administrative Agent shall not be required to execute any document necessary to evidence such release authorized under clause (i)(B) or (ii) of Section 9.10(a) unless a Responsible Officer of Borrowers shall certify in writing to Administrative Agent that the transaction requiring such release is permitted under the Loan Documents (it being acknowledged that Administrative Agent may rely on any such certificate without further enquiry), (ii) Administrative Agent shall not be required to execute any document necessary to evidence such release on terms that, in Administrative Agent's opinion, would expose Administrative Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse, representation, or warranty, and (iii) no such release shall in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of any Loan Parties in respect of) all interests retained by Loan Parties, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral. To the extent Administrative Agent is required to execute any releases or other documents in accordance with this Section 9.10(c), Administrative Agent shall do so promptly upon request of Borrowers without the consent or further agreement of any Secured Party.

(d) The Administrative Agent shall not have any obligation whatsoever to any of the Secured Parties to assure that the Collateral exists or is owned by any Loan Party or its Subsidiaries or is cared for, protected, or insured or has been encumbered, or that the Administrative Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, or that any particular items of Collateral meet the eligibility criteria applicable in respect thereof or whether to impose, maintain, reduce, or eliminate any particular reserve hereunder or whether the amount of any such reserve is appropriate or not, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Administrative Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, the Administrative Agent may act in any manner it may deem appropriate, in its sole discretion given the Administrative Agent's own interest in the Collateral in its capacity as one of the Lenders and that the Administrative Agent shall not have any duty or liability whatsoever to any Secured Party as to any of the foregoing, except as otherwise provided herein.

PRIVATE & CONFIDENTIAL
SUBJECT TO FRE 408 & ITS EQUIVALENTS

(e) Credit Bidding. The Administrative Agent shall have the right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of the Obligations owed under the Loan Documents, in connection with any sale of all or any portion of the Collateral, including (without limitation) any sale occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code or by a chapter 7 trustee under section 725 of the Bankruptcy Code, in all cases subject to (1) the terms of the Intercreditor Agreements and (2) such credit bid containing a cash component sufficient to cause the payment in full of any Prepetition Senior Secured Obligations secured by such Collateral.

**SECTION 9.11. Bailee for Perfection**. Administrative Agent hereby appoints each of the other Lenders to serve as bailee to perfect the Administrative Agent's Liens in any Collateral in the possession of any such other Lender. Each Lender possessing any Collateral agrees to so act as bailee for Administrative Agent in accordance with the terms and provisions hereof. No Lender (other than Administrative Agent acting for the benefit of the Secured Parties) shall exercise any right of set-off or banker's lien against any Loan Party for any obligations other than the Obligations.

## ARTICLE X **MISCELLANEOUS**

**SECTION 10.01. Notices**.

(a) General Address for Notices. Except in the case of communications expressly permitted to be given by telephone hereunder or under any other Loan Documents, all notices and other communications ("***Communications***") provided for herein or in any other Loan Document shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy or, subject to Section 10.01(b), by electronic communication, as follows:

(i) if to any Borrower, to it at:

c/o UPG Enterprises LLC
1400 16th Street, #250
Oak Brook, IL 60523
Attn: John Sordillo
E-mail: jsordillo@glassratner.com

With a copy (which shall not constitute notice) to:

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
PO Box 1347
Wilmington, DE 19899-1347
Attn: Derek Abbott
E-mail: dabbott@morrisnichols.com

(ii) if to Firehorse (in any capacity), to it at:

Firehorse Capital LLC
281 S Frontage Road
Burr Ridge, IL 60527
Attn: Paul Douglass; Chris Hutter
E-mail: pdouglass@firehorsecap.com; chutter@firehorsecap.com

With copies (which shall not constitute notice) to:

DLA Piper LLP (US)

444 West Lake Street, Suite 900
Chicago, IL 60606-0089
Attn: John Lyons
E-mail: john.lyons@us.dlapiper.com

DLA Piper LLP (US)
51 John F. Kennedy Parkway, Suite 120
Short Hills, NJ 07078-2704
Attn: Kira Mineroff
E-mail: kira.mineroff@us.dlapiper.com

(iii) if to another Lender, to it at its address set forth in the applicable Assignment and Assumption.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received. Notices sent by telecopier shall be deemed to have been given when sent (except that, if not given before or during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day). Notices delivered through electronic communications to the extent provided in Section 10.01(b), shall be effective as provided in such Section 10.01(b).

(b) Electronic Communications. Communications to the Lenders under the Loan Documents may be delivered or furnished by electronic communications pursuant to procedures approved by Administrative Agent. Administrative Agent or a Borrower may, in its discretion, agree to accept Communications to it under the Loan Documents by electronic communications pursuant to procedures approved by it; **provided** that approval of such procedures may be limited to particular Communications. Unless Administrative Agent otherwise prescribes, (i) Communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), and (ii) Communications posted on an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in clause (i) of this Section 10.01(b) notification that such Communication is available and identifying the website address thereof; **provided** that, for both clauses (i) and (ii) of this Section 10.01(b), if such Communication is not sent before or during the normal business hours of the recipient, such Communication shall be deemed to have been sent at the opening of business on the next Business Day.

(c) Change of Address for Notices. Any party hereto may change its address or telecopy number for, or individual designated to receive, Communications under the Loan Documents by notice to the other parties hereto (or, in the case of any such change by a Lender, by notice to a Borrower and Administrative Agent). All Communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

(d) Reliance on Notices. The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic notices of a Borrowing) purportedly given by or on behalf of Borrowers even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. Borrowers shall, jointly and severally, indemnify the Administrative Agent, each Lender, and the Related Parties of each of them from all losses, costs, expenses, and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of Borrowers. All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

**SECTION 10.02. Waivers; Amendments**.

(a) No Deemed Waivers; Remedies Cumulative. No failure or delay by Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of Administrative Agent, the Lenders, and the other Secured Parties hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Borrower therefrom shall in any event be effective unless the same shall be permitted by Section 10.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether Administrative Agent, any Lender may have had notice or knowledge of such Default at the time.

(b) Amendments. Neither this Agreement (including any Exhibit or Schedule hereto), nor any other Loan Document nor any provision hereof or thereof may be waived, amended, or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Borrowers, Administrative Agent and Firehorse in its capacity as a Lender or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by Administrative Agent and the Loan Parties that are parties thereto, in each case with the consent of Firehorse; **provided** that no such agreement shall (i) increase any New Money DIP Loan Commitment of any Lender without the written consent of such Lender, (ii) reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce the rate of any fees due hereunder, without the written consent of each Lender affected thereby (**provided** that in no event shall the waiver of applicability of Section 2.11(b) (which waiver shall be effective with the written consent of Firehorse) constitute a reduction in the rate of interest or a reduction of fees for purposes of this clause (ii)), (iii) postpone the scheduled date of payment of the principal amount of any Loan (excluding any payment required by Sections 2.09(b) and (c)), or any interest thereon, or any fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or extend the Maturity Date, without the written consent of each Lender affected thereby, (iv) modify Section 8.02 or Section 10.04 (including the modification of any financial or other definition that would affect the interpretation of Section 8.02 or Section 10.04) without the written consent of each Lender, (v) change any of the provisions of this Section 10.02, without the written consent of each Lender and/or (vi) except as permitted by Section 9.10, (A) release a Loan Party or release any Guarantor from any of its guarantee obligations without the written consent of each Lender or (B) release any of the Collateral without the written consent of each Lender. Article VII may not be waived, amended, or modified except pursuant to an agreement or agreements in writing entered into by Borrowers, Administrative Agent, Firehorse in its capacity as a Lender and each Prepetition Senior Agent.

**SECTION 10.03. Expenses; Indemnity; Damage Waiver**.

(a) Costs and Expenses. Subject to the provisions of the DIP Order, Borrowers agree, jointly and severally, to pay (i) all expenses incurred by Firehorse and its Affiliates, including the fees, charges and disbursements of counsel and financial advisors for Firehorse in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and all aspects of the Bankruptcy Cases, including the preparation and review of pleadings, documents and reports related to the Bankruptcy Cases (and any successor cases relating thereto), attendance at meetings, court hearings or conferences related to the Bankruptcy Cases (and any successor cases relating thereto) and general monitoring of the Bankruptcy Cases (and any successor cases relating thereto), (ii) all expenses incurred by Firehorse including the fees, charges and disbursements of counsel and financial advisors in connection with the enforcement or protection of such Person's rights in connection with this Agreement and the other Loan Documents or the Collateral, including its rights under this Section, and including in

connection with any bankruptcy or insolvency proceeding, workout, restructuring or related negotiations in respect thereof, and (iii) all costs incurred by Firehorse in connection with any filing, registration, recording or perfection of any security interest contemplated by any Security Document or any other document referred to therein or, subject to Section 5.06, any audit, verification, inspection or appraisal of the Collateral.

(b) Indemnification by Borrowers. Borrowers hereby agree, jointly and severally, to indemnify Administrative Agent, each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "***Indemnitee***") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, and related expenses, including the fees, charges, and disbursements of counsel (limited to the documented out-of-pocket fees, disbursements and other charges of one primary counsel, one local counsel in each relevant jurisdiction, and one specialty counsel for each relevant specialty for all Indemnitees taken as a whole, and one or more additional counsel if one or more conflicts of interest, or perceived conflicts of interest arise) incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the Transactions or any other transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any other property owned or operated by any Borrower or any of the Subsidiaries, or any Environmental Liability related in any way to any Borrower or any of the Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation, or proceeding relating to any of the foregoing, whether based on contract, tort, or any other theory and regardless of whether any Indemnitee is a party thereto; **provided** that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have (x) resulted solely from the gross negligence or willful misconduct of such Indemnitee, or (y) arisen out of any claim, litigation, investigation or proceeding brought by such Indemnitee solely against one or more other Indemnitees (other than any claim, litigation, investigation or proceeding that is brought by or against Administrative Agent or any arranger or similar role, acting in its capacity as Administrative Agent or arranger or similar role) that does not involve any act or omission of any Loan Parties or any of their respective subsidiaries or affiliates. This Section 10.03(b) shall not apply with respect to Taxes, other than any Taxes that represent losses, claims, or damages arising from any non-Tax claim.

(c) [Reserved].

(d) Waiver of Consequential Damages, Etc. To the extent permitted by applicable law, no Indemnitee, Borrower or any Related Party of a Borrower shall have any liability for, and no Borrower shall assert, and each Borrower hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document, the Transactions, any Loan, or the use of the proceeds thereof; **provided** that nothing in this sentence shall limit any Borrower's indemnity and reimbursement obligations to the extent that such special, indirect, consequential or punitive damages are incurred or paid by an Indemnitee to a third party for which such Indemnitee is otherwise entitled to reimbursement or indemnification as set forth in Section 10.03(a) or (b).

(e) Payments. All amounts due under this Section shall be subject to the terms of the Intercreditor Agreements and otherwise payable no later than 10 Business Days after written demand therefor.

**SECTION 10.04. Successors and Assigns**.

(a) Assignments Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of a Lender who is owed any of the Obligations and any Indemnitee),

except that (i) no Borrower may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of each Lender (and any attempted assignment or transfer of any Borrower without such consent shall be null and void), and (ii) no Lender may assign or otherwise transfer any of its rights or obligations hereunder except in accordance with this Section (and any attempted assignment or transfer by any Lender that is not in accordance with this Section shall be null and void) or with the prior written consent of the Borrowers and Firehorse. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of a Lender who is owed any of the Obligations, and, to the extent expressly contemplated hereby, the Related Parties of each of Administrative Agent and the Lenders)) any legal or equitable right, remedy, or claim under, or by reason, of this Agreement.

(b) Assignments by Lenders Generally. Each Lender may at any time assign to one or more assignees all or a portion of its respective rights and obligations under this Agreement (including all or a portion of its New Money DIP Loan Commitment, as applicable, and the Loans at the time owing to it); **provided** that any such assignment shall be subject to the following conditions:

(i) Required Consents. No consent shall be required for any assignment, except the consent of Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Loans to a Person who is not a Lender.

(ii) Assignment and Assumption. The parties to each assignment shall execute and deliver to Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (**provided** that Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment).

(iii) Administrative Questionnaire. The assignee, if it shall not already be a Lender, shall deliver to Administrative Agent an Administrative Questionnaire if so requested by Administrative Agent.

(c) Effectiveness of Assignments. Subject to acceptance and recording thereof pursuant to Section 10.04(d), from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the rights referred to in Sections 2.12, 2.13, and 10.03 with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.04(e).

(d) Maintenance of Register by Administrative Agent. Administrative Agent, acting solely for this purpose as a non-fiduciary agent of Borrowers, shall maintain at one of its offices in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the New Money DIP Loan Commitment of, and principal amount (and stated interest) of the Loans (each, a "***Registered Loan***") owing to, each Lender pursuant to the terms hereof from time to time (the "***Register***"). Other than in connection with an assignment by a Lender of all or any portion of its Loan to an Affiliate of such Lender (i) a Registered Loan may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register, and (ii) any assignment or sale of all or part of such Registered Loan may be effected only by registration of such assignment or sale on the Register. In the case of any assignment by a Lender of all or any portion of its Loan to an Affiliate of such Lender, and which assignment is not recorded in the Register, the assigning Lender, on behalf of Borrowers, shall maintain a register comparable to the Register. The entries in the Register shall be conclusive absent manifest error, and Borrowers,

Administrative Agent, and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by Borrowers and any Lender, at any reasonable time and from time to time, upon reasonable prior notice.

(e) Participations. Each Lender may at any time, without the consent of, or notice to, Borrowers or Administrative Agent, sell participations to any Person (a "***Participant***") in all or a portion of such Lender's rights or obligations under this Agreement (including all or a portion of its New Money DIP Loan Commitment or the Loans owing to it); **provided** that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such participation shall not increase the obligations of any Borrower under any Loan Document, except as contemplated below, and (iv) Borrowers, Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which such Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification, or waiver of any provision of the Loan Documents; **provided** that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification, or waiver described in the first proviso to Section 10.02(b) that affects such Participant. Borrowers agree that each Participant shall be entitled to the benefits of Section 2.12, (subject to the requirements and limitations therein, including the requirements under Section 2.12(g) (it being understood that the documentation required under Section 2.12(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.04(b); **provided** that such Participant (shall not be entitled to receive any greater payment under Section 2.12, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender**; provided** that such Participant agrees to be subject to Section 2.13(d). Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "***Participant Register***"); **provided** that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any New Money DIP Loan Commitment or Loan or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such New Money DIP Loan Commitment or Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f) Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank (or other central bank under any central banking system established under the jurisdiction or organization of such Lender (or its parent bank)); **provided** that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

**SECTION 10.05. Survival**. All covenants, agreements, certifications, representations and warranties made by Borrowers or any other Loan Party herein or in the other Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or the other Loan Documents shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the other Loan Documents and the making of any Loans,

regardless of any investigation made by any such other party or on its behalf and notwithstanding that Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect certification, representation, or warranty at the time any credit is extended hereunder, and shall continue in full force and effect until the Full Satisfaction of the Obligations. The provisions of Sections 2.12, 2.13, 10.03, and 10.18 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the termination of the Loan Documents and payment of the Obligations hereunder, or the expiration or termination of the New Money DIP Loan Commitments.

**SECTION 10.06. Counterparts; Integration; Effectiveness**. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract between and among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by Administrative Agent and when Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution," "signed," "signature," and words of like import in this Agreement or any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**SECTION 10.07. Severability**. Any provision of this Agreement or any other Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality, and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**SECTION 10.08. Right of Setoff**. If an Event of Default shall have occurred and be continuing, subject to the Intercreditor Agreements, Firehorse and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held, and other obligations (in whatever currency) at any time owing, by Firehorse or any such Affiliate, to or for the credit or the account of Borrowers or any other Loan Party against any and all of the obligations of Borrowers or any other Loan Party now or hereafter existing under this Agreement or any other Loan Document to Firehorse or its Affiliates, irrespective of whether or not Firehorse or such Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of Borrowers or such Loan Party may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness. The rights of Firehorse and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that Firehorse and its Affiliates may have. Firehorse agrees to notify Borrowers and Administrative Agent promptly after any such setoff and application and share such set-off pursuant to Section 2.13(d); **provided** that the failure to give such notice shall not affect the validity of such setoff and application.

**SECTION 10.09. Governing Law; Jurisdiction; Etc**.

(a) Governing Law. This Agreement and the other Loan Documents (other than those containing a contrary express choice of law provision) shall be construed in accordance with, and this Agreement, the other Loan Documents and all matters arising out of or relating in any way whatsoever to the Loan Documents (whether in contract, tort or otherwise) shall be governed by, the law

of the State of New York and, to the extent applicable, the Bankruptcy Code. This governing law election has been made by the parties in reliance (at least in part) on Section 5-1401 of the General Obligation Law of the State of New York, as amended (as and to the extent applicable), and other applicable law.

(b) Submission to Jurisdiction. Each Borrower hereby irrevocably and unconditionally agrees that it shall not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against Administrative Agent, any Lender, or any Related Party of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the Bankruptcy Court (if applicable), the Supreme Court of the State of Illinois and the United States District Court for the Northern District of Illinois, and any appellate court from any thereof, and each of the parties hereto hereby irrevocably and unconditionally irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in the Bankruptcy Court (if applicable), such Illinois State court or, to the fullest extent permitted by applicable law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or in any other Loan Document shall affect any right that Administrative Agent, or any Lender may otherwise have to bring any action or proceeding relating to any Loan Document against any Borrower or its properties in the courts of any jurisdiction.

(c) Waiver of Venue. Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to any Loan Document in any court referred to in Section 10.09(b). Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d) Service of Process. Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 10.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by applicable law.

**SECTION 10.10. WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY, OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

**SECTION 10.11. Treatment of Certain Information; Confidentiality; Independence of Covenants**.

(a) Treatment of Certain Information. Each Borrower acknowledges that from time to time financial advisory, investment banking and other services may be offered or provided to Loan Parties or one or more of the Subsidiaries (in connection with this Agreement or otherwise) by any Lender or by one or more Subsidiaries or Affiliates of such Lender and each Borrower hereby authorizes each Lender to share any information delivered to such Lender by any Loan Parties or their Subsidiaries pursuant to this Agreement, or in connection with the decision of such Lender to enter into this Agreement, to any such Subsidiary or Affiliate, it being understood that any such Subsidiary or Affiliate

receiving such information shall be bound by the provisions of Section 10.11(b) as if it were a Lender hereunder. Such authorization shall survive the repayment of the Loans, the expiration or termination of the New Money DIP Loan Commitments or the termination of this Agreement or any provision hereof.

(b) Confidentiality. Each of Administrative Agent and the Lenders agree to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its Affiliates and to its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and to use such Information subject to such Person's internal regulatory and/or ethical obligations regarding the same); (ii) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners or any listing authority or stock exchange); (iii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process; (iv) to any other party hereto; (v) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (vi) subject to an agreement containing provisions substantially the same as those of this Section, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement or any pledgee under Section 10.04(f), or (B) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to Loan Parties and their obligations, this Agreement or payments hereunder; (vii) on a confidential basis to (A) any rating agency in connection with rating Loan Parties or their Subsidiaries or the credit facilities under this Agreement or (B) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to this Agreements; (viii) with the consent of a Borrower; or (ix) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Section, or (B) becomes available to Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Loan Parties that is not to the knowledge of the receiving party in violation of any confidentiality restriction. For purposes of this Section, "***Information***" means all information received from the Loan Parties or any of their Subsidiaries and/or its Related Parties or representatives relating to the Loan Parties or any of their Subsidiaries or any of their respective businesses, other than any such information that is available to Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Loan Parties or any of their Subsidiaries and/or its Related Parties or representatives. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(c) Independence of Covenants. All covenants and other agreements contained in this Agreement or any other Loan Document shall be given independent effect so that, if a particular action or condition is not permitted by any of such covenants or other agreements, the fact that such action or condition would be permitted by an exception to, or otherwise be within the limitations of, another covenant or other agreement shall not avoid the occurrence of a Default if such action is taken or such condition exists.

**SECTION 10.12. Interest Rate Limitation**. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges or other amounts that are treated as interest on such Loan under applicable law (collectively the "***Charges***"), shall exceed the maximum lawful rate (the "***Maximum Rate***") that may be contracted for, charged, taken, received, or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect to such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefore) until such cumulated amount, shall have been received by such Lender.

If Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to Borrowers.

**SECTION 10.13. USA Patriot Act**. Each of Administrative Agent and each Lender subject to the USA Patriot Act hereby notifies each Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify, and record information that identifies each Borrower and other information that will allow Administrative Agent and such Lender to identify each Borrower in accordance with the USA Patriot Act. Borrowers hereby agree to provide, and cause each Guarantor to provide, such information promptly upon the request of Administrative Agent or any Lender. Each Lender subject to the USA Patriot Act acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on Administrative Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA Patriot Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "***CIP Regulations***"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any Borrower, its Affiliates or its agents, this Agreement, the Loan Documents or the transactions hereunder or contemplated hereby: (a) any identity verification procedures, (b) any record-keeping, (c) comparisons with government lists, (d) customer notices, or (e) other procedures required under the CIP Regulations or such other law.

**SECTION 10.14. Press Release and Related Matters**. No party hereto shall, and no party hereto shall permit any of its Affiliates to, issue any press release or other public disclosure using the name, logo or otherwise referring to any party hereto or any of their respective Affiliates, the Loan Documents or any transaction contemplated therein without the prior consent of a Borrower, Administrative Agent, or any applicable Lender, as the case may be, except to the extent required to do so under applicable law and then, in any event, such party hereto will advise Borrowers or Administrative Agent, as the case may be, as soon as possible with respect to such press release or other public disclosure.

**SECTION 10.15. No Duty**. All attorneys, accountants, appraisers, and other professional Persons and consultants retained by the Administrative Agent or any Lender shall have the right to act exclusively in the interest of the Administrative Agent or such Lender, as applicable and shall have no duty of disclosure, duty of loyalty, duty of care, or other duty or obligation of any type or nature whatsoever to Loan Parties, any holders of Equity Interests of any Loan Party, or any other Person.

**SECTION 10.16. No Fiduciary Relationship**. The relationship between the Loan Parties on the one hand and the Administrative Agent and each Lender on the other is solely that of debtor and creditor, and none of the Administrative Agent or any Lender, has any fiduciary, advisory, agency or other special relationship with the Loan Parties, and no term or condition of any of the Loan Documents shall be construed so as to deem the relationship between the Loan Parties on the one hand and the Administrative Agent and each Lender on the other to be other than that of debtor and creditor. To the fullest extent permitted by law, each Borrower hereby waives and releases any claims that it may have against any of the Administrative Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**SECTION 10.17. Construction**. Borrowers, each Guarantor (by its execution of the Loan Documents to which it is a party), Administrative Agent and each Lender acknowledges that each of them has had the benefit of legal counsel of its own choice and has been afforded an opportunity to review the Loan Documents with its legal counsel and that the Loan Documents shall be construed as if jointly drafted by the parties thereto. Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**SECTION 10.18. Payments Set Aside**. To the extent that any payment by or on behalf of any Borrower under any Loan Document is made to Administrative Agent or any Lender, or Administrative Agent or any Lender exercises its right of setoff as to any Borrower, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or

PRIVATE & CONFIDENTIAL
SUBJECT TO FRE 408 & ITS EQUIVALENTS

preferential, set aside or required (including pursuant to any settlement entered into by Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Laws or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to Administrative Agent upon demand its Pro Rata Share of any amount so recovered from or repaid by Administrative Agent, *plus* interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.

**SECTION 10.19. Benefits of Agreement**. The Loan Documents are entered into for the sole protection and benefit of the parties hereto and their permitted successors and assigns, and no other Person (other than any Related Parties of the Administrative Agent, the Lenders and any Participants to the extent provided for in Section 10.04(e)) shall be a direct or indirect beneficiary of, or shall have any direct or indirect cause of action or claim in connection with, any Loan Document.

**SECTION 10.20. [Reserved]**.

**SECTION 10.21. Release of Claims.** Subject in all respects to the provisions of the DIP Order, including any challenge provisions set forth therein, in consideration of the Lender making the New Money DIP Loans available to the Borrowers pursuant to this Agreement, each Borrower and Guarantor (by its execution of the Loan Documents to which it is a party), hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Released Parties (as defined in the DIP Order) to the full extent set forth in paragraph G.(xiv) of the Interim DIP Order and the corresponding provision of the Final DIP Order.

**SECTION 10.22. [Reserved]**.

**SECTION 10.23. Joint and Several Obligations**.

(a) All Obligations shall constitute joint and several obligations of Borrowers. Each Borrower expressly represents and acknowledges that it is part of a common enterprise with the other Borrower and that any financial accommodations by Administrative Agent and the Lenders, or any of them, to any other Borrower hereunder and under the other Loan Documents are and will be of direct and indirect interest, benefit and advantage to all Borrowers. Each Borrower acknowledges that any notice of Borrowing or any other notice given by any other Borrower to Administrative Agent or the Lenders shall bind all Borrowers, and that any notice given by Administrative Agent or the Lenders to any Borrower shall be effective with respect to all Borrowers. Each Borrower acknowledges and agrees that each Borrower shall be liable, on a joint and several basis, for all of the Loans and other Obligations, regardless of which such Person actually may have received the proceeds of any of the Loans or other extensions of credit or the amount of such Loans or other extensions of credit received or the manner in which Administrative Agent or the Lenders accounts among Borrowers for such Loans or other Obligations on its books and records, and further acknowledges and agrees that Loans and other extensions of credit to any Borrower inure to the mutual benefit of all of Borrowers and that Administrative Agent and the Lenders are relying on the joint and several liability of Borrowers in extending the Loans and other financial accommodations under the Loan Documents.

(b) Each Borrower shall be entitled to subrogation and contribution rights from and against the other Borrower to the extent such Person is required to pay to Administrative Agent, or the Lenders any amount in excess of the Loans advanced directly to, or other Obligations incurred directly by, such Person or as otherwise available under applicable law; **provided**, **however**, that such subrogation and contribution rights are and shall be subject to the terms and conditions of Section 10.23(c) and 10.23(d).

(c) It is the intent of each Borrower, Administrative Agent, the Lenders and any other Person holding any of the Obligations that the maximum obligations of each Borrower hereunder

(such Person's "***Maximum Borrower Liability***") in any case or proceeding referred to below (but only in such a case or proceeding) shall not be in excess of:

(i) in a case or proceeding commenced by or against such Person under the Bankruptcy Code on or within one year from the date on which any of the Obligations of such Person are incurred, the maximum amount that would not otherwise cause the Obligations of such Person hereunder (or any other Obligations of such Person to Administrative Agent, the Lenders and any other Person holding any of the Obligations) to be avoidable or unenforceable against such Person under (A) section 548 of the Bankruptcy Code or (B) any state fraudulent transfer or fraudulent conveyance act or statute applied in such case or proceeding by virtue of section 544 of the Bankruptcy Code; or

(ii) in a case or proceeding commenced by or against such Person under the Bankruptcy Code subsequent to one year from the date on which any of the Obligations of such Person are incurred, the maximum amount that would not otherwise cause the Obligations of such Person hereunder (or any other Obligations of such Person to Administrative Agent, the Lenders and any other Person holding any of the Obligations) to be avoidable or unenforceable against such Person under any state fraudulent transfer or fraudulent conveyance act or statute applied in any such case or proceeding by virtue of section 544 of the Bankruptcy Code; or

(iii) in a case or proceeding commenced by or against such Person under any law, statute or regulation other than the Bankruptcy Code relating to dissolution, liquidation, conservatorship, bankruptcy, moratorium, readjustment of debt, compromise, rearrangement, receivership, insolvency, reorganization or similar debtor relief from time to time in effect affecting the rights of creditors generally (collectively, "***Other Debtor Relief Law***"), the maximum amount that would not otherwise cause the Obligations of such Person hereunder (or any other Obligations of such Person to Administrative Agent, the Lenders and any other Person holding any of the Obligations) to be avoidable or unenforceable against such Person under such Other Debtor Relief Law, including, without limitation, any state fraudulent transfer or fraudulent conveyance act or statute applied in any such case or proceeding. (The substantive state or federal laws under which the possible avoidance or unenforceability of the Obligations of any Borrower hereunder (or any other Obligations of such Person to Administrative Agent, the Lenders and any other Person holding any of the Obligations) shall be determined in any such case or proceeding shall hereinafter be referred to as the "***Avoidance Provisions***").

Notwithstanding the foregoing, no provision of this Section 10.23(c) shall limit the liability of any Borrower for loans advanced directly or indirectly to it under this Agreement.

(d) To the extent set forth in Section 10.23(c), but only to the extent that the Obligations of any Borrower hereunder would otherwise be subject to avoidance under any Avoidance Provisions if such Person is not deemed to have received valuable consideration, fair value, fair consideration or reasonably equivalent value for such transfers or obligations, or if such transfers or obligations of any Borrower hereunder would render such Person insolvent, or leave such Person with an unreasonably small capital or unreasonably small assets to conduct its business, or cause such Person to have incurred debts (or to have intended to have incurred debts) beyond its ability to pay such debts as they mature, in each case as of the time any of the obligations of such Person are deemed to have been incurred and transfers made under such Avoidance Provisions, then the obligations of such Person hereunder shall be reduced to that amount which, after giving effect thereto, would not cause the Obligations of such Person hereunder (or any other Obligations of such Person to Administrative Agent, the Lenders and any other Person holding any of the Obligations), as so reduced, to be subject to avoidance under such Avoidance Provisions. This Section 10.23(d) is intended solely to preserve the rights hereunder of Administrative Agent, the Lenders and any other Person holding any of the Obligations to the maximum extent that would not cause the obligations of Borrowers hereunder to be subject to avoidance under any Avoidance Provisions, and none of Borrowers nor any other Person shall

have any right, defense, offset, or claim under this Section 10.23(d) as against Administrative Agent, the Lenders and any other Person holding any of the Obligations that would not otherwise be available to such Person under the Avoidance Provisions.

(e) Each Borrower agrees that the Obligations may at any time and from time to time exceed the Maximum Borrower Liability of such Person, and may exceed the aggregate Maximum Borrower Liability of all of Borrowers hereunder, without impairing this Agreement or any provision contained herein or affecting the rights and remedies of Administrative Agent and the Lenders hereunder.

(f) In the event any Borrower (a "***Funding Borrower***") shall make any payment or payments under this Agreement or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations hereunder, each other Borrower (each, a "***Contributing Borrower***") shall contribute to such Funding Borrower an amount equal to such payment or payments made, or losses suffered, by such Funding Borrower determined as of the date on which such payment or loss was made **multiplied by** the ratio of (i) the Maximum Borrower Liability of such Contributing Borrower (without giving effect to any right to receive any contribution or other obligation to make any contribution hereunder), to (ii) the aggregate Maximum Borrower Liability of all Borrowers (including the Funding Borrowers) hereunder (without giving effect to any right to receive, or obligation to make, any contribution hereunder). Nothing in this Section 10.23(f) shall affect the joint and several liability of any Borrower to Administrative Agent and the Lenders for the entire amount of its Obligations. Each Borrower covenants and agrees that its right to receive any contribution hereunder from a Contributing Borrower shall be subordinate and junior in right of payment to all obligations of Borrowers to Administrative Agent and the Lenders hereunder.

(g) No Borrower will exercise any rights which it may acquire by way of subrogation hereunder or under any other Loan Document or at law by any payment made hereunder or otherwise, nor shall any Borrower seek or be entitled to seek any contribution or reimbursement from any other Borrower in respect of payments made by such Person hereunder or under any other Loan Document, until all amounts owing to Administrative Agent and the Lenders on account of the Obligations are paid in full in cash. If any amounts shall be paid to any Borrower on account of such subrogation or contribution rights at any time when all of the Obligations shall not have been paid in full, such amount shall be held by such Person in trust for Administrative Agent and the Lenders, segregated from other funds of such Person, and shall, forthwith upon receipt by such Person, be turned over to Administrative Agent in the exact form received by such Person (duly endorsed by such Person to Administrative Agent, if required), to be applied against the Obligations, whether matured or unmatured, as provided for herein.

**SECTION 10.24. Acknowledgement Regarding Any Supported QFCs**. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Hedging Agreements or any other agreement or instrument that is a QFC (such support, "***QFC Credit Support***" and each such QFC a "***Supported QFC***"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "***U.S. Special Resolution Regimes***") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a) In the event a Covered Entity that is party to a Supported QFC (each, a "***Covered Party***") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate

of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.

(b) As used in this Section 10.24, the following terms have the following meanings:

"***BHC Act Affiliate***" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"***Covered Entity***" means any of the following:

(i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"***Default Right***" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"***QFC***" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

**SECTION 10.25. DIP Order**. In the event of any conflict between this Agreement and the DIP Order, the DIP Order shall control, other than as otherwise expressly set forth in any Intercreditor Agreements.

**SECTION 10.26. INTERCREDITOR AGREEMENTS.**

(a) EACH LENDER PARTY HERETO UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT IT (AND EACH OF ITS SUCCESSORS AND ASSIGNS) AND EACH OTHER LENDER (AND EACH OF THEIR SUCCESSORS AND ASSIGNS) SHALL BE BOUND BY THE INTERCREDITOR AGREEMENTS (INCLUDING ARTICLE VII HEREOF), WHICH IN CERTAIN CIRCUMSTANCES MAY REQUIRE (AS MORE FULLY PROVIDED THEREIN) THE TAKING OF CERTAIN ACTIONS BY THE LENDERS, AND IN THE EVENT OF A CONFLICT BETWEEN THE TERMS OF AN INTERCREDITOR AND THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, THE TERMS OF THE INTERCREDITOR AGREEMENT SHALL GOVERN AND CONTROL.

(b) THE PROVISIONS OF THIS SECTION 10.26 ARE NOT INTENDED TO SUMMARIZE OR FULLY DESCRIBE THE PROVISIONS OF ANY INTERCREDITOR AGREEMENTS. REFERENCE MUST BE MADE TO THE APPLICABLE INTERCREDITOR AGREEMENTS THEMSELVES TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF. EACH LENDER IS RESPONSIBLE FOR MAKING ITS OWN ANALYSIS AND REVIEW OF THE INTERCREDITOR AGREEMENTS AND THE TERMS AND PROVISIONS THEREOF, AND FIREHORSE MAKES NO REPRESENTATION TO ANY LENDER AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN THE INTERCREDITOR AGREEMENTS. A COPY OF THE INTERCREDITOR AGREEMENTS MAY BE OBTAINED FROM THE ADMINISTRATIVE AGENT.

(c) AS MORE FULLY PROVIDED THEREIN, EACH INTERCREDITOR AGREEMENT CAN ONLY BE AMENDED IN ACCORDANCE WITH THE PROVISIONS THEREOF.

## ARTICLE XI **SECURITY AGREEMENT**

**SECTION 11.01. Grant of Security Interest**. Unless otherwise indicated in this Agreement, words used in this Section that are defined in Article 9 of UCC as in effect in the Governing Jurisdiction on the date of this Agreement ("***Article 9***"), or are used in Article 9, shall have the same meanings as in Article 9. To secure the full and complete payment and performance of the Obligations, the Loan Parties hereby grants to the Administrative Agent a security interest in all assets of the Loan Parties including, without limitation, the following personal property and fixtures, now owned and hereafter acquired, created or arising and including all DIP Collateral (collectively, "***Collateral***"): (i) accounts; (ii) certificates of title; (iii) chattel paper, including, without limitation, tangible chattel paper and electronic chattel paper; (iv) deposit accounts; (v) documents, including, without limitation, tangible documents of title, electronic documents of title and warehouse receipts; (vi) general intangibles, including, without limitation, payment intangibles, including, without limitation residual rights in the Loans; (vii) goods, including, without limitation, inventory, equipment, fixtures, manufactured homes and farm products; (viii) health-care-insurance receivables; (ix) instruments; (x) intellectual property, including, without limitation, patents, trademarks, copyrights, mask works, licenses, and trade secrets; (xi) investment property, including, without limitation, securities, security entitlements, securities accounts, commodity accounts, and commodity contracts; (xii) letter-of-credit rights and letters of credit; (xiii) money; (xiv) promissory notes; (xv) software; (xvi) as-extracted collateral; (xvii) timber to be cut; (xviii) the following commercial tort claim(s): (xix) supporting obligations; (xx) products of any of the foregoing; (xxi) proceeds of any of the foregoing (including, without limitation, cash and non-cash proceeds and insurance proceeds, including, without limitation, proceeds of directors and officers insurance); and (xxii) records. If any Loan Party now has, or hereafter acquires, any right, title, or interest in any commercial tort claim that is not described above, the Loan Parties shall promptly (and in any event within ten (10) days hereafter or after such acquisition, as applicable) give the Administrative Agent written notice thereof and the Loan Parties shall execute and deliver to the Administrative Agent a security agreement in form and substance satisfactory to the Administrative Agent for the purpose of granting to the Administrative Agent a valid and enforceable security interest in such commercial tort claim to further secure the Obligations. Each of the Loan Parties represents and warrants to the Administrative Agent that the security interests granted to the Administrative Agent in this Agreement are now and shall at all times be valid and enforceable first priority security interests, subject to any Intercreditor Agreement.

**SECTION 11.02. Perfection of Security Interest**. The Administrative Agent shall be entitled to file and maintain one or more UCC financing statements identifying the Loan Parties as the debtors and the Administrative Agent as the secured party for purposes of perfecting and giving notice of the security interests granted to the Administrative Agent in this Agreement. The Administrative Agent shall be entitled to describe the collateral on such UCC financing statements in the manner described in this Section 11.02, or as "all assets of the Debtor," or as "all personal property of the Debtor," or any combination thereof. Promptly upon, and in any event within five (5) days after, the Administrative Agent's written request, the Loan Parties shall provide the Administrative Agent with all information that the Administrative Agent requests for purposes of preparing and filing such UCC financing statements. With respect to security interests granted to the Administrative Agent in this Agreement in any personal property or fixtures as to which another method of perfection (for example, perfection by possession, perfection by control, perfection by filing a fixture filing, or perfection by any filing other than a UCC financing statement filing) may be required, or may be deemed necessary or advisable by the Administrative Agent (and the Administrative Agent shall have notified the Loan Parties thereof), the Loan Parties shall promptly cause such security interests to be perfected by such other method of perfection, and to the extent that it is necessary to obtain an account control agreement, written consent, written acknowledgment or other documentation from a deposit account bank, a securities intermediary, a letter of credit issuer, a bailee, or other Person for such purposes, the Loan Parties shall promptly obtain such agreement, consent, acknowledgment or other

documentation from such deposit account bank, securities intermediary, letter of credit issuer, bailee or other Person, in form and substance satisfactory to the Administrative Agent and otherwise subject to the Intercreditor Agreements. Promptly upon the Administrative Agent's written request, the Loan Parties shall take such actions, and cause the Loan Parties' other creditors and counterparties to take such actions, as may be necessary or advisable, as determined by the Administrative Agent in the Administrative Agent's discretion, to confirm that the security interests granted to the Administrative Agent under this Agreement are perfected first priority security interests and are not subject to any security interest, lien or encumbrance of any other Person (in each case, subject to any Intercreditor Agreement). Subject to the Intercreditor Agreements, all costs and expenses (including the Administrative Agent's attorneys' fees and other legal expenses, and all costs, expenses, and taxes relating to filings and the like) of perfecting, confirming and maintaining the first priority (subject to any Intercreditor Agreement) of the security interests granted to the Administrative Agent under this Agreement shall be paid or reimbursed by the Loan Parties promptly upon, and in any event within ten (10) days after, the Administrative Agent's written requests for such payment or reimbursement from time to time. The Administrative Agent shall have all of the rights and remedies of a secured party under the UCC as in effect in the Governing Jurisdiction and other applicable law. Within ten (10) days after the Administrative Agent's written requests from time to time, the Loan Parties shall provide the Administrative Agent with such information as the Administrative Agent may request regarding any or all of the Collateral. This Agreement constitutes a security agreement made by the Loan Parties for the benefit and security of the Administrative Agent. The Loan Parties and Administrative Agent intend that the liens and security interest granted hereunder are intended to be substantially contemporaneous exchange of new value between the Loan Parties and Administrative Agent.

[remainder of this page intentionally left blank]

**IN WITNESS WHEREOF,** each of the parties hereto has caused this Agreement to be duly executed and delivered by its officer or officers thereunto duly authorized as of the date first above written.

**BORROWERS:**

**UPG ENTERPRISES LLC**, a Delaware limited liability company

Signed by:
By: John Sordillo
C2DE6D9CA6C149C...
Name: John Sordillo
Title: Chief Restructuring Officer

**UP INVESTMENT HOLDINGS LLC**, a Delaware limited liability company

Signed by:
By: John Sordillo
C2DE6D9CA6C149C...
Name: John Sordillo
Title: Chief Restructuring Officer

**METALEX, LLC**, a
Delaware limited liability company

Signed by:
By: John Sordillo
C2DE6D9CA6C149C...
Name: John Sordillo
Title: Chief Restructuring Officer

**UPG FABRICATION LLC**, a
Delaware limited liability company

Signed by:
By: John Sordillo
C2DE6D9CA6C149C...
Name: John Sordillo
Title: Chief Restructuring Officer

**NATIONAL METALWARES, L.P.,** a
Delaware limited partnership

Signed by:
By: John Sordillo
C2DE6D9CA6C149C...
Name: John Sordillo
Title: Chief Restructuring Officer

**NATIONAL METALWARES HOLDINGS LLC**, a
Delaware limited liability company

Signed by:
By: John Sordillo
C2DE6D9CA6C149C...
Name: John Sordillo
Title: Chief Restructuring Officer

**SIDECAR NM LLC**, a
Delaware limited liability company

Signed by:
By: John Sordillo
C2DE6D9CA6C149C
Name: John Sordillo
Title: Chief Restructuring Officer

**MAKSTEEL USA LLC**, a
Delaware limited liability company

Signed by:
By: John Sordillo
C2DE6D9CA6C149C
Name: John Sordillo
Title: Chief Restructuring Officer

**CHICAGO STEEL HOLDINGS LLC**, a
Delaware limited liability company

Signed by:
By: John Sordillo
C2DE6D9CA6C149C
Name: John Sordillo
Title: Chief Restructuring Officer

**LEXINGTON STEEL LLC**, a
Delaware limited liability company

Signed by:
By: John Sordillo
C2DE6D9CA6C149C
Name: John Sordillo
Title: Chief Restructuring Officer

**MAKSTEEL HOLDING CORP.**, a
Delaware corporation

Signed by:
By: John Sordillo
C2DE6D9CA6C149C
Name: John Sordillo
Title: Chief Restructuring Officer

**UPG FLAT ROLL GROUP LLC**, a
Delaware limited liability company

Signed by:
By: John Sordillo
C2DE6D9CA6C149C
Name: John Sordillo
Title: Chief Restructuring Officer

**UP EQUIPMENT HOLDINGS LLC**, a
Delaware limited liability company

Signed by:
By: John Sordillo
C2DE6D9CA6C149C...
Name: John Sordillo
Title: Chief Restructuring Officer

**UP CENTRAL OFFICE LLC**, a
Delaware limited liability company

Signed by:
By: John Sordillo
C2DE6D9CA6C149C...
Name: John Sordillo
Title: Chief Restructuring Officer

**UPI MAKUSA LLC**, a
Delaware limited liability company

Signed by:
By: John Sordillo
C2DE6D9CA6C149C...
Name: John Sordillo
Title: Chief Restructuring Officer

**DOUGLASS LOGISTICS LLC**, an
Illinois limited liability company

Signed by:
By: John Sordillo
C2DE6D9CA6C149C...
Name: John Sordillo
Title: Chief Restructuring Officer

**UPI LS LLC**, a
Delaware limited liability company

Signed by:
By: John Sordillo
C2DE6D9CA6C149C...
Name: John Sordillo
Title: Chief Restructuring Officer

**MAKSTEEL TRANSPORT LLC**, an
Illinois limited liability company

Signed by:
By: John Sordillo
C2DE6D9CA6C149C...
Name: John Sordillo
Title: Chief Restructuring Officer

**UPG METAL SERVICES LLC**, a
Delaware limited liability company

By: ______________________________
Name: John Sordillo
Title: Chief Restructuring Officer

**MHIG LLC**, a
Delaware limited liability company

Signed by:
By: John Sordillo
C2DB6D9CA6C149D
Name: John Sordillo
Title: Chief Restructuring Officer

**GENX LEASING PARTNERS LLC**, a
a Delaware limited liability company

Signed by:
By: John Sordillo
C2DB6D9CA6C149D
Name: John Sordillo
Title: Chief Restructuring Officer

**ADMINISTRATIVE AGENT:**

**Firehorse Capital LLC**, as Administrative Agent

DocuSigned by:

By: Paul Douglass
078DA726DFAC449...

Name: Paul Douglass
Title: Manager

**LENDERS:**

**Firehorse Capital LLC**, as a Lender

DocuSigned by:

By: Paul Douglass

Name: Paul Douglass

Title: Manager

New Money DIP Loan Commitment: $6,083,000.00

[Schedules on file with the Administrative Agent.]

# Exhibit 2.02

# FORM OF
BORROWING REQUEST[1]

_______________, 20___

FIREHORSE CAPITAL LLC
in its capacity as Administrative Agent
281 S Frontage Road
Burr Ridge, IL 60527
Attention: Chris Hutter; Paul Douglass
E-mail: pdouglass@firehorsecap.com; chutter@firehorsecap.com

Ladies and Gentlemen:

The undersigned, UPG ENTERPRISES LLC, a Delaware limited liability company (the "***Company***" or "***Borrower Agent***"), refers to that certain Credit and Security Agreement dated as of September 22, 2026 (as amended, restated, supplemented, extended or otherwise modified from time to time, the "***Credit Agreement***"), by and among the Company and each other Person listed on the signature pages thereto as a "Borrower" (together with the Company, each, individually, a "***Borrower***", and collectively, "***Borrowers***"), the Lenders from time to time party thereto and FIREHORSE CAPITAL LLC, a Delaware limited liability company, as Administrative Agent. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

Borrower Agent, on behalf of the Borrowers, hereby gives you notice that Borrowers request a New Money DIP Loan pursuant to the provisions of Sections 2.01 and 2.02 of the Credit Agreement, and in connection therewith sets forth below the terms on which such Loan is requested to be made:

**(1)** Date of Borrowing:[2] ________________________

**(2)** Aggregate principal amount of Borrowing: ________________________

Borrowers hereby represent and warrant as of the date hereof, and, upon acceptance of the Loan made in response to this request, Borrowers shall be deemed to have represented and warranted, that (i) the conditions to lending specified in Sections 4.02 of the Credit Agreement have been satisfied, including, without limitation that the Borrowers are in compliance in all respects with the Milestones that have occurred on or prior to the date hereof and (ii) [no event has occurred that would require a mandatory prepayment be made pursuant to Section 2.09(b)]/[a mandatory prepayment in the amount of $[__] is required to be made pursuant to Section 2.09(b) on [__], which amount, in the sole discretion of the Lenders, may be netted from the aggregate principal amount of the Borrowing set forth in clause (2) above].

---

[1] Borrowing Request must be received by Administrative Agent no later than 1:00 p.m., New York City time, 3 Business Days before the date of the proposed Borrowing (or such shorter notice as agreed to by the Administrative Agent and the applicable Lender(s) in their sole discretion).

[2] Must be a Business Day.

**BORROWER AGENT:**

Very truly yours,

**UPG ENTERPRISES LLC**

By: ___________________________

Name:
Title:

# Exhibit 2.12-1

# FORM OF
U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit and Security Agreement dated as of September 22, 2026 (as amended, restated, supplemented, extended or otherwise modified from time to time, the "***Credit Agreement***"), by and among UPG ENTERPRISES LLC, a Delaware limited liability company ("***Company***") and each Person listed on the signature pages thereto as a "Borrower" and each other Person joined thereto as a Borrower from time to time (together with the Company, each, individually, a "***Borrower***", and collectively, "***Borrowers***"), the Lenders from time to time party thereto and Firehorse Capital LLC, a Delaware limited liability company, as Administrative Agent.

Pursuant to the provisions of Section 2.12 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s), (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and Borrowers with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform Borrowers and the Administrative Agent, and (2) the undersigned shall have at all times furnished Borrowers and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

**LENDER:** [ ______________________________ ]

By: ___________________________________

Name:
Title:

# Exhibit 2.12-2

# FORM OF
# U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit and Security Agreement dated as of September 22, 2026 (as amended, restated, supplemented, extended or otherwise modified from time to time, the "***Credit Agreement***"), by and among UPG ENTERPRISES LLC, a Delaware limited liability company ("***Company***") and each Person listed on the signature pages thereto as a "Borrower" and each other Person joined thereto as a Borrower from time to time (together with the Company, each, individually, a "***Borrower***", and collectively, "***Borrowers***"), the Lenders from time to time party thereto and Firehorse Capital LLC, a Delaware limited liability company, as Administrative Agent.

Pursuant to the provisions of Section 2.12 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, and (iv) it is not a "controlled foreign corporation" related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

**PARTICIPANT:** [ ______________________________]

By: _________________________________

Name:
Title:

# Exhibit 2.12-3

# FORM OF
# U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit and Security Agreement dated as of September 22, 2026 (as amended, restated, supplemented, extended or otherwise modified from time to time, the "***Credit Agreement***"), by and among UPG ENTERPRISES LLC, a Delaware limited liability company ("***Company***") and each Person listed on the signature pages thereto as a "Borrower" and each other Person joined thereto as a Borrower from time to time (together with the Company, each, individually, a "***Borrower***", and collectively, "***Borrowers***"), the Lenders from time to time party thereto and Firehorse Capital LLC, a Delaware limited liability company, as Administrative Agent.

Pursuant to the provisions of Section 2.12 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect to such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN, (ii) an IRS Form W-8BEN-E or (iii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

**PARTICIPANT:** [ ________________________________]

By: ___________________________________

Name:
Title:

**Exhibit 2.12-4**

# FORM OF
# U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit and Security Agreement dated as of September 22, 2026 (as amended, restated, supplemented, extended or otherwise modified from time to time, the "***Credit Agreement***"), by and among UPG ENTERPRISES LLC, a Delaware limited liability company ("***Company***") and each Person listed on the signature pages thereto as a "Borrower" and each other Person joined thereto as a Borrower from time to time (together with the Company, each, individually, a "***Borrower***", and collectively, "***Borrowers***"), the Lenders from time to time party thereto and Firehorse Capital LLC, a Delaware limited liability company, as Administrative Agent.

Pursuant to the provisions of Section 2.12 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s), (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and Borrowers with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN, (ii) an IRS Form W-8BEN-E, or (iii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform Borrowers and the Administrative Agent, and (2) the undersigned shall have at all times furnished Borrowers and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

**LENDER:** [________________________________]

By: ___________________________________

Name:
Title:

**Exhibit 3.13**

# APPROVED BUDGET

(See Attached)

**UPG Enterprises, LLC,** *et. al.*
DEBTOR IN POSSESSION
(in 000's)

| WEEK ENDING >>> | 1<br>09/25/26 | 2<br>10/02/26 | 3<br>10/09/26 | 4<br>10/16/26 | 5<br>10/23/26 | 6<br>10/30/26 | 7<br>11/06/26 | 8<br>11/13/26 | 9<br>11/20/26 | 10<br>11/27/26 | 11<br>12/04/26 | 12<br>12/11/26 | 13<br>12/18/26 | 13- Week<br>TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DIP Budget** | | | | | | *Milestone 1* | | | | *Milestone 2* | | | | |
| Cash Balance | 250 | (393) | (1,497) | (1,966) | (2,406) | (2,847) | (3,441) | (4,144) | (4,585) | (4,922) | (5,204) | (5,506) | (5,788) | $ 250 |
| **Corporate Expenses** | - | (77) | (66) | (38) | (38) | (148) | (235) | (38) | (16) | (16) | (36) | (16) | (29) | (754) |
| **Adequate Protection Payments** | | | | | | | | | | | | | - | |
| **Flat Roll Group** | | | | | | | | | | | | | | |
| Professional Fees (Lender counsel, FA) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | - | - | - | - | (225) |
| **Total** | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | - | | | | (225) |
| **Fabrication Group** | | | | | | | | | | | | | | |
| Professional Fees (Lender counsel, FA) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | - | - | - | - | (270) |
| Interest Payments | - | (65) | - | - | - | - | (65) | - | - | - | - | - | - | (130) |
| **Total** | (30) | (95) | (30) | (30) | (30) | (30) | (95) | (30) | (30) | - | | | | (400) |
| **Total Adequate Protection** | **(55)** | **(120)** | **(55)** | **(55)** | **(55)** | **(55)** | **(120)** | **(55)** | **(55)** | **-** | **-** | **-** | **-** | **(625)** |
| **Critical Vendor Payments** | - | (600) | - | - | - | - | - | - | - | - | - | - | - | (600) |
| **Professional Fees** [1] | | | | | | | | | | | | | | |
| Independent Board Member | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (6) | (6) | (6) | (6) | (6) | (90) |
| Debtor BK Counsel | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (85) | (85) | (85) | (85) | (85) | (1,425) |
| Debtor BK Local Counsel | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (10) | (10) | (10) | (10) | (10) | (150) |
| Financial Advisor / CRO | (81) | (81) | (81) | (81) | (81) | (81) | (81) | (81) | (60) | (60) | (60) | (60) | (60) | (950) |
| Counsel Other (DIP) | (325) | (45) | (45) | (45) | (45) | (45) | (45) | (45) | (36) | (36) | (36) | (36) | (36) | (820) |
| Claims Agent | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (10) | (10) | (10) | (10) | (10) | (150) |
| Investment Banker | (11) | (11) | (11) | (11) | (11) | (11) | (11) | (11) | (9) | (9) | (9) | (9) | (9) | (135) |
| OCP | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (10) | (10) | (10) | (10) | (10) | (150) |
| UST | - | - | - | - | - | (44) | - | - | - | - | - | - | - | (44) |
| UCC Counsel | - | - | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (220) |
| UCC FA | - | - | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (220) |
| **Total Professional Fees** | **(588)** | **(308)** | **(348)** | **(348)** | **(348)** | **(392)** | **(348)** | **(348)** | **(266)** | **(266)** | **(266)** | **(266)** | **(266)** | **(4,354)** |
| **Cash Flow** | **(643)** | **(1,105)** | **(469)** | **(441)** | **(441)** | **(594)** | **(703)** | **(441)** | **(337)** | **(282)** | **(302)** | **(282)** | **(295)** | **(6,333)** |
| **DIP Budget** | **393** | **1,497** | **1,966** | **2,406** | **2,847** | **3,441** | **4,144** | **4,585** | **4,922** | **5,204** | **5,506** | **5,788** | **6,083** | **6,083** |

*Milestone 1 - Recoveries deposited into the DIP account or committed APA's totaling $2M*
*Milestone 2 - Recoveries deposited into the DIP account totaling $2M*

**UPG Enterprises, LLC,** ***et. al.***

DEBTOR IN POSSESSION
(in 000's)

| WEEK ENDING >>> | 1<br>09/25/26 | 2<br>10/02/26 | 3<br>10/09/26 | 4<br>10/16/26 | 5<br>10/23/26 | 6<br>10/30/26 | 7<br>11/06/26 | 8<br>11/13/26 | 9<br>11/20/26 | 10<br>11/27/26 | 11<br>12/04/26 | 12<br>12/11/26 | 13<br>12/18/26 | 13- Week TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DIP** | **$ (393)** | **$ (1,497)** | **$ (1,966)** | **$ (2,406)** | **$ (2,847)** | **$ (3,441)** | **$ (4,144)** | **$ (4,585)** | **$ (4,922)** | **$ (5,204)** | **$ (5,506)** | **$ (5,788)** | **$ (6,083)** | **$ (6,083)** |
| **DIP Sources** | | | | | | | | | | | | | | |
| Firehorse Funding | $ 2,000 | | | | | | | | | | | | | 2,000 |
| Transaction Recovery [2] | - | 440 | 991 | 371 | 371 | 371 | 371 | 371 | 2,774 | 415 | 415 | - | - | 6,892 |
| **Total DIP Sources** | **$ 2,000** | **$ 2,440** | **$ 3,431** | **$ 3,803** | **$ 4,174** | **$ 4,546** | **$ 4,917** | **$ 5,289** | **$ 8,063** | **$ 8,477** | **$ 8,892** | **$ 8,892** | **$ 8,892** | **$ 8,892** |
| **DIP Balance** | **$ 1,608** | **$ 943** | **$ 1,466** | **$ 1,396** | **$ 1,327** | **$ 1,104** | **$ 773** | **$ 704** | **$ 3,141** | **$ 3,274** | **$ 3,386** | **$ 3,104** | **$ 2,809** | **$ 2,809** |
| DIP Interest (10%) & Unused line fee (1.5%) | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 126 |
| DIP Exit Fee (4%) | | | | | | | | | | | | | $ 253 | $ 253 |
| **Firehorse Loan** | | | | | | | | | | | | | | |
| Firehorse Initial Payments | $ 4,984 | | | | | | | | | | | | | $ 4,984 |
| Firehorse DIP | $ 2,000 | | | | | | | | | | | | | $ 2,000 |
| Unused line fee and exit fee | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 263 | $ 379 |
| **Firehorse Total Loan** | **$ 6,994** | **$ 7,003** | **$ 7,013** | **$ 7,023** | **$ 7,032** | **$ 7,042** | **$ 7,052** | **$ 7,062** | **$ 7,071** | **$ 7,081** | **$ 7,091** | **$ 7,100** | **$ 7,363** | **$ 7,363** |

**[1] Professional fees escrow into a sinking fund and will be paid based on court approved timing**
**[2] Transaction Recovery: funds received estimated timing and amounts based on sales process**

**Flat Roll Group Recovery**

| **Loans Balance** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start | **$ 8,771** | **$ 8,771** | **$ 8,321** | **$ 6,121** | **$ 5,936** | **$ 5,936** | **$ 5,936** | **$ 5,936** | **$ 5,936** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 8,771** |
| Pay-down | | **$ (450)** | **$ (2,200)** | **$ (185)** | **$ -** | **$ -** | **$ -** | **$ -** | **$ (5,936)** | **$ -** | **$ -** | **$ -** | **$ -** | **$ (8,771)** |
| Ending | **$ 8,771** | **$ 8,321** | **$ 6,121** | **$ 5,936** | **$ 5,936** | **$ 5,936** | **$ 5,936** | **$ 5,936** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** |

## Exhibit 5.01

# FORM OF
# COMPLIANCE CERTIFICATE

For the Fiscal Period ended ___________ ___, 20___

This Compliance Certificate is delivered to you pursuant to Section 5.01(a) of that certain Credit and Security Agreement dated as of September 22, 2026 (as amended, restated, supplemented, extended or otherwise modified from time to time, the "***Credit Agreement***"), by and among the Borrowers (as defined below), Firehorse Capital LLC, a Delaware limited liability company ("***Firehorse***"), as a Lender, the other Lenders from time to time party thereto and Firehorse, as Administrative Agent. Capitalized terms used but not otherwise defined herein shall have the meanings provided in the Credit Agreement.

I, [____], the [_] of UPG ENTERPRISES LLC, a Delaware limited liability company (the "***Company***" or "***Borrower Agent***"), on behalf of the Company and each other Person listed on the signature pages to the Credit Agreement as a "Borrower" and each other Person joined thereto as a Borrower from time to time (together with the Company, each, individually, a "***Borrower***", and collectively, "***Borrowers***") hereby certify solely in my capacity as a Responsible Officer of the Borrower Agent and not in my individual capacity that the following information is accurate as of the date hereof.

(i) Since [_____][1] [no Default or Event of Default has occurred under the Credit Agreement][a Default or Event of Default has occurred, as described on Annex 1 hereto, and the action taken or proposed to be taken with respect thereto is described on Annex 1 hereto].

(ii) Since the Effective Date and except as previously notified to the Administrative Agent, none of the Borrowers nor any Subsidiary has changed its legal name, organizational identity, jurisdiction of organization, identification number; the location of its chief executive office.

(iii) Delivered herewith as Attachment A are reasonably detailed calculations of the variance report and such other supporting documentation requested by Firehorse as required pursuant to Section 5.11(a) of the Credit Agreement and a statement of whether Borrowers were in compliance with the Annual Budget on each Friday of each weekly period occurring within the Fiscal Period referred to above pursuant to Section 5.11(b) of the Credit Agreement.

[Remainder of Page Intentionally Left Blank]

---

[1] The date of the last similar certification, or, if none, the Effective Date.

This ___ day of ____________ , 20___.

**BORROWER AGENT:**

**UPG ENTERPRISES LLC**

By: ______________________________

Name:
Title:

**"Attachment A" to Compliance Certificate**

[See attached for Variance Report]

Certification regarding Section 5.11(b) of the Credit Agreement

| | |
|---|---|
| The cash receipts and aggregate cash disbursements (excluding debtor and lender professional fees) for the applicable weekly period do not vary by more than 10% from the Approved Budget for such period. | **Yes ___ No ___** |

## Exhibit 10.04(b)(i1)

## FORM OF ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (this "***Assignment and Assumption***") is dated as of the Effective Date set forth below and is entered into by and between _______[*insert name of Assignor*] (the "***Assignor***") and _____________[*insert name of Assignee*] (the "***Assignee***"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as may be amended, restated, supplemented, extended or otherwise modified from time to time, the "***Credit Agreement***"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto (the "***Standard Terms and Conditions***") are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement, and any other documents or instruments delivered pursuant thereto, to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity, in each case to the extent related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as, the "***Assigned Interest***"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

(i) Assignor: _________

(ii) Assignee: _________

[and is an Affiliate/Approved Fund of [*identify Lender*]

(iii) Borrowers: UPG ENTERPRISES LLC, a Delaware limited liability company and the other Borrowers signatory thereto

(iv) Administrative Agent: FIREHORSE CAPITAL LLC, as the administrative agent under the Credit Agreement

(v) Credit Agreement: The Credit and Security Agreement dated as of September 22, 2026 (as amended, restated, supplemented, extended or otherwise modified from time to time), by and among the Borrowers, the Lenders from time to time party thereto, and the Administrative Agent.

(vi) Assigned Interest:

| Facility Assigned | Aggregate Amount of New Money DIP Loan Commitments / Roll-Up DIP Loans for all Lenders | Amount of New Money DIP Loan Commitments / Roll-Up DIP Loans Assigned | Percentage Assigned of New Money DIP Loan Commitments / Roll-Up DIP Loans[1] |
|---|---|---|---|
| New Money DIP Loan Commitment | $ | $ | % |
| Roll-Up DIP Loan | $ | $ | % |

(vii) [Trade Date: ________]

Effective Date: ___________ ___, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

**ASSIGNOR:**

**[NAME OF ASSIGNOR]**

By: ___________________________
Title:

**ASSIGNEE:**

**[NAME OF ASSIGNEE]**

By: ___________________________
Title:

[1] Set forth, to at least 9 decimals, as a percentage of the New Term Loan Commitments / Loans of all Lenders thereunder.

[Consented to and] Accepted:

**FIREHORSE CAPITAL LLC**, as Administrative Agent

By: ______________________________
Name:
Title:

# ANNEX I

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1. Representations and Warranties

1.1 Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver the Assignment and Assumption and to consummate the transactions contemplated hereby, and (iv) it is not a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrowers, any of their Subsidiaries or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrowers, any of their Subsidiaries or any other Person of any of their respective obligations under any Loan Document.

1.2 Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements for an assignee under Section 10.04(b) of the Credit Agreement (subject to receipt of such consents as may be required under the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 5.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest, on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, (vi) attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement (including Section 2.13(g)), duly completed and executed by the Assignee, and (vii) all of the representations and warranties contained in Section 9.04(c) of the Credit Agreement are true and correct and the Assignee hereby agrees to the covenants contained in such Section; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2. Payments. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to Assignee for amounts which have accrued from and after the Effective Date.

3. General Provisions. This Assignment and Assumption shall be binding upon, and inure to the benefit of the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy or

electronic mail shall be effective as delivery of a manually executed counterpart of a signature page of this Assignment and Assumption. This Assignment and Assumption shall be governed by and construed in accordance with, the law of the State of New York.

**Exhibit 3.13**

# APPROVED BUDGET

(See Attached)

**UPG Enterprises, LLC,** *et. al.*
DEBTOR IN POSSESSION
(in 000's)

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13- Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WEEK ENDING >>> | 09/25/26 | 10/02/26 | 10/09/26 | 10/16/26 | 10/23/26 | 10/30/26 | 11/06/26 | 11/13/26 | 11/20/26 | 11/27/26 | 12/04/26 | 12/11/26 | 12/18/26 | TOTAL |
| **DIP Budget** | | | | | | *Milestone 1* | | | | *Milestone 2* | | | | |
| Cash Balance | 250 | (393) | (1,497) | (1,966) | (2,406) | (2,847) | (3,441) | (4,144) | (4,585) | (4,922) | (5,204) | (5,506) | (5,788) | $ 250 |
| **Corporate Expenses** | - | (77) | (66) | (38) | (38) | (148) | (235) | (38) | (16) | (16) | (36) | (16) | (29) | (754) |
| **Adequate Protection Payments** | | | | | | | | | | | | | - | |
| **Flat Roll Group** | | | | | | | | | | | | | | |
| Professional Fees (Lender counsel, FA) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | - | - | - | - | (225) |
| **Total** | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | - | | | | (225) |
| **Fabrication Group** | | | | | | | | | | | | | | |
| Professional Fees (Lender counsel, FA) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | - | - | - | - | (270) |
| Interest Payments | - | (65) | - | - | - | - | (65) | - | - | - | - | - | - | (130) |
| **Total** | (30) | (95) | (30) | (30) | (30) | (30) | (95) | (30) | (30) | - | | | | (400) |
| **Total Adequate Protection** | **(55)** | **(120)** | **(55)** | **(55)** | **(55)** | **(55)** | **(120)** | **(55)** | **(55)** | **-** | **-** | **-** | **-** | **(625)** |
| **Critical Vendor Payments** | - | (600) | - | - | - | - | - | - | - | - | - | - | - | (600) |
| **Professional Fees** [1] | | | | | | | | | | | | | | |
| Independent Board Member | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (6) | (6) | (6) | (6) | (6) | (90) |
| Debtor BK Counsel | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (85) | (85) | (85) | (85) | (85) | (1,425) |
| Debtor BK Local Counsel | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (10) | (10) | (10) | (10) | (10) | (150) |
| Financial Advisor / CRO | (81) | (81) | (81) | (81) | (81) | (81) | (81) | (81) | (60) | (60) | (60) | (60) | (60) | (950) |
| Counsel Other (DIP) | (325) | (45) | (45) | (45) | (45) | (45) | (45) | (45) | (36) | (36) | (36) | (36) | (36) | (820) |
| Claims Agent | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (10) | (10) | (10) | (10) | (10) | (150) |
| Investment Banker | (11) | (11) | (11) | (11) | (11) | (11) | (11) | (11) | (9) | (9) | (9) | (9) | (9) | (135) |
| OCP | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (10) | (10) | (10) | (10) | (10) | (150) |
| UST | - | - | - | - | - | (44) | - | - | - | - | - | - | - | (44) |
| UCC Counsel | - | - | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (220) |
| UCC FA | - | - | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (220) |
| **Total Professional Fees** | **(588)** | **(308)** | **(348)** | **(348)** | **(348)** | **(392)** | **(348)** | **(348)** | **(266)** | **(266)** | **(266)** | **(266)** | **(266)** | **(4,354)** |
| **Cash Flow** | **(643)** | **(1,105)** | **(469)** | **(441)** | **(441)** | **(594)** | **(703)** | **(441)** | **(337)** | **(282)** | **(302)** | **(282)** | **(295)** | **(6,333)** |
| **DIP Budget** | **393** | **1,497** | **1,966** | **2,406** | **2,847** | **3,441** | **4,144** | **4,585** | **4,922** | **5,204** | **5,506** | **5,788** | **6,083** | **6,083** |

*Milestone 1 - Recoveries deposited into the DIP account or committed APA's totaling $2M*
*Milestone 2 - Recoveries deposited into the DIP account totaling $2M*

**UPG Enterprises, LLC,** *et. al.*
DEBTOR IN POSSESSION
(in 000's)

| WEEK ENDING >>> | 1<br>09/25/26 | 2<br>10/02/26 | 3<br>10/09/26 | 4<br>10/16/26 | 5<br>10/23/26 | 6<br>10/30/26 | 7<br>11/06/26 | 8<br>11/13/26 | 9<br>11/20/26 | 10<br>11/27/26 | 11<br>12/04/26 | 12<br>12/11/26 | 13<br>12/18/26 | 13- Week TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DIP** | **$ (393)** | **$ (1,497)** | **$ (1,966)** | **$ (2,406)** | **$ (2,847)** | **$ (3,441)** | **$ (4,144)** | **$ (4,585)** | **$ (4,922)** | **$ (5,204)** | **$ (5,506)** | **$ (5,788)** | **$ (6,083)** | **$ (6,083)** |
| **DIP Sources** | | | | | | | | | | | | | | |
| Firehorse Funding | $ 2,000 | | | | | | | | | | | | | 2,000 |
| Transaction Recovery [2] | - | 440 | 991 | 371 | 371 | 371 | 371 | 371 | 2,774 | 415 | 415 | - | - | 6,892 |
| **Total DIP Sources** | **$ 2,000** | **$ 2,440** | **$ 3,431** | **$ 3,803** | **$ 4,174** | **$ 4,546** | **$ 4,917** | **$ 5,289** | **$ 8,063** | **$ 8,477** | **$ 8,892** | **$ 8,892** | **$ 8,892** | **$ 8,892** |
| **DIP Balance** | **$ 1,608** | **$ 943** | **$ 1,466** | **$ 1,396** | **$ 1,327** | **$ 1,104** | **$ 773** | **$ 704** | **$ 3,141** | **$ 3,274** | **$ 3,386** | **$ 3,104** | **$ 2,809** | **$ 2,809** |
| DIP Interest (10%) & Unused line fee (1.5%) | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 126 |
| DIP Exit Fee (4%) | | | | | | | | | | | | | $ 253 | $ 253 |
| <u>**Firehorse Loan**</u> | | | | | | | | | | | | | | |
| Firehorse Initial Payments | $ 4,984 | | | | | | | | | | | | | $ 4,984 |
| Firehorse DIP | $ 2,000 | | | | | | | | | | | | | $ 2,000 |
| Unused line fee and exit fee | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 263 | $ 379 |
| **Firehorse Total Loan** | **$ 6,994** | **$ 7,003** | **$ 7,013** | **$ 7,023** | **$ 7,032** | **$ 7,042** | **$ 7,052** | **$ 7,062** | **$ 7,071** | **$ 7,081** | **$ 7,091** | **$ 7,100** | **$ 7,363** | **$ 7,363** |

**[1] Professional fees escrow into a sinking fund and will be paid based on court approved timing**
**[2] Transaction Recovery: funds received estimated timing and amounts based on sales process**

**Flat Roll Group Recovery**

| **Loans Balance** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13- Week TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start | **$ 8,771** | **$ 8,771** | **$ 8,321** | **$ 6,121** | **$ 5,936** | **$ 5,936** | **$ 5,936** | **$ 5,936** | **$ 5,936** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 8,771** |
| Pay-down | | **$ (450)** | **$ (2,200)** | **$ (185)** | **$ -** | **$ -** | **$ -** | **$ -** | **$ (5,936)** | **$ -** | **$ -** | **$ -** | **$ -** | **$ (8,771)** |
| Ending | **$ 8,771** | **$ 8,321** | **$ 6,121** | **$ 5,936** | **$ 5,936** | **$ 5,936** | **$ 5,936** | **$ 5,936** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** |

# Exhibit 5.01

# FORM OF
COMPLIANCE CERTIFICATE

For the Fiscal Period ended ___________ ___, 20___

This Compliance Certificate is delivered to you pursuant to Section 5.01(a) of that certain Credit and Security Agreement dated as of September 22, 2026 (as amended, restated, supplemented, extended or otherwise modified from time to time, the "***Credit Agreement***"), by and among the Borrowers (as defined below), Firehorse Capital LLC, a Delaware limited liability company ("***Firehorse***"), as a Lender, the other Lenders from time to time party thereto and Firehorse, as Administrative Agent. Capitalized terms used but not otherwise defined herein shall have the meanings provided in the Credit Agreement.

I, [____], the [_] of UPG ENTERPRISES LLC, a Delaware limited liability company (the "***Company***" or "***Borrower Agent***"), on behalf of the Company and each other Person listed on the signature pages to the Credit Agreement as a "Borrower" and each other Person joined thereto as a Borrower from time to time (together with the Company, each, individually, a "***Borrower***", and collectively, "***Borrowers***") hereby certify solely in my capacity as a Responsible Officer of the Borrower Agent and not in my individual capacity that the following information is accurate as of the date hereof.

(i) Since [_____][1] [no Default or Event of Default has occurred under the Credit Agreement][a Default or Event of Default has occurred, as described on Annex 1 hereto, and the action taken or proposed to be taken with respect thereto is described on Annex 1 hereto].

(ii) Since the Effective Date and except as previously notified to the Administrative Agent, none of the Borrowers nor any Subsidiary has changed its legal name, organizational identity, jurisdiction of organization, identification number; the location of its chief executive office.

(iii) Delivered herewith as Attachment A are reasonably detailed calculations of the variance report and such other supporting documentation requested by Firehorse as required pursuant to Section 5.11(a) of the Credit Agreement and a statement of whether Borrowers were in compliance with the Annual Budget on each Friday of each weekly period occurring within the Fiscal Period referred to above pursuant to Section 5.11(b) of the Credit Agreement.

[Remainder of Page Intentionally Left Blank]

[1] The date of the last similar certification, or, if none, the Effective Date.

This ___ day of ____________ , 20___.

**BORROWER AGENT:**

**UPG ENTERPRISES LLC**

By: ______________________________
Name:
Title:

**“Attachment A” to Compliance Certificate**

[See attached for Variance Report]

Certification regarding Section 5.11(b) of the Credit Agreement

| | |
|---|---|
| The cash receipts and aggregate cash disbursements (excluding debtor and lender professional fees) for the applicable weekly period do not vary by more than 10% from the Approved Budget for such period. | **Yes ___ No ___** |

## Exhibit 10.04(b)(i1)

## FORM OF
## ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (this "***Assignment and Assumption***") is dated as of the Effective Date set forth below and is entered into by and between _______[*insert name of Assignor*] (the "***Assignor***") and _____________[*insert name of Assignee*] (the "***Assignee***"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as may be amended, restated, supplemented, extended or otherwise modified from time to time, the "***Credit Agreement***"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto (the "***Standard Terms and Conditions***") are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement, and any other documents or instruments delivered pursuant thereto, to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity, in each case to the extent related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as, the "***Assigned Interest***"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

(i) Assignor: _________

(ii) Assignee: _________

[and is an Affiliate/Approved Fund of [*identify Lender*]

(iii) Borrowers: UPG ENTERPRISES LLC, a Delaware limited liability company and the other Borrowers signatory thereto

(iv) Administrative Agent: FIREHORSE CAPITAL LLC, as the administrative agent under the Credit Agreement

(v) Credit Agreement: The Credit and Security Agreement dated as of September 22, 2026 (as amended, restated, supplemented, extended or otherwise modified from time to time), by and among the Borrowers, the Lenders from time to time party thereto, and the Administrative Agent.

(vi) Assigned Interest:

| Facility Assigned | Aggregate Amount of New Money DIP Loan Commitments / Roll-Up DIP Loans for all Lenders | Amount of New Money DIP Loan Commitments / Roll-Up DIP Loans Assigned | Percentage Assigned of New Money DIP Loan Commitments / Roll-Up DIP Loans[1] |
|---|---|---|---|
| New Money DIP Loan Commitment | $ | $ | % |
| Roll-Up DIP Loan | $ | $ | % |

(vii) [Trade Date: ________]

Effective Date: ___________ ___, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

**ASSIGNOR:**

**[NAME OF ASSIGNOR]**

By: ___________________________
Title:

**ASSIGNEE:**

**[NAME OF ASSIGNEE]**

By: ___________________________
Title:

[1] Set forth, to at least 9 decimals, as a percentage of the New Term Loan Commitments / Loans of all Lenders thereunder.

[Consented to and] Accepted:

**FIREHORSE CAPITAL LLC**, as Administrative Agent

By: ______________________________
Name:
Title:

# ANNEX I

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1. Representations and Warranties

1.1 Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver the Assignment and Assumption and to consummate the transactions contemplated hereby, and (iv) it is not a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrowers, any of their Subsidiaries or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrowers, any of their Subsidiaries or any other Person of any of their respective obligations under any Loan Document.

1.2 Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements for an assignee under Section 10.04(b) of the Credit Agreement (subject to receipt of such consents as may be required under the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 5.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest, on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, (vi) attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement (including Section 2.13(g)), duly completed and executed by the Assignee, and (vii) all of the representations and warranties contained in Section 9.04(c) of the Credit Agreement are true and correct and the Assignee hereby agrees to the covenants contained in such Section; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2. Payments. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to Assignee for amounts which have accrued from and after the Effective Date.

3. General Provisions. This Assignment and Assumption shall be binding upon, and inure to the benefit of the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy or

electronic mail shall be effective as delivery of a manually executed counterpart of a signature page of this Assignment and Assumption. This Assignment and Assumption shall be governed by and construed in accordance with, the law of the State of New York.

# Exhibit 2

## Initial DIP Budget

**UPG Enterprises, LLC,** *et. al.*
DEBTOR IN POSSESSION
(in 000's)

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13- Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WEEK ENDING >>> | 09/25/26 | 10/02/26 | 10/09/26 | 10/16/26 | 10/23/26 | 10/30/26 | 11/06/26 | 11/13/26 | 11/20/26 | 11/27/26 | 12/04/26 | 12/11/26 | 12/18/26 | TOTAL |
| **DIP Budget** | | | | | | *Milestone 1* | | | | *Milestone 2* | | | | |
| Cash Balance | 250 | (393) | (1,497) | (1,966) | (2,406) | (2,847) | (3,441) | (4,144) | (4,585) | (4,922) | (5,204) | (5,506) | (5,788) | $ 250 |
| **Corporate Expenses** | - | (77) | (66) | (38) | (38) | (148) | (235) | (38) | (16) | (16) | (36) | (16) | (29) | (754) |
| **Adequate Protection Payments** | | | | | | | | | | | | | - | |
| **Flat Roll Group** | | | | | | | | | | | | | | |
| Professional Fees (Lender counsel, FA) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | - | - | - | - | (225) |
| **Total** | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | - | | | | (225) |
| **Fabrication Group** | | | | | | | | | | | | | | |
| Professional Fees (Lender counsel, FA) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | - | - | - | - | (270) |
| Interest Payments | - | (65) | - | - | - | - | (65) | - | - | - | - | - | - | (130) |
| **Total** | (30) | (95) | (30) | (30) | (30) | (30) | (95) | (30) | (30) | - | | | | (400) |
| **Total Adequate Protection** | **(55)** | **(120)** | **(55)** | **(55)** | **(55)** | **(55)** | **(120)** | **(55)** | **(55)** | **-** | **-** | **-** | **-** | **(625)** |
| **Critical Vendor Payments** | - | (600) | - | - | - | - | - | - | - | - | - | - | - | (600) |
| **Professional Fees** [1] | | | | | | | | | | | | | | |
| Independent Board Member | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (6) | (6) | (6) | (6) | (6) | (90) |
| Debtor BK Counsel | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (85) | (85) | (85) | (85) | (85) | (1,425) |
| Debtor BK Local Counsel | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (10) | (10) | (10) | (10) | (10) | (150) |
| Financial Advisor / CRO | (81) | (81) | (81) | (81) | (81) | (81) | (81) | (81) | (60) | (60) | (60) | (60) | (60) | (950) |
| Counsel Other (DIP) | (325) | (45) | (45) | (45) | (45) | (45) | (45) | (45) | (36) | (36) | (36) | (36) | (36) | (820) |
| Claims Agent | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (10) | (10) | (10) | (10) | (10) | (150) |
| Investment Banker | (11) | (11) | (11) | (11) | (11) | (11) | (11) | (11) | (9) | (9) | (9) | (9) | (9) | (135) |
| OCP | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (10) | (10) | (10) | (10) | (10) | (150) |
| UST | - | - | - | - | - | (44) | - | - | - | - | - | - | - | (44) |
| UCC Counsel | - | - | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (220) |
| UCC FA | - | - | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (220) |
| **Total Professional Fees** | **(588)** | **(308)** | **(348)** | **(348)** | **(348)** | **(392)** | **(348)** | **(348)** | **(266)** | **(266)** | **(266)** | **(266)** | **(266)** | **(4,354)** |
| **Cash Flow** | **(643)** | **(1,105)** | **(469)** | **(441)** | **(441)** | **(594)** | **(703)** | **(441)** | **(337)** | **(282)** | **(302)** | **(282)** | **(295)** | **(6,333)** |
| **DIP Budget** | **393** | **1,497** | **1,966** | **2,406** | **2,847** | **3,441** | **4,144** | **4,585** | **4,922** | **5,204** | **5,506** | **5,788** | **6,083** | **6,083** |

*Milestone 1 - Recoveries deposited into the DIP account or committed APA's totaling $2M*
*Milestone 2 - Recoveries deposited into the DIP account totaling $2M*

**UPG Enterprises, LLC,** *et. al.*

DEBTOR IN POSSESSION

(in 000's)

| WEEK ENDING >>> | 1<br>09/25/26 | 2<br>10/02/26 | 3<br>10/09/26 | 4<br>10/16/26 | 5<br>10/23/26 | 6<br>10/30/26 | 7<br>11/06/26 | 8<br>11/13/26 | 9<br>11/20/26 | 10<br>11/27/26 | 11<br>12/04/26 | 12<br>12/11/26 | 13<br>12/18/26 | 13- Week<br>TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DIP** | **$ (393)** | **$ (1,497)** | **$ (1,966)** | **$ (2,406)** | **$ (2,847)** | **$ (3,441)** | **$ (4,144)** | **$ (4,585)** | **$ (4,922)** | **$ (5,204)** | **$ (5,506)** | **$ (5,788)** | **$ (6,083)** | **$ (6,083)** |
| **DIP Sources** | | | | | | | | | | | | | | |
| Firehorse Funding | $ 2,000 | | | | | | | | | | | | | 2,000 |
| Transaction Recovery [2] | - | 440 | 991 | 371 | 371 | 371 | 371 | 371 | 2,774 | 415 | 415 | - | - | 6,892 |
| **Total DIP Sources** | **$ 2,000** | **$ 2,440** | **$ 3,431** | **$ 3,803** | **$ 4,174** | **$ 4,546** | **$ 4,917** | **$ 5,289** | **$ 8,063** | **$ 8,477** | **$ 8,892** | **$ 8,892** | **$ 8,892** | **$ 8,892** |
| **DIP Balance** | **$ 1,608** | **$ 943** | **$ 1,466** | **$ 1,396** | **$ 1,327** | **$ 1,104** | **$ 773** | **$ 704** | **$ 3,141** | **$ 3,274** | **$ 3,386** | **$ 3,104** | **$ 2,809** | **$ 2,809** |
| DIP Interest (10%) & Unused line fee (1.5%) | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 126 |
| DIP Exit Fee (4%) | | | | | | | | | | | | | $ 253 | $ 253 |
| **Firehorse Loan** | | | | | | | | | | | | | | |
| Firehorse Initial Payments | $ 4,984 | | | | | | | | | | | | | $ 4,984 |
| Firehorse DIP | $ 2,000 | | | | | | | | | | | | | $ 2,000 |
| Unused line fee and exit fee | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 263 | $ 379 |
| **Firehorse Total Loan** | **$ 6,994** | **$ 7,003** | **$ 7,013** | **$ 7,023** | **$ 7,032** | **$ 7,042** | **$ 7,052** | **$ 7,062** | **$ 7,071** | **$ 7,081** | **$ 7,091** | **$ 7,100** | **$ 7,363** | **$ 7,363** |

**[1] Professional fees escrow into a sinking fund and will be paid based on court approved timing**

**[2] Transaction Recovery: funds received estimated timing and amounts based on sales process**

**UPG Enterprises, LLC,** ***et. al.***

Cash Collateral Forecast
Flat Roll Group
(in 000's)

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13 - Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WEEK ENDING >>> | 09/25/26 | 10/02/26 | 10/09/26 | 10/16/26 | 10/23/26 | 10/30/26 | 11/06/26 | 11/13/26 | 11/20/26 | 11/27/26 | 12/04/26 | 12/11/26 | 12/18/26 | TOTAL |
| Opening Availability / Cash Balance | 140 | 689 | 394 | 473 | 627 | 683 | 774 | 616 | 700 | | | | | $ 140 |
| Receipts | 549 | 489 | 571 | 596 | 549 | 574 | 610 | 610 | 610 | | | | | 5,158 |
| Cash Inflows | 549 | 489 | 571 | 596 | 549 | 574 | 610 | 610 | 610 | - | - | - | - | 5,158 |
| **Disbursements** | | | | | | | | | | | | | | |
| Materials | - | (275) | (275) | (175) | (275) | (275) | (275) | (250) | (366) | | | | | (2,166) |
| Other Manufacturing | - | (40) | (50) | (40) | (50) | (40) | (25) | (50) | (50) | | | | | (345) |
| Payroll | - | (160) | (160) | (220) | (160) | (160) | (160) | (220) | (160) | | | | | (1,400) |
| Benefits | - | (88) | - | - | - | - | (88) | - | - | | | | | (176) |
| Rent | - | (213) | - | - | - | - | (213) | - | - | | | | | (426) |
| SG&A and Other Exp | - | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | | | | | (62) |
| Interest | | | | | | | | | | | | | | - |
| Cash Out Flows | - | (784) | (493) | (443) | (493) | (483) | (768) | (526) | (581) | - | - | - | - | (4,568) |
| Operating Cash Flow | 549 | (295) | 79 | 154 | 56 | 91 | (158) | 84 | 29 | - | - | - | - | 590 |
| **Ending Cash** | **$ 689** | **$ 394** | **$ 473** | **$ 627** | **$ 683** | **$ 774** | **$ 616** | **$ 700** | **$ 730** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 730** |
| **Collateral Roll Forward** | | | | | | | | | | | | | | |
| **Available AR** | | | | | | | | | | | | | | |
| Starting AR | $ 10,828 | $ 10,889 | $ 10,998 | $ 11,036 | $ 11,037 | $ 11,083 | $ 11,119 | $ 11,119 | $ 11,119 | | | | | |
| Collections | (549) | (489) | (571) | (596) | (549) | (574) | (610) | (610) | (610) | | | | | |
| Sales | 610 | 598 | 610 | 597 | 595 | 610 | 610 | 610 | 610 | | | | | |
| **Ending AR** | $ 10,889 | $ 10,998 | $ 11,036 | $ 11,037 | $ 11,083 | $ 11,119 | $ 11,119 | $ 11,119 | $ 11,119 | | | | | |
| *less ineligibles* | $ (8,708) | $ (8,795) | $ (8,826) | $ (8,827) | $ (8,864) | $ (8,893) | $ (8,893) | $ (8,893) | $ (8,893) | | | | | |
| Eligible AR | $ 2,180 | $ 2,202 | $ 2,210 | $ 2,210 | $ 2,219 | $ 2,227 | $ 2,227 | $ 2,227 | $ 2,227 | | | | | |
| ***Available AR*** | $ 1,962 | $ 1,982 | $ 1,989 | $ 1,989 | $ 1,997 | $ 2,004 | $ 2,004 | $ 2,004 | $ 2,004 | | | | | |
| *less reserves* | $ (60) | $ (60) | $ (60) | $ (60) | $ (60) | $ (60) | $ (60) | $ (60) | $ (60) | | | | | |
| ***Net Available AR*** | $ 1,902 | $ 1,922 | $ 1,929 | $ 1,929 | $ 1,937 | $ 1,944 | $ 1,944 | $ 1,944 | $ 1,944 | | | | | |
| **Inventory** | | | | | | | | | | | | | | |
| *Net Available Inventory* | $ 388 | $ 388 | $ 388 | $ 388 | $ 388 | $ 388 | $ 388 | $ 388 | $ 388 | | | | | |
| **NEW Inventory** | | | | | | | | | | | | | | |
| Starting Inventory | $ 560 | $ 541 | $ 577 | $ 608 | $ 544 | $ 456 | $ 487 | $ 518 | $ 524 | | | | | |
| COGS | (244) | (239) | (244) | (239) | (238) | (244) | (244) | (244) | (244) | | | | | |
| Purchases | 225 | 275 | 275 | 175 | 150 | 275 | 275 | 250 | 266 | | | | | |
| **Ending Inventory** | $ 541 | $ 577 | $ 608 | $ 544 | $ 456 | $ 487 | $ 518 | $ 524 | $ 546 | | | | | |
| *Net Available Inventory* | $ 406 | $ 433 | $ 456 | $ 408 | $ 342 | $ 365 | $ 389 | $ 393 | $ 410 | | | | | |
| ***Net Available Combined Inventory*** | **$ 794** | **$ 821** | **$ 844** | **$ 796** | **$ 730** | **$ 753** | **$ 777** | **$ 781** | **$ 798** | | | | | |
| **M&E Collateral** | **$ 2,689** | **$ 2,689** | **$ 2,689** | **$ 2,689** | **$ 2,689** | **$ 2,689** | **$ 2,689** | **$ 2,689** | **$ 2,689** | | | | | |
| *less reserve* | (222) | (222) | (222) | (222) | (222) | (222) | (222) | (222) | (222) | | | | | |
| **Combined Collateral** | **$ 5,163** | **$ 5,210** | **$ 5,240** | **$ 5,192** | **$ 5,134** | **$ 5,164** | **$ 5,187** | **$ 5,192** | **$ 5,208** | | | | | |
| overadvance allowance | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | | | | | |
| **Total Collateral** | **$ 9,163** | **$ 9,210** | **$ 9,240** | **$ 9,192** | **$ 9,134** | **$ 9,164** | **$ 9,187** | **$ 9,192** | **$ 9,208** | | | | | |
| Balance Outstanding [1] | $ 8,771 | $ 8,771 | $ 8,771 | $ 8,771 | $ 8,771 | $ 8,771 | $ 8,771 | $ 8,771 | $ 8,771 | | | | | |
| **Availability** | **$ 392** | **$ 439** | **$ 469** | **$ 421** | **$ 364** | **$ 393** | **$ 417** | **$ 421** | **$ 438** | | | | | |

**UPG Enterprises, LLC,** ***et. al.***

Cash Collateral Forecast
Fabrication Group
(in 000's)

| WEEK ENDING >>> | 1<br>09/25/26 | 2<br>10/02/26 | 3<br>10/09/26 | 4<br>10/16/26 | 5<br>10/23/26 | 6<br>10/30/26 | 7<br>11/06/26 | 8<br>11/13/26 | 9<br>11/20/26 | 10<br>11/27/26 | 11<br>12/04/26 | 12<br>12/11/26 | 13<br>12/18/26 | 13 - Week<br>TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening Availability / Cash Balance | $ 350 | $ 590 | $ 519 | $ 349 | $ 479 | $ 486 | $ 351 | $ 214 | $ 126 | | | | | $ 350 |
| Receipts | 480 | 799 | 703 | 778 | 785 | 718 | 718 | 703 | 778 | | | | | 6,462 |
| Cash Inflows | 480 | 799 | 703 | 778 | 785 | 718 | 718 | 703 | 778 | - | - | - | - | 6,462 |
| **Disbursements** | | | | | | | | | | | | | | |
| Materials | (240) | (319) | (285) | (259) | (474) | (374) | (280) | (395) | (304) | | | | | (2,930) |
| Other Manufacturing | - | (105) | (45) | (45) | (45) | (45) | (45) | (45) | (45) | | | | | (420) |
| Payroll | - | (242) | (243) | (230) | (230) | (230) | (230) | (237) | (237) | | | | | (1,877) |
| MX Payroll | - | (30) | (30) | (86) | (30) | (30) | (30) | (86) | (30) | | | | | (352) |
| Benefits | - | - | (242) | - | - | - | (242) | - | (200) | | | | | (684) |
| Rent | - | (174) | - | - | - | (174) | - | - | - | | | | | (349) |
| MX Rent | - | - | (28) | (28) | - | - | (28) | (28) | - | | | | | (112) |
| Professional Fees | | | | | | | | | | | | | | - |
| Interest | | | | | | | | | | | | | | - |
| Cash Out Flows | (240) | (870) | (873) | (648) | (779) | (853) | (855) | (790) | (816) | | | | - | (6,724) |
| Operating Cash Flow | 240 | (71) | (171) | 130 | 7 | (135) | (137) | (88) | (38) | - | - | - | - | (262) |
| **Ending Cash** | **$ 590** | **$ 519** | **$ 349** | **$ 479** | **$ 486** | **$ 351** | **$ 214** | **$ 126** | **$ 88** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 88** |
| **Collateral Roll Forward** | | | | | | | | | | | | | | |
| **Available AR** | | | | | | | | | | | | | | |
| Starting AR | $ 9,487 | $ 9,527 | $ 9,453 | $ 9,576 | $ 9,533 | $ 9,498 | $ 9,530 | $ 9,638 | $ 9,685 | | | | | |
| Collections | (480) | (799) | (703) | (778) | (785) | (718) | (718) | (703) | (778) | | | | | |
| Sales | 520 | 725 | 826 | 735 | 750 | 750 | 826 | 750 | 750 | | | | | |
| **Ending AR** | $ 9,527 | $ 9,453 | $ 9,576 | $ 9,533 | $ 9,498 | $ 9,530 | $ 9,638 | $ 9,685 | $ 9,657 | | | | | |
| *less ineligibles* | $ (3,265) | $ (3,265) | $ (3,265) | $ (3,265) | $ (3,265) | $ (3,265) | $ (3,265) | $ (3,265) | $ (3,265) | | | | | |
| Eligible AR | $ 6,261 | $ 6,188 | $ 6,311 | $ 6,268 | $ 6,233 | $ 6,265 | $ 6,373 | $ 6,420 | $ 6,392 | | | | | |
| *Net Available AR* | $ 5,322 | $ 5,259 | $ 5,364 | $ 5,328 | $ 5,298 | $ 5,325 | $ 5,417 | $ 5,457 | $ 5,433 | | | | | |
| **Available Inventory** | | | | | | | | | | | | | | |
| Starting Inventory | $ 4,780 | $ 4,718 | $ 4,601 | $ 4,391 | $ 4,209 | $ 4,233 | $ 4,157 | $ 3,791 | $ 3,636 | | | | | |
| COGS | (312) | (435) | (496) | (441) | (450) | (450) | (496) | (450) | (450) | | | | | |
| Purchases | 250 | 319 | 285 | 259 | 474 | 374 | 130 | 295 | 304 | | | | | |
| **Ending Inventory** | $ 4,718 | $ 4,601 | $ 4,391 | $ 4,209 | $ 4,233 | $ 4,157 | $ 3,791 | $ 3,636 | $ 3,491 | | | | | |
| *less ineligibles* | $ (1,239) | $ (1,239) | $ (1,239) | $ (1,239) | $ (1,239) | $ (1,239) | $ (1,239) | $ (1,239) | $ (1,239) | | | | | |
| Eligible Inventory | $ 3,478 | $ 3,362 | $ 3,151 | $ 2,969 | $ 2,993 | $ 2,917 | $ 2,552 | $ 2,397 | $ 2,251 | | | | | |
| *Net Available Inventory* | $ 2,087 | $ 2,017 | $ 1,891 | $ 1,782 | $ 1,796 | $ 1,750 | $ 1,531 | $ 1,438 | $ 1,351 | | | | | |
| *less rent reserve* | $ (164) | $ (164) | $ (164) | $ (164) | $ (164) | $ (164) | $ (164) | $ (164) | $ (163) | | | | | |
| **Combined Collateral** | $ 7,245 | $ 7,112 | $ 7,091 | $ 6,945 | $ 6,930 | $ 6,912 | $ 6,784 | $ 6,731 | $ 6,621 | | | | | |
| Balance Outstanding | $ 6,736 | $ 6,736 | $ 6,736 | $ 6,736 | $ 6,736 | $ 6,736 | $ 6,736 | $ 6,736 | $ 6,736 | | | | | |
| **Availability** | **$ 509** | **$ 376** | **$ 355** | **$ 209** | **$ 194** | **$ 176** | **$ 48** | **$ (5)** | **$ (115)** | | | | | |